DISCIPLINARY COUNSEL *v.* O'NEILL.

[Cite as *Disciplinary Counsel v. O'Neill,*
103 Ohio St.3d 204, 2004-Ohio-4704.]

(No. 2004–0809—Submitted August 17, 2004—Decided September 7, 2004.)

**Per Curiam.**

{¶ 1} Respondent, Deborah P. O'Neill of Columbus, Ohio, Attorney Registration No. 0007128, a judge of the Common Pleas Court of Franklin County, was admitted to the practice of law in 1980. In a complaint filed on June 17, 2002, amended on November 19, 2002, relator, Disciplinary Counsel, charged respondent with six counts of misconduct involving numerous violations of the Code of Professional Responsibility and the Code of Judicial Conduct.

{¶ 2} Relator's allegations implicated incidents from 1997 through 2002. Count I of the complaint charged that during this period, respondent had repeatedly held improper ex parte conversations, failed to appropriately exercise judicial discretion, and failed to follow the law in a variety of ways, including unwarranted bond revocation. Count II charged that respondent had improperly refused to allow attorneys to preserve their objections on the record. Count III charged that respondent had improperly denied continuances without exercising judicial discretion. Count IV charged that respondent had repeatedly made misrepresentations to lawyers, other judges, and court personnel in the course of her duties. Count V charged respondent with acts of judicial intemperance on numerous occasions, including rudeness to judges, other court personnel, counsel, litigants, and members of the public. Finally, Count VI charged that respondent had improperly used county resources and personnel to promote her unsuccessful campaign in 2002 for a seat on the Franklin County Court of Appeals.

{¶ 3} A three-member panel of the Board of Commissioners on Grievances and Discipline heard the cause, conducting 19 days of proceedings during May, August, September, October, and November 2003, and February 2004. From the testimony of 99 witnesses, the parties' factual stipulations, 529 stipulated exhibits, and numerous other exhibits, a majority of the panel made findings of misconduct with respect to Counts I, II, IV, V, and VI of the complaint and recommended that respondent be suspended from the practice of law for two years. The

dissenting panel member found misconduct only with respect to Count V and recommended a one-year suspension, conditionally stayed, and a probation period with mandatory professional counseling and mentoring. The board adopted the panel majority's findings of misconduct as to Counts I, IV, V, and VI, as well as the finding of no misconduct as to Count III, and further found no misconduct in connection with Count II. The board recommended that respondent be suspended from the practice of law for two years.

## Count I

{¶ 4} The most serious misconduct established in support of Count I was that respondent has used a variety of coercive tactics to expedite dispositions in criminal cases, usually as a means to manage her docket. In three cases during the relevant time period, respondent forced pleas from defendants by threatening to revoke or actually revoking their bonds—not for acceptable reasons such as that the defendants posed flight risks or safety concerns or had failed to appear— but because the defendants wanted to exercise their rights to refuse an offered plea and go to trial. Similarly, respondent improperly revoked the defendant's bond in a fourth case because his counsel was not prepared for trial on the trial date. In a fifth case, respondent, after rejecting a misdemeanor plea offered by the parties, threatened to impose the maximum sentence if the defendant did not plead guilty as charged in the indictment and chose to exercise his right to a trial.

{¶ 5} The effect of this type of misconduct was discussed in *People v. Ali* (2000), 277 A.D.2d 138, 139, 717 N.Y.S.2d 114, reversed on other grounds (2001), 96 N.Y.2d 840, 729 N.Y.S.2d 434, 754 N.E.2d 193:

{¶ 6} "It is impermissibly coercive for a trial court to tell a criminal defendant that it will impose the maximum sentence if he is convicted after a trial. * * * When a court announces a blanket policy of imposing the maximum sentence for a certain type of crime, regardless of any mitigating evidence that may develop at trial, a defendant may feel he has no choice but to plead guilty. 'The inescapable effect of the court's statement, under the circumstances in which the plea was taken, was to coerce defendant into pleading guilty, and we find, therefore, that the plea was not a voluntary one.' (*People v. Wilson* [ (1997), 245 A.D.2d 161, 163, 666 N.Y.S.2d 164] )."

{¶ 7} Judges must routinely exercise their discretion in a myriad of ways while executing their duties in the administration of justice, and the abuse of that discretion typically generates an appeal, not disciplinary proceedings. But as the board found, judicial discretion does not extend to these strong-arm measures that respondent used to compromise defendants' right to trial. Thus, rather than classifying respondent's actions as an abuse of legitimate discretion, we agree that respondent's repeated use of the bond process and jail as leverage fell "outside any permissible discretion" and was "totally improper." For such an

egregious departure from the bounds of judicial discretion, professional discipline is warranted.

{¶ 8} In another grave example of misconduct, respondent in another case failed to act as an impartial arbiter, refused to follow a court of appeals mandate, and interfered as an advocate, all in violation of the duties incumbent on a judge. In this sixth incident, a criminal defendant who had been charged with felony sex offenses and kidnapping entered an *Alford* plea[1] to a non-sex-offense misdemeanor, simple assault. As a term of his probation, respondent ordered the defendant into sex-offender counseling, which, unknown to counsel in the case, would require respondent to admit that he had committed a sexual assault on a victim. The defendant refused to make this admission, and he was therefore discharged from counseling programs.

{¶ 9} Respondent revoked the defendant's probation for noncompliance. On appeal, the court of appeals invalidated the sex-offender-counseling condition of the defendant's probation. Despite this order and the plea she had accepted, respondent persistently attempted on remand to enforce the condition and to treat the defendant as a sex offender. Respondent also threatened on the record that if the defendant did not comply with the ordered counseling, the prosecution would file a motion for withdrawal of the guilty plea and that she would then set the matter for trial as a sexual offense.

{¶ 10} By refusing to comply with the mandate of an appellate court, respondent violated another basic judicial duty. Moreover, because the right to withdraw a plea belongs to the defendant alone, respondent's threat of withdrawal on the state's motion was, as the board found, "legally impossible" to fulfill. The threat was also highly coercive, so much so that the defendant decided to forgo his granted probation and serve the remainder of his jail term.

{¶ 11} In addition, respondent engaged in improper ex parte communications and violated her duties to remain impartial and avoid advocacy. In a seventh case, respondent refused to accept two codefendants' pleas of no contest to misdemeanors because the pleas were offered on the date of trial, and respondent had a policy that after pretrial, defendants could only plead guilty to the charges in the indictment or go to trial. Respondent enforced her policy in this instance so vigorously that the codefendants pled guilty to the indicted felony offense, notwithstanding that both stood to be deported for their crimes. After their convictions were reversed on appeal because of the coercion, respondent, in a

---

1. An *Alford* plea is one that permits a defendant, with appropriate constitutional safeguards, to plead guilty to a charge while maintaining his or her innocence. *N. Carolina v. Alford* (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162. See, also, *In re Kirby*, 101 Ohio St.3d 312, 2004-Ohio-970, 804 N.E.2d 476, ¶ 3.

blatant act of advocacy, contacted the prosecutor in the underlying case and encouraged her to appeal the reversal, saying, "We're going to have to fight this."

{¶ 12} Similarly, in an eighth case, respondent accepted a defendant's plea to corruption of a minor, a fourth-degree felony, and immediately afterward directed defense counsel to solicit "a better deal" from a supervising prosecutor in the case. When the prosecutor refused, respondent attempted to prevail upon the prosecutor herself.

{¶ 13} "The responsibility of a judge is to decide matters that have been submitted to the court by the parties. The judge may not, having decided a case, advocate for or, as in this case, materially assist one party at the expense of the other. Such advocacy creates the appearance, and perhaps the reality, of partiality on the part of the judge. This, in turn, erodes public confidence in the fairness of the judiciary and undermines the faith in the judicial process that is a necessary component of republican democracy." *In re Complaint Against White* (2002), 264 Neb. 740, 752, 651 N.W.2d 551. Judicial advocacy through ex parte communications therefore also warrants discipline. *Disciplinary Counsel v. Ferreri* (2000), 88 Ohio St.3d 456, 727 N.E.2d 908.

{¶ 14} Three other examples of respondent's failure to comply with the law and act in a manner that promotes public confidence in the judiciary were also established in support of Count I. In addition to her advocacy in the eighth case, respondent further refused the parties' request for a presentencing investigation that might have justified a community-control sanction instead of prison for the defendant—an 18–year–old nearly homebound because of a liver transplant. Instead, respondent sentenced the defendant to prison and thereafter misrepresented her reasons for doing so.

{¶ 15} In a subsequent discussion with a supervising prosecutor in the case, respondent initially blamed the harsh sentence on the assistant prosecutor who had appeared, claiming that by refusing to waive the presentence investigation, the assistant prosecutor had somehow forced respondent under sentencing statutes to send the defendant to jail. That explanation was false. To avoid the necessity of a prison term, which respondent herself had said was not warranted, respondent had only to order a presentence report as requested. See R.C. 2951.03, requiring a presentence investigation before a community-control sanction may be considered. Moreover, during the disciplinary proceedings, respondent initially explained that she had already known what a presentence investigation would have revealed. And later she testified before the panel that she had wanted to employ a "scared straight" approach with this defendant and would not have considered probation. These facts confirm for us the board's finding that, for whatever purpose, respondent misrepresented her reasoning for sentencing this defendant.

{¶ 16} In a ninth case, a defendant accepted a plea bargain. On the day before sentencing, his counsel asked respondent (with the prosecution's consent to the ex parte communication) to order a presentence investigation and to continue the defendant's bond pending the investigation. Respondent agreed. The next day, defense counsel appeared for the 9:00 a.m. hearing, but the defendant was two hours late, explaining that he had been unable to get transportation. Summoning them to the bench, respondent lost her composure, slamming books and desk drawers and screaming about how the defendant had interfered with her intention to leave at 11:00 a.m. that day.

{¶ 17} Respondent then proceeded to sentence the defendant, notwithstanding her consent to a presentence investigation on the day before. His counsel was therefore not prepared to speak on sentencing or mitigation. Respondent sentenced the defendant to six months with jail credit. Respondent testified before the panel that she did not remember speaking with defense counsel but also insisted that she would not have had a conversation of that kind under the circumstances of that case. The board credited defense counsel's testimony and found respondent's sentencing of his client to be retaliatory, a finding that we now adopt.

{¶ 18} Similarly, in a tenth case, a defendant charged with bank robbery made an unexpected plea of guilty to the full indictment at a first pretrial, and the prosecutor requested a continuance until a bank teller was able to be present to make a victim-impact statement, a privilege guaranteed by the Ohio Rights of Victims of Crimes Act, R.C. 2930.14. Respondent refused, saying, "I want to get this case off my docket." A debate ensued in which the prosecutor repeatedly refused to proceed until she was permitted to explain on the record why the victim had not been allowed to testify, and respondent repeatedly refused to allow a record to be made. None of these discussions appeared on the record, and respondent did not grant a continuance until the Franklin County Prosecuting Attorney himself gave respondent a copy of the victims' rights statute. Respondent later falsely told the court reporter that the prosecutor was considering disciplinary action against the reporter for the reporter's failure to make the requested record.

{¶ 19} Respondent insisted that she had adequate justification for her actions in these cases and that she had not attempted to force the defendants to plead to charges against their wishes. Respondent's explanations and denials, however, were contradicted by virtually all of the witnesses to these events and, at times, by the records she prepared to document them. We therefore accept the board's credibility determinations on these facts and also find respondent's accounts to be implausible.

{¶ 20} Upon review of the board's factual findings relative to Count I, we agree that respondent engaged in a series of transgressions that violated the following provisions of the Code of Judicial Conduct and the Code of Professional Responsibility: Canon 1 (a judge shall uphold the integrity and independence of the judiciary), Canon 2 (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the judiciary), Canon 3 (a judge shall perform the duties of judicial office impartially and diligently), Canon 3(B)(2) (a judge shall be faithful to the law and maintain professional competence in it), Canon 3(B)(4) (a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity), Canon 3(B)(7) (a judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding), Canon 3(E)(1) (a judge shall disqualify herself in a proceeding in which the judge's impartiality might reasonably be questioned), Canon 4 (a judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities), DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR 1–102(A)(5) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice).

## Count II

{¶ 21} Count II alleged that respondent refused to allow attorneys to go on the record to preserve their objections to respondent's rulings. Upon review of the board's factual findings on Count II, we agree that the evidence presented to establish the violations of the Code of Judicial Conduct and the Disciplinary Rules charged in that count was not clear and convincing.

## Count III

{¶ 22} Upon review of the board's factual findings for Count III, we agree that relator has not proven by clear and convincing evidence that respondent violated the Code of Judicial Conduct or the Disciplinary Rules by denying continuances. Granting or denying a request for a continuance is within the " 'broad, sound discretion of the trial judge.' " *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 44, quoting *State v. Jones* (2001), 91 Ohio St.3d 335, 342, 744 N.E.2d 1163. "The need for a principled approach to determining the limits of judicial power or discretion is important because of the danger of compromising judicial independence through the random or arbitrary application of ethical norms." Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3 Ed.2000) 35, Section 2.01. Even an abuse of discretion is not necessarily tantamount to a violation of the Code of Judicial Conduct. See, e.g., *W. Virginia Judicial Inquiry Comm. v. Dostert* (1980), 165 W.Va. 233, 271 S.E.2d 427, 433; *Oberholzer*

*v. Comm. on Judicial Performance* (1999), 20 Cal.4th 371, 398, 84 Cal.Rptr.2d 466, 975 P.2d 663.

### Count IV

{¶ 23} In Count IV, the evidence established that respondent engaged in a pattern of misrepresentation in her interactions with judges, litigants, attorneys, and court personnel. In two cases during the pertinent period, respondent misrepresented to common pleas court judges that actions had either occurred or not occurred during court proceedings. In the first of these cases, which the board determined to be "the most troublesome" of the incidents, respondent misrepresented in a memorandum to the administrative judge, which she distributed to all of the common pleas court judges, that she had ruled on a petition for an emergency protective order, that she had found that the petitioner had not met her burden of proof, that she had advised the petitioner that she would grant the protection order if the petitioner could not obtain one from the municipal court, and that the petitioner's nonattorney advocate had not answered her questions. In the second case, respondent falsely advised other judges at a meeting that she had never denied anyone the opportunity to make a record, although she had done so on at least two occasions.

{¶ 24} In a third case, respondent told a criminal defendant and her counsel during sentencing that they had not timely appeared for trial at 9:00 a.m. and that respondent had appeared before 9:00 a.m. But court parking garage records proved that respondent had not arrived until 9:30 a.m. that day.

{¶ 25} Moreover, in one remaining case, respondent misrepresented to court personnel that a court reporter was leaving work early without respondent's permission.

{¶ 26} As the board concluded, these multiple misrepresentations, when considered with the additional misrepresentations found to violate DR 1–102(A)(4) in Counts I and V, represent "the most serious charges" against respondent. Respondent's continued denials of this misconduct were contradicted by the evidence, and the board properly concluded that her testimony was not credible. And these misrepresentations were not innocuous. For example, she sought to have the court reporter disciplined for supposedly leaving early without permission.

{¶ 27} By misrepresenting events that occurred in court proceedings and in the court itself, respondent failed to treat other judges, litigants, attorneys, and court personnel with courtesy, respect, and honesty and thus undermined public confidence in the integrity of the judicial system. As the Supreme Court of Iowa recently observed, "a judge who misrepresents the truth tarnishes the dignity and honor of his or her office" because "[t]ruth and honesty lie at the heart of the

judicial system, and judges who conduct themselves in an untruthful manner contradict this most basic ideal." *In re Inquiry Concerning McCormick* (Iowa 2002), 639 N.W.2d 12, 16. And by engaging in conduct "that would appear to an objective observer to be unjudicial and prejudicial to the public esteem for the judicial office," respondent acted in a manner prejudicial to the administration of justice, as prohibited by DR 1–102(A)(5). *Cleveland Bar Assn. v. Cleary* (2001), 93 Ohio St.3d 191, 206, 754 N.E.2d 235.

{¶ 28} Upon review of the board's factual findings relative to Count IV, we agree that respondent engaged in a series of deliberate misrepresentations and thereby committed additional violations of Canons 1, 2, 3, 3(B)(2), 3(B)(4), and 4, and DR 1–102(A)(4) and (5).

## Count V

{¶ 29} Count V involves a series of incidents in which respondent, between October 1997 and July 2000, acted in an unbecoming, unprofessional, and discourteous fashion towards her staff, other court personnel, visiting judges, law enforcement personnel, attorneys, probation officials, and members of the public. In July 2000, respondent attended a personnel committee meeting and admitted that she had problems dealing with her employees and pledged to do better. In early 2001, Judge Michael H. Watson, who was then serving as the administrative judge of the Franklin County Common Pleas Court, met privately with respondent in an attempt to address these concerns. Judge Watson had previously offered to assist respondent in any way he could, and at the 2001 meeting he offered constructive suggestions on how to deal with people whom she perceived to be challenging her authority. Judge Watson testified that respondent was initially receptive to his advice but that she quickly became defensive, stating that she was tired of people "f'ing with her." As the record demonstrates, respondent's behavior and demeanor did not improve after these meetings.

{¶ 30} The record shows a pattern of rude, undignified, and unprofessional conduct that included abusive verbal outbursts, unjustified expulsions from the courtroom, and berating or humiliating persons in the presence of others. Respondent also lodged numerous verbal and written complaints about court or court-affiliated personnel that were not factually accurate. These outbursts and complaints were often accompanied by threats of discipline or termination.

{¶ 31} Witness testimony painted a hostile work and courtroom environment in which court staff were constantly on edge and persons appearing before respondent were frightened and intimidated because of her volatile and unpredictable personality. Personnel issues and simple differences of opinion and interpretation could not be resolved because of respondent's inaccessibility and her steadfast refusal to engage in two-sided dialogue. Testimony persistently describes

respondent as a person who would not listen to the concerns of others and dismissed any view other than her own.

{¶ 32} Much of the testimony as to this count went unrebutted at the hearing. In other instances, respondent asserted that she had sufficient justification for her action. On still other occasions, respondent offered a version of the facts diametrically opposed to that of the witness. As in the previous counts, the witnesses to these events steadily contradict respondent's explanations and denials. We once again, therefore, accept the board's determination as to the veracity of these allegations and reject as unpersuasive respondent's version of the facts.

{¶ 33} An independent and honorable judiciary is indispensable to justice in our society. Canon 1 of the Code of Judicial Conduct. The primary purpose of judicial discipline is to protect the public, guarantee the evenhanded administration of justice, and maintain and enhance public confidence in the integrity of this institution. *Kloepfer v. Comm. on Judicial Performance* (1989), 49 Cal.3d 826, 864–865, 264 Cal.Rptr. 100, 782 P.2d 239. Judicial misconduct undermines these goals and, in so doing, demeans the judicial system itself. See *In re Probert* (1981), 411 Mich. 210, 225, 308 N.W.2d 773.

{¶ 34} Respondent's actions were not random, isolated incidents but instead reflect a pattern of discourteous, impatient, and undignified behavior that not only poisoned the immediate environment but extended far beyond as well. The hostile work environment created by respondent unquestionably compromised the ability of court personnel to perform their important functions to the best of their ability, which directly affects the efficiency and effectiveness of the judicial process. Other jurisdictions have held that rude and abusive treatment of court staff constitutes a violation of judicial canons. *Kloepfer*; *In re Inquiry Concerning Holien* (Iowa 2000), 612 N.W.2d 789.

{¶ 35} Respondent's conduct in the courtroom certainly had the same deleterious effect on the attorneys, law enforcement officers, and other individuals indispensable to the administration of justice. See *Holien*. Additionally, in at least one instance, respondent's intemperance threatened the physical well-being of others. Respondent's decision on November 30, 1999, to leave the bench and confront a deputy sheriff while the deputy was escorting an agitated criminal defendant to lock-up directly compromised the safety of every person in the courtroom.

{¶ 36} Respondent's rebuttal testimony convinces us that she has no appreciation of the gravity of her actions or their effect on the integrity and operation of both her courtroom and the Franklin County Court of Common Pleas as a whole. Equally important, respondent was completely indifferent to the effect of her actions on the public's perception of the integrity, impartiality, and fairness of the

justice system. As aptly stated by the Maine Supreme Judicial Court in *In re Kellam* (Me.1986), 503 A.2d 1308, 1312:

{¶ 37} "Although discourtesy does not constitute an error or violation of law in the decision-making process, such conduct on the part of a judge is particularly egregious because it undermines respect for the law in a most insidious manner. Our appellate process effectively corrects judicial error and the mere occurrence of such error does not usually inflict lasting damage upon our system of laws. On the other hand, a litigant who is subjected to rude and insensitive treatment is left without recourse. Whether the litigant wins or loses, the end result is an irreparable loss of respect for the system that tolerates such behavior."

{¶ 38} This was certainly true for a victim of a brutal attempted murder who was ejected from the courtroom by respondent for whispering to a companion. As a result, the distraught victim was absent from both the defendant's plea and sentence. And surely it was also true for anyone who observed respondent's courtroom outbursts. Judicial intemperance "invariably conveys the message of a closed mind," and witnesses to such displays rarely accept that the decision of a hostile and combative judge is fair. *In re O'Dea* (1993), 159 Vt. 590, 605, 622 A.2d 507.

{¶ 39} We recognize that judges differ in both style and personality and that these qualities, in and of themselves, are not matters for discipline. But whatever a judge's style, "[p]atience, dignity and common courtesy are essential parts of judging, whatever the personality of the judge," and "a pattern of judicial discourtesy represents a profound threat to the institution of the law and requires a strong response." Id. at 604 and 605, 622 A.2d 507.

{¶ 40} Upon review of the board's findings as to Count V, we agree that respondent repeatedly acted in an unbecoming, unprofessional, and discourteous manner towards many with whom she interacted as both judge and judge/employer. We find that this conduct violates Canons 1, 2, 3, 3(B)(4), 3(C)(1) (a judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business) and 4 of the Code of Judicial Conduct, as well as DR 1–102(A)(5) of the Code of Professional Responsibility.

## Count VI

{¶ 41} Finally, upon review of the factual findings of the board relative to Count VI, we agree that the respondent engaged in misconduct that violated the following provisions of the Code of Judicial Conduct: Canon 4, Canon 7(C)(1) (a judicial candidate shall prohibit public employees subject to his or her direction or control from soliciting or receiving campaign fund contributions), and Canon

7(C)(2)(a) (a judicial candidate personally shall not solicit or receive campaign funds).

{¶ 42} The misconduct established by the evidence in support of Count VI was that respondent personally solicited campaign contributions through a staff attorney, from both the staff attorney's future employer and her husband's law firm, while the staff attorney remained a public employee under respondent's control. Respondent engaged in the campaign solicitation as a meagerly attended campaign fundraiser in her honor drew to a close. Respondent approached the staff attorney and demanded that both her future law firm and her husband's law firm "needed to step up to the plate and contribute to her campaign" in the maximum allowed PAC amount. Testimony also supported that the respondent's solicitation of campaign funds from the husband's firm implicated one of the firm's cases that had recently been before respondent, in that respondent stated that the firm "owed her" for the favorable verdict. Respondent's campaign solicitation occurred in the presence of an additional two attorneys, who the board determined were credible witnesses and whose testimony solidly supported the board's findings of misconduct as to Count VI.

{¶ 43} Respondent insisted that she never inappropriately solicited campaign contributions from anyone and that she had only inquired as to whether the staff attorney's husband was coming to the fundraiser that evening. Respondent also insisted that she did not discuss the favorable verdict that evening. The board did not find respondent's testimony credible, and, deferring to the board's determinations on these facts, we agree.

{¶ 44} Canon 4(A) prohibits judges from using the prestige of judicial office to advance their private interests. One example of this is represented by the admonition in Canon 7(C)(1) against judges' soliciting campaign contributions through public employees. Canon 7 guards against actual or apparent bias by restricting the political and fund-raising activity of judges, shielding judicial candidates and the public alike from dangers inherent in the direct solicitation of campaign funds. See In re Disqualification of Ney (1995), 74 Ohio St.3d 1271, 1272, 657 N.E.2d 1367. The breach of these restrictions warrants discipline.

## Sanction

{¶ 45} In determining the appropriate sanction to impose on respondent for her violations of the Code of Judicial Conduct and Disciplinary Rules in Counts I, IV, V, and VI, " 'we consider the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent.' " Disciplinary Counsel v. Kaup, 102 Ohio St.3d 29, 2004-Ohio-1525, 806 N.E.2d 513, ¶ 11, quoting Disciplinary Counsel v. Evans (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609.

{¶ 46} Respondent violated duties owed under the Code of Judicial Conduct and Disciplinary Rules, including duties to the public, DR 1–102(A)(4) and (5), and the judiciary, see, e.g., Canon 1 of the Code of Judicial Conduct. See *Portage Cty. Bar Assn. v. Mitchell*, 101 Ohio St.3d 1, 2003-Ohio-6449, 800 N.E.2d 1106, ¶ 12; *Disciplinary Counsel v. Shramek*, 98 Ohio St.3d 441, 2003-Ohio-1636, 786 N.E.2d 869, ¶ 9.

{¶ 47} Respondent's misconduct also resulted in harm—most notably to criminal defendants who were subjected to respondent's threats and revocation of bond if they chose to go to trial—as detailed in Count I. In addition, respondent's misconduct demeaned judges, lawyers, litigants, and court employees and caused a loss of respect for the judicial system.

{¶ 48} Regarding aggravating circumstances, respondent's misconduct evidenced a selfish motive, a pattern of misconduct, multiple offenses, the submission of false statements in the disciplinary process, a refusal to acknowledge the wrongful nature of her conduct, and harm to vulnerable persons, e.g., criminal defendants and court personnel. See Section 10(B)(1)(b), (c), (d), (f), (g), and (h) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 49} In mitigation, the court has never disciplined respondent in over 20 years of practice, including over 10 years as a judge. *Kaup*, 102 Ohio St.3d 29, 2004-Ohio-1525, 806 N.E.2d 513, ¶ 8; BCGD Proc.Reg. 10(B)(2)(a). In addition, since 1993, respondent has been actively involved in educating middle school and high school students about the legal system, visiting over 400 classes in 63 schools in Franklin and surrounding counties. *Cleveland Bar Assn. v. Briggs* (2000), 89 Ohio St.3d 74, 75, 728 N.E.2d 1049 (mitigating evidence in attorney-discipline proceeding included political, cultural, and charitable events).

{¶ 50} In analyzing these and other pertinent factors, we first note that this is an extraordinary case that is "complex and hotly contested" and unprecedented; as the board determined, "there is no Ohio case similar in size and scope to the charges against Respondent." This case involves countercharges that this proceeding was politically motivated and has been highly publicized.

{¶ 51} "The political context and highly publicized nature of these charges cannot distract us from the seriousness of the underlying conduct * * *." *In re Kroger* (1997), 167 Vt. 1, 15, 702 A.2d 64. Respondent's continued pattern of misrepresentation, threats, and intemperate behavior to judges, lawyers, litigants, and court personnel is both inexcusable and detrimental to the integrity of the judiciary.

{¶ 52} Because the depth and scope of the charges in this case are so unusual, the fashioning of an appropriate sanction for this misconduct is not an easy task;

however, respondent's pervasive conduct of misrepresentation in violation of DR 1–102(A)(4) by itself warrants an actual suspension from the practice of law for an appropriate period of time. See, e.g., *Disciplinary Counsel v. Hutchins*, 102 Ohio St.3d 97, 2004-Ohio-1805, 807 N.E.2d 303, ¶ 32–33; *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 658 N.E.2d 237, syllabus. The sanction of an actual suspension does not in any way limit the exercise of discretion that judges routinely and necessarily exercise in the performance of their duties. It merely reinforces what should already be manifest: judges should not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

{¶ 53} But in determining the appropriate length of the suspension and any attendant conditions, we must recognize that the primary purpose of disciplinary sanctions is not to punish the offender, but to protect the public. See *Ohio State Bar Assn. v. Weaver* (1975), 41 Ohio St.2d 97, 100, 70 O.O.2d 175, 322 N.E.2d 665; *Hickey v. N. Dakota Dept. of Health & Consol. Laboratories* (N.D.1995), 536 N.W.2d 370, 372.

{¶ 54} We are persuaded here that respondent's repeated volatile outbursts and unprovoked intemperate actions evidence a potential behavioral cause for her misconduct that would be best addressed by a mental health professional. While this possibility does not diminish the effects of respondent's misconduct, it perhaps explains what the board had "struggled throughout these hearings to understand."

{¶ 55} Taking all the foregoing facts and considerations into account, we find the board's recommendation of a two-year suspension to be inappropriate under the circumstances of this case and find a two-year suspension with one year stayed on conditions to be in order. Accordingly, respondent is hereby suspended from the practice of law for two years; however, the second year of this suspension is stayed on the following conditions: respondent shall (1) submit to a mental health evaluation, to be performed by a mental health professional of her choice, for a complete emotional, behavioral, and if necessary physical assessment; (2) fully cooperate in the mental health evaluation and comply with the recommended course of treatment, if any; and (3) if reinstated to the practice of law, submit to the supervision of a monitor to be appointed by relator upon reinstatement. Further, in addition to the requirements of Gov.Bar R. V(10), respondent shall, upon any application for reinstatement, provide a report from the evaluating mental health professional as to her current medical condition, including any reason for which she should not be readmitted to the practice of law.

{¶ 56} In so holding, we recognize the important role that judges play in society and their concomitant duty to act in an ethical manner:

{¶ 57} "Because they are so important to our society, judges must be competent and ethical, and their actions must foster respect for their decisions as well as for the judiciary as a whole. Given that they hold positions of considerable authority and are entrusted with a great deal of power and discretion, judges are expected to conduct themselves according to high standards of professional conduct. Indeed, it is often said that judges are subject to the highest standards of professional behavior. Judges are held to higher standards of integrity and ethical conduct than attorneys or other persons not invested with the public trust. * * *

{¶ 58} "Judges should exercise their judicial functions with integrity, impartiality, and independence. They should perform their work with a high degree of competence, and should treat litigants, witnesses, attorneys, and others who appear before them with courtesy and respect. * * * In sum, they should inspire trust and confidence, and should bring honor to the judiciary." See Shaman, Lubet & Alfini, Judicial Conduct and Ethics, supra, at 1–2.

{¶ 59} With the foregoing sanction, we hope that respondent can learn to accord judges, lawyers, litigants, court employees, and the public the service, honesty, courtesy, and respect to which they are entitled and thereby once again earn the public trust that the judiciary should command.

{¶ 60} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., F.E. SWEENEY, WINKLER, O'CONNOR and O'DONNELL, JJ., concur. RESNICK and PFEIFER, JJ., concur in judgment only.

RALPH WINKLER, J., of the First Appellate District, sitting for LUNDBERG STRATTON, J.

---

ALICE ROBIE RESNICK, J., concurring in judgment only.

{¶ 61} I reluctantly concur in judgment only. Like the panel member who dissented from the panel's opinion, I view the allegations of Count V as the heart of this case. I believe that not all of the incidents detailed in the majority opinion's discussion of the other counts have been proven by clear and convincing evidence to constitute violations in their own right. However, unlike the dissenting panel member, I am unable to totally overlook all of the evidence supporting the other counts, particularly Count I, on which the majority has found disciplinary violations. I find, however, that Counts II and III have not been proven by clear and convincing evidence.

{¶ 62} The majority opinion has, except for a very brief mention, ignored the significant political aspects underlying the grievances that were filed against

respondent. As the panel dissenter recognized, respondent's viewpoint that the complaints against her were politically motivated is supported by "substantial evidence" in the record. To a certain extent, some of the actions of respondent discussed in the majority opinion seem sufficiently open to question that some amount of piling on appears to be occurring, in that specific alleged instances of misconduct that would not normally themselves be the basis for charges are being used to bolster unrelated charges based on other events to further the overall case against respondent.

{¶ 63} Furthermore, as the panel dissenter recognized, some of the witnesses who testified against respondent, particularly as to Count IV and her interaction with other court personnel, appear to have "had their own agendas which compromised their credibility." It is evident that political and personal consider- ations that cannot be entirely disregarded permeate this case. Moreover, these charges should have been brought in a timelier manner. Some of the alleged behavior occurred as far back as 1997.

{¶ 64} Nevertheless, the record contains enough evidence of disciplinary viola- tions beyond Count V that I believe an actual suspension from the practice of law is warranted. Like the majority, I believe that the board's recommendation of a full two-year suspension is inappropriate, based on a consideration of the entire record. Consistent with that view, relator's vigorous advocacy that respondent should be disbarred strikes me as so disproportionate to the magnitude of respondent's actions that it is unjustifiable.

{¶ 65} I believe that after all factors are weighed, a lesser sanction than that imposed by the majority opinion would be supportable, such as a two-year suspension with 18 months stayed. That sanction would not take away respon- dent's ability to earn a livelihood but would still provide her an opportunity to obtain counseling and to further develop the qualities that would allow her to continue to be an asset to the judiciary and bar. Respondent has been twice elected to the common pleas bench by the voters of Franklin County. It seems strange to me that we often show more compassion to attorneys and judges who break the law than we seem to be showing here.

{¶ 66} However, particularly because I believe that Count V is a serious infraction, I believe that respondent should be suspended for two years with the second year stayed upon conditions. I am hopeful that, with the satisfaction of those conditions, respondent can return as a valued member of the legal profession after serving the first year of her suspension.

---

PFEIFER, J., concurring in judgment only.

{¶ 67} I concur in judgment only because I have several concerns about this case. Judge Puffenberger's dissent from the report and recommendation of the board so well articulates my concerns that I herein incorporate his entire dissent, except for his recommended sanction.[2]

{¶ 68} "The extensive allegations presented in this complaint are far reaching in substance and, in many instances, require Respondent to justify judicial determinations made many years before. This Board must be cautious not to infringe upon areas of our legal system wherein our judiciary has traditionally been granted extensive discretion in making judicial determinations. Inappropriate actions of one member of the judiciary must not be sanctioned in a manner that would have a 'chilling effect' on judges who may sometimes utilize methods which may be perceived as 'unconventional'. Judges are constantly making split second decisions in the courtroom and sometimes their motives for making these determinations can be placed in question. Our legal system has acknowledged this and provides proper avenues of recourse outside the disciplinary process. To require our judges to be placed under oath in a disciplinary setting and explain why a judicial determination was made is foreign to our legal system. In situations where the judicial determination was made years earlier, that task of explaining why the decision was made can be nearly impossible.

{¶ 69} "While it is not my intention to review the panel report case by case, I will generally address each of the counts in the Amended Complaint and conclude by formulating a more generalized dissent to both the findings and the recommendation.

{¶ 70} "In reviewing each of the Counts in the Amended Complaint, the Board must apply the standard of whether the violations have been proven by clear and convincing evidence. This is a high standard to meet and is more than a simple preponderance of the evidence.

{¶ 71} "In Count I, the panel report finds that Respondent engaged in ex parte communications. In *Nezvalova*, Disciplinary Counsel clearly failed to establish that the conversations were ex parte in nature. No one gained a procedural or tactical advantage as a result of the conversation which was administrative in nature. Two distinguished judges, Judge Corzine and Judge Parrott, testified that this was not an ex parte conversation. Likewise, the conversation in *Smiley* was administrative in nature and Judges Corzine, Parrott and former Judge Tracey testified that conversations such as this are not uncommon. Certainly the clear and convincing standard was not met to establish that any ex parte communications even occurred unless one were to totally disbelieve the testimony of not only Judge O'Neill, but also the testimony of Judge Corzine, Judge Parrot[t] and former Judge Tracey. Moreover, the *Smiley* case was not a pending case and the conversation did not involve the merits of the case.

---

2. I am attaching a copy of the full report of the board as an appendix to my opinion.

Absolutely no one was prejudiced by these conversations and they do not fall within the realm of sanctionable conversations. That portion of Count I relating to ex parte communications is without merit and must be dismissed.

{¶ 72} "Count II alleges that Respondent refused to allow attorneys to go on the record. In 1998, the local rules of the Franklin County Common Pleas Court did not require pretrials to be on the record. The allegation that Attorney Swartz was denied the opportunity to go on the record during a pretrial was readily admitted by Respondent in her letter to the Chief Justice on September 10, 1998. (Ex. ON 01507) Respondent explained to the Chief Justice that she, 'denied Mr. Swartz' request to put the bench conference on the record as I did not find it necessary to record my denial of his request for a continuance.' This denial was not even found to be sufficient for the granting of an Affidavit of Disqualification by the Chief Justice, much less a disciplinary violation. In both *Dennis* and *Lane* the allegations of failure to allow a record occurred in pretrial settings. Both Judge Parrot[t] and former Judge and now Professor Tracey testified that the preferred method of making a record is not to disrupt the schedule in order to make a record whenever one is demanded, but to wait until such time as there is an actual court hearing. In fact, Attorney Swartz testified that a written motion would have been the proper way to make a record for the motion for continuance. The allegations in Count II have not been established by clear and convincing evidence and must be dismissed.

{¶ 73} "Count III consists of allegations that Respondent denied continuances without exercising judicial discretion. The granting or denial of requests for continuance should not be the subject of disciplinary actions. The law adequately provides recourse to the parties in these situations.

{¶ 74} "Count IV relates to alleged misrepresentations Respondent made in her interactions with lawyers, judges and court personnel. While there is certainly variation in the recollection of parties to the same incidents, it must be remembered that these incidents occurred years ago and it is common for people to have different perceptions of an incident after the passage of time. The panel report takes great umbrage to the fact that Respondent denied the allegations against her and her recollection of incidents was often times different from those of other witnesses. This does not mean that Respondent was necessarily lying or being deceitful. It means that she had a different perception of certain encounters. In addition, her answer to the complaint seems to contain responses in conflict with her own testimony at hearing. The panel was made aware that the answer was prepared prior to any formal discovery and that Respondent answered the complaint utilizing her best recollection at the time. Those familiar with legal proceedings are quite aware that recollection can be refreshed once the witness is afforded an opportunity to review documents relative to an incident.

This is especially true when the incident occurred years prior. The finding of a violation for merely denying the allegations and having a different perception of what transpired from that of her accusers is totally unfair. In addition, it is not difficult to find that a number of witnesses who testified as to Count IV had their own agendas which compromised their credibility. Once again, the burden of clear and convincing evidence has not been met in these allegations.

{¶ 75} "While Disciplinary Counsel has attempted to demonstrate a 'pattern' of inappropriate behavior by Respondent, the allegation of a violation in Count VI is totally unrelated to any other count in that it concerns activity that occurred outside the courthouse setting. The Panel report finds a solitary violation related to a campaign conversation Respondent had with an individual who was still technically her employee even though the individual had already tendered her employment resignation. It is exactly this type of remote violation that the Preamble to the Code of Judicial Conduct envisioned when it states: 'It is not intended, however, that every transgression will result in disciplinary action.' This single technical violation of the campaign solicitation canon by a judge who has been involved in several contested elections does not demonstrate a 'pattern' of campaign violations and should be dismissed in conformity with the spirit of the Preamble.

{¶ 76} "Counts I, II and III generally relate to matters within the discretion of the trial judge which this Board should not allow the disciplinary procedure to substitute for the Courts of appeals and Counts IV and VI have been addressed above. However, Count V of the Amended Complaint is much more problematic for Respondent. In fact, it goes to the very crux of this dissent. Count V relates to Respondent's interaction with lawyers, judges and court staff. Herein lies the one true, glaring basis for the entire Amended Complaint: the judicial temperament of Respondent. This is the underlying theme of the entire complaint. All of the allegations, with the exception of the alleged campaign violation, relate in one way or another to the judicial temperament of Respondent. Judicial temperament includes common sense, compassion, humility, open-mindedness, patience, tact and understanding. It is a quality that can best be identified when it is absent. The absence of judicial temperament generally exhibits itself in many ways including arrogance, impatience, pomposity, loquacity, irascibility, arbitrariness or tyranny. Unfortunately, the absence of judicial temperament by Respondent exhibited itself far too often during the hearing of this matter. While all judges have 'bad days' even this dissenter believes that Disciplinary Counsel has established a pattern of behavior by Respondent that exceeds the acceptable bounds of what must be demanded of the judiciary. I therefore agree that, in Count V, Disciplinary Counsel has established a violation of Canon 1 and Canon 3(B)(4) of the Code of Judicial Conduct which must be sanctioned.

{¶ 77} "The panel report regarding aggravation, mitigation and recommended sanction underscores the temptation to be swept up in the sheer magnitude of the evidence presented. Every possible aggravating circumstance is mentioned and testimony was molded to justify the severe sanction recommended. The panel heard many witnesses, reviewed many exhibits and considered an incredible number of incidents alleging numerous violations. The volume of evidence should not be used as a justification to take drastic action. A reasoned approach to this matter is consistent with the above argument. This is a case about a judge who lacks judicial temperament, nothing more, nothing less. After all of the detailed analysis of each specific case and every shred of evidence that could be solicited over a number of years, we are left with the ultimate conclusion: this is a judge who has a number of good qualities but judicial temperament is not one of them. Her behavior warrants action.

{¶ 78} "In considering a recommended sanction, the panel report discards each of Respondent's defenses. One of Respondent's defenses was that the complaints were politically motivated. Certainly, politics did not force Respondent to behave the way she did at times. However, to totally discard this factor one would have to ignore substantial evidence to the contrary. One witness, Sherry Mitchell, [a] former employee of the Franklin County Court of Common Pleas, who left for a better employment opportunity, seemed to be one of the few impartial witnesses on this topic. She described the Court as a 'political, back-biting environment' and that decisions by court administration were 'rarely based on fact' but rather were 'made on personal agenda, who knew who and politics.' She testified as to the 'self-serving, malicious environment.' One judge openly made derogatory comments about Respondent to courthouse staff. (TR 17/22) Having served on a multi-judge court, I do not discard this issue as easily as the other panel members. The atmosphere which seems to pervade this Court has Respondent at the center, but there are other parties who seem to relish throwing gasoline on the fire. The scene of one of the complainant judges on her hands and knees writing an antagonistic remark with chalk on Respondent's parking spot would be comical if not so tragic. Some who claim that Respondent brings disrespect to that Court should consider the atmosphere they have helped foster. It must be clearly stated once again that Respondent cannot utilize this atmosphere as justification for her actions, but to ignore it is to provide only a partial picture of reality. The panel report's reference to a prior disciplinary action that was dismissed is prejudicial and should be removed.

{¶ 79} "The panel report reference to Respondent's refusal to acknowledge the wrongful nature of her conduct as a significant aggravating factor is not born[e] out by her testimony. Respondent did testify that in some instances she should have handled things differently. She acknowledged that some mistakes were made. The fact that she denies the allegations is not evidence of anything. To

chastise her for denying the allegations and mounting a vigorous defense should not be an aggravating factor since many of the counts are without basis.

{¶ 80} "The panel report further considers the criminal litigants to be victims of Respondent's actions. All of these individuals had recourse in the law for perceived violations of their due process rights. These individuals do not have a 'right' to probation or a presentence investigation if the judge determines that probation is not going to be granted. Competent counsel protects your due process rights within the law. That is their function. These criminal defendants were not denied their right to go to trial. These instances cannot stand alone on their merits as violations and certainly cannot be considered as a pattern of how Respondent handles criminal cases. Since 1992, she has presided over hundreds, if not thousands, of criminal cases and to allege that these several cases demonstrate a 'pattern' is stretching beyond the limits of reasonableness.

{¶ 81} "The panel report finding that Respondent was motivated by a selfish motive lacks justification. Respondent did not personally gain from her actions in any way. To insinuate that her personal motive was to have a manageable caseload is to ignore pressures put on trial judges to keep the docket current. The Supreme Court initiated the case reporting requirements to insure the timely resolution of cases. Once again, the few cases mentioned in the Amended Complaint certainly do not establish a pattern that docket control was more important to respondent than the rights of the parties. The testimony established the Respondent did grant continuance requests when she felt they were merited. A clear and convincing pattern is not established by such a min[u]scule percentage of cases handled.

{¶ 82} "In conclusion, the bases for the panel report sanction recommendation have not been established by clear and convincing evidence. It has not been established that Respondent acted with dishonesty. A pattern of conduct was not established except as it relates to intemperate behavior. Any resulting harm from Respondent[']s decisions was minimal and could have been reviewed by a higher court. Respondent was responsible for her part in the effect on the public esteem for the integrity of the judiciary. Others are also to blame.

{¶ 83} "At the end of the day, the question is what to do with a judge who lacks judicial temperament. Should she effectively be removed from office even though the citizens of Franklin County want her to be their judge? Should the citizens of Franklin County have the right to a judge who lacks judicial temperament if they want one?

{¶ 84} "Respondent has a problem that is affecting her ability to be a better judge. For some time the legal profession has sought to render assistance to members who experience problems. The OLAP program of the Ohio S[t]ate Bar Association is one example of a profession striving to assist colleagues who are experiencing personal problems. I believe that the panel unanimously agrees

that Respondent is in need of professional assistance in helping her attain a better judicial temperament on a more consistent basis. Her situation is not hopeless. The testimony regarding her temperament was not all one-sided. A number of witnesses, including a former Board member, testified as to very positive experiences in her courtroom. Unfortunately, her past behavior toward others in the legal system has contributed to the dislike some individuals seem to have for her. Sometimes she is not an easy person to like. She is demanding. She is strong-willed. She can and has displayed some very negative emotions in the courthouse. It is my belief that the Board has several responsibilities in this matter. The Board must not get caught up in the negative media frenzy that has followed Respondent for some time. The Board must not look at the sheer volume of the evidence presented and think that severe punishment must be justified. Above all, the Board has a responsibility to try to assist this individual in dealing with her imperfections at the same time that she is sanctioned. Any sanction by this Board is a severe sanction for Respondent. The publicity of a sanction against a sitting judge for lack of proper judicial temperament will be a severe punishment in itself. The cost of her defense in this matter will be astronomical. The mitigating factors contained in the panel report are substantial and aggravating factors are minimal at best. This Board should strive to fashion a sanction that is not overly punitive, but addresses the true violation of Respondent: her temperament."

{¶ 85} One additional note: I am concerned that Disciplinary Counsel in this case developed a strong animus against Judge O'Neill. During oral argument, counsel repeatedly called Judge O'Neill a liar. As with the rest of her problems, much of this one was her own doing; many of her explanations do not bear up under scrutiny. Many other "lies," however, are simply disputes about events that occurred in the past, sometimes years in the past. Disciplinary Counsel appears in this case not to differentiate among legitimate differences of recollection, inadvertent misrepresentations, and deliberate misrepresentations.

{¶ 86} Disciplinary Counsel sought disbarment of Judge O'Neill, a remarkable instance of overcharging—to the best of my knowledge, no sitting judge has ever been disbarred in this country. He continued to seek this sanction despite the recommendation of the panel that heard the case and against the recommendation of the Board of Commissioners on Grievances and Discipline.

{¶ 87} Finally, because of the multitude of minor charges that counsel chose to present to the panel, the hearing in this case took 19 days, a period of time that maximally taxed our volunteer hearing panel and the financial resources of Judge O'Neill. A sharper focus on the significant charges would have led to a more timely and economic resolution of this case.

RESNICK, J., concurs in the foregoing concurring opinion.

*APPENDIX to concurring opinion of Pfeifer, J.*

## BEFORE THE BOARD OF COMMISSIONERS
## ON
## GRIEVANCES AND DISCIPLINE
## OF
## THE SUPREME COURT OF OHIO

In Re:

Complaint against

Judge Deborah P. O'Neill

Attorney Reg. No. 0007128

*Respondent,*

Disciplinary Counsel

*Relator.*

Case No. 02–34

Findings of Fact,
Conclusions of Law and
Recommendation of the
Board of Commissioners on
Grievances and Discipline of
the Supreme Court of Ohio

1. This matter came on for final hearing before panel members Judge Jack Puffenberger of Toledo, Ohio, Attorney Stanley C. Bender of Portsmouth, Ohio and Attorney Jean M. McQuillan of Rocky River, Ohio, Chair, on May 19, 20 and 21, August 5, 6 and 7, September 29 and 30, October 1, November 17, 18, 19, 20, 21, 24, 25 and 26, 2003 and February 2 and 3, 2004. None of the panel members was a member of the probable cause panel that heard this Complaint, or resides in the district from which this Complaint arose.

2. The panel heard testimony from ninety-nine different witnesses and received and considered the Stipulations of Fact and Stipulated Exhibits as to each Count. (Numbered Exhibits 1–529) The panel also considered Exhibits from each party as to each Count of the Amended Complaint. (Relator's Exhibits A–XXX and Respondent's Exhibits A–V)

3. This complaint originated from a group of grievances filed with the Office of Disciplinary Counsel in January 2001 signed by 8 Franklin County Common Pleas judges: Judges Watson, McGrath, Cain, Crawford, Miller, Bessey, Sadler and Hogan. Judge O'Neill received a first letter of inquiry relating to these

grievances from Disciplinary Counsel dated January 19, 2001. Respondent submitted a reply dated March 6, 2001. A second letter of inquiry to respondent regarding additional matters was dated June 14, 2001 and Respondent replied to the second letter of inquiry on July 25, 2001. Within one year of the first letter of inquiry, on January 7, 2002, Relator provided to Respondent notice that the investigation had terminated and Relator intended to file a complaint. A draft complaint was submitted to Respondent on March 9, 2002. Respondent requested additional time to respond. On June 6, 2002 a Probable Cause Panel of the Board considered the complaint and on June 17, 2002 the complaint, as approved by Probable Cause, was filed.

4. Respondent's Answer was filed on July 8, 2002 and a panel was assigned on July 10, 2002. On July 23, 2002 Relator sent Respondent a third letter of Inquiry. With the agreement of the parties, the filing of an amended complaint was delayed until November 19, 2002, adding Count VI and other factual matters to the already existing counts. Respondent's Answer to the Amended Complaint was filed on January 15, 2003. Respondent filed a Motion for Judgment on the Pleadings or, in the Alternative Summary Judgment on February 20, 2003. Briefing of these Motions was completed on March 28, 2003. An entry denying the Motions was filed April 5, 2003. Final hearing dates were set based on the jointly proposed dates from counsel for the parties and the final hearing commenced on May 19, 2003. Additional hearing dates were added in August 2003 and February 2004 based upon the progress of hearings and with the consent of the parties.

5. Because of the factual complexity of the Amended Complaint, the number of different incidents alleged and witnesses involved, the panel chair ordered that the final hearing not proceed in the traditional manner but rather proceed Count by Count. The purpose was to hear all the testimony relating to each factual incident in as close proximity as possible. As nearly as practicable, Relator and Respondent both presented their evidence on each separate Count before proceeding to present evidence on the next Count. The parties proposed and the hearings proceeded on Count 1, then Counts 2–4, then Count 5 and then Count 6. When the Relator rested on each Count or group of Counts, Respondent made Motions for Dismissal which were opposed by Relator and denied by the Panel. The Respondent then proceeded with her evidence on the Count being heard. Evidence relating generally to mitigation was taken throughout the final hearings. The parties submitted final arguments in written briefs.

6. Despite the complex and hotly contested nature of these proceedings the Panel notes with appreciation and gratitude that counsel for Relator and counsel for Respondent presented this matter in an extremely civil and professional matter.

7. The six count Amended Complaint alleges violations of the Disciplinary Rules and Canons of Judicial Conduct. The factual incidents involved date from 1997 through 2002. This report will cover each Count of the Complaint separately making findings of fact and conclusions of law as appropriate to each Count. This report, for consistency, will use the descriptive labels that appear in the Amended Complaint and/or the name of the primary party involved to organize findings of fact.

## FINDINGS OF FACT

8. *COUNT 1* alleged that Judge O'Neill held ex parte conversations, failed to exercise judicial discretion and failed to follow the law. The panel heard evidence relating to 11 factual incidents, detailed below and identified by the names of the parties involved.

9. *BIRCHLER*: Testimony taken on behalf of Relator from Kenneth Birchler, (defendant) (Transcript Vol. I—115–150), Barry Littrell (defense attorney) (Transcript Vol. I—27–112), Angela Canepa, (Director of Sex Offender's Unit, Franklin County Prosecutor) (Transcript Vol. I—153–195) Professor Lewis Katz (Transcript Vol. IV—8–80), Judge O'Neill, (Transcript Vol. V—6–59, Vol. VI—185–197, Vol. VII, 159) and on behalf of Respondent from Rachel Ginsburg (Franklin County Probation Department, Sex Offenders Unit Supervisor) (Transcript Vol. IV—81–119) Judge William J. Corzine (Transcript Vol. XI—155–183), Judge Richard E. Parrott (Transcript Vol. XI—183–212), former Judge Lewis E. Williams, Jr. (Transcript Vol. VII—73–194), former Judge Gary Tyack (Transcript Vol. VI—37–71), former Judge Ann Marie Tracey (Transcript Vol. XII—35–87) and Judge O'Neill, (Transcript Vol. VI—185–197, Vol. VII, 159), Stipulated Exhibits 1–45, (Relator's Exhibits A, B), (Respondent's Exhibits A, D).

10. Kenneth Birchler was charged with multiple counts of rape, sexual assault and kidnapping relating to an incident, which occurred in 1997 while he was working as a maintenance man in an apartment complex. The victim alleged that he had sexually assaulted her while he was in her apartment to perform maintenance.

11. Barry Littrell represented Birchler. Littrell was admitted to practice in 1983 and has a general practice in central Ohio. Birchler admitted to being in the victim's apartment but adamantly denied that a sexual assault took place or any sexual conduct took place. The case was called for trial on November 10, 1997 and the jury was selected. Angela Canepa, who was the Director of the Sex Crimes Unit of the Franklin County prosecutor's office, took over the case on the day of trial. She learned that day that there was no physical evidence and there were serious issues with the victim's credibility, which compromised the prosecution's case. (Transcript Vol. I—157–159)

12. Seeking to salvage this prosecution Canepa offered Birchler a plea to simple assault (a non-sex offense misdemeanor). Birchler accepted and counsel discussed with Judge O'Neill a sentence of six months with 60 days work release jail time, the rest suspended and five years probation. In the transcript, (Exhibit 35) the plea is described as an Alford plea, albeit somewhat tardily. Although considerable testimony was taken as to the nature of the plea, all participating parties who testified herein agreed this was an Alford plea. In an Alford plea the defendant pleads guilty to a charge while protesting his innocence.

13. In the sentencing transcript, Judge O'Neill for the first time told the parties that one of the conditions of probation would be Birchler's participation in sex offender counseling. Neither Birchler, Littrell nor Canepa were aware that sex-offender counseling required participants to admit they committed a sexual assault on a victim. (Transcript Vol. I—23,163,187). Over the next 2 years Birchler complied with all conditions of his probation except the sexual offender counseling. He was discharged from the 2 programs offered in Franklin County, because he refused to admit he committed a sexual assault and that he had a victim.

14. In 2000, a Request for Revocation of Probation was filed. Littrell and Canepa entered into and submitted to Judge O'Neill an entry that removed Birchler's sex offender counseling condition of his probation to resolve the matter. (Exhibit 1, Relator's Exhibit A) Judge O'Neill rejected the entry and a revocation hearing was held February 28, 2000. (Transcript Vol. I—168,169)

15. At the revocation hearing it was established that Birchler had not completed the sex-offender counseling programs because he would not admit to committing a sexual assault and having a victim. He would only admit he had been convicted of simple assault out of a plea bargain. (Exhibit 35, p. 38) Littrell argued that the sexual assault requirement was inconsistent with his client's Alford plea. (Exhibit 35, p. 43–46) Judge O'Neill revoked Birchler's probation for failure to meet the sexual offender counseling condition stating she was "infuriated" that Birchler denied he had a victim and stated in the transcript "it doesn't take a rocket scientist to figure out that if you are on probation from a sex offense and the Judge tells you that you are to successfully complete sex offender counseling that you either go with the program or you are going to be revoked," "I don't care what you call it, this was a sexual assault and he did plead guilty," and "he has been convicted of an assault that arose out of a sexual attack" (Exhibit 35, pp. 48, 57)

16. Littrell appealed the probation revocation and the Tenth District Court of Appeals reversed, stating "We cannot reconcile appellant's Alford plea and the requirement as a part of his counseling session that he admit he had a victim.... Requiring appellant to admit that there was a victim or to specific criminal

conduct would be in contradiction to his maintenance of factual innocence pursuant to Alford." (Exhibit 5, p. 4) The appellate court further held that "because appellant did not have notice of this term of his probation, which was significant due to his Alford plea, he could not have been expected to file a direct appeal of his probation requirements. The trial court abused its discretion in revoking appellant's probation based upon that reasoning." (Exhibit 5, p. 6) Littrell also argued that the trial court had failed to serve as a neutral and detached hearing officer in the revocation hearing but that assignment of error was held moot. (Exhibit 5, p. 6–7)

17. In anticipation of the remand hearing, Littrell and Canepa prepared another agreed entry for Judge O'Neill amending the probation to remove the sex offender counseling requirement. Judge O'Neill did not accept the proffered entry and refused to meet with counsel. (Transcript Vol. 1—51–52, Vol. V—36, Exhibit 5, P.7, Relator's Exhibit B)

18. On November 7, 2000 Judge O'Neill held a remand hearing. Littrell testified that in this hearing Judge O'Neill had an air of prejudice and hostility. Birchler testified that the judge was not happy with him. (Transcript Vol. I—46–47, 120) Respondent began the hearing by stating, "I have read the decision. I respectfully disagree. The Court can assess those terms, especially since the underlying offense was a sex offense." (Exhibit 34, p. 2–3)

19. Judge O'Neill then stated: "This is where it stands. It stands that either he is going to comply with the terms and conditions of his probation, or the State is going to withdraw—file a motion to withdraw the guilty plea and the Court will set it for trial on the rape charge." Twice more in the hearing Judge O'Neill represented that the state would move to withdraw Birchler's plea if Birchler would not comply with terms and conditions of probation as originally ordered. (Exhibit 34, p. 4, 6) Canepa testified that the state had no intention nor any desire to vacate the plea and that she had never discussed that topic with Judge O'Neill before the hearing. (Transcript Vol. I—170–171) Canepa was asked: Q. Have you ever heard of a judge saying to a prosecutor, "You will be making a motion to withdraw the defendant's guilty plea" other than this instance? A. No. Judges don't usually tell the state what they should or should not do." (Transcript Vol. 1—17)

20. In the hearing record, Judge O'Neill characterized Birchler's behavior as absolutely despicable and entering into an Alford plea to try to take advantage of the system. When Littrell objected that only the defendant has the right to ask for a withdrawal of the plea and asked Judge O'Neill to reimpose probation without the obligation for counseling as set forth by the Court of Appeals order, Judge O'Neill stated, "Well, Barry, you don't do a lot of criminal work down here and I don't know if you've ever done one before this case." (Exhibit 34 p. 5)

21.  Judge O'Neill concluded the hearing stating: "I'm going to set this back in the original terms and conditions of probation ... If he fails to cooperate, he'll be set for revocation and at that time I'm sure the State will file its motion to withdraw the guilty plea.  Of course you know what the Court's thinking was all along in the matter.  We'll just set the matter for trial."  (Exhibit 34 p. 7)

22.  Birchler described his impression from that hearing: "And she just basically said that it was her courtroom, she was going to do what she wanted, and, you know, that's the way it was.  And she told me if I didn't like it to appeal it.  I was—just kind of made me lose faith in the judicial system.  It was just like, what did I go to appeals court for, what was I paying $17,000 for if I'm going to win an appeal, and then they're just going to deny it?"  (Transcript Vol. 1—146)

23.  Birchler attempted another sex offender counseling program that refused to admit him until he admitted to a sexual assault.  "I just decided to go ahead and do the three months in jail, because I didn't want to take the chance of Judge O'Neill—she'd already threatened me with the fact that she was going to take me back up on the original charges if I didn't comply with the sentencing that she'd sentenced me on I said, "I'll just go ahead and do the three months and get it over with."  I didn't want to, but I did. " (Transcript Vol. I—147)

24.  Professor Lewis Katz is the Hutchins Professor of Law at Case Western Reserve University and he has taught Criminal Law and Criminal Procedure for 37 years.  Regarding Birchler he testified that the withdrawal of a plea under Ohio law is the right of a defendant only.  An Alford plea is a plea of guilty to the charge with protestations of innocence.  Given the mandate from the Court of Appeals, the Court should have amended the conditions of probation in some fashion to eliminate the need for sexual offender counseling, either by removing the requirement of admitting a victim or substituting other counseling.  (Transcript Vol. IV—23–25)

25.  Judge O'Neill's testimony was that at the remand hearing she just wanted to get Birchler back to square one given that there had been a lack of understanding.  She maintained in her Answer and in testimony that Canepa had told her before the remand hearing that the State felt defrauded by the "ruse" of Birchler's Alford plea.  She admitted that that position was clearly inconsistent with Canepa's testimony at this hearing and Canepa's willingness to consent to amend Birchler's probation requirements at the time of the revocation and at the time of the remand.  Judge O'Neill believed that this inconsistency was due to the State feeling "stuck".  (Transcript Vol. V—46–49)

26.  *NEZVALOVA*: Testimony taken on behalf of Relator from Joseph Edwards (defense attorney)(Transcript Vol. I—197–228), Renee Amblin (prosecutor)(Transcript Vol. I—228–257), Corrina Vaughn (supervising prosecutor)(Tran-

script Vol. 257–287) and Judge O'Neill, (Transcript Vol. V—60–91, VI—197–202), (Exhibits 46–75)

27. Three non-U.S. citizens, Lenka Nezvalova, Peter Janik and Marcel Stasko were arrested by Columbus police in the act of using cocaine. They were charged with F–5 drug offenses. They were at first all represented by W. Joseph Edwards, admitted to practice in 1985 with a criminal defense and personal injury practice in Columbus. Prior to indictment Edwards had approached Cindy Taylor, the head of the Narcotics Unit of the Franklin County prosecutors office to discuss a deal in which his clients would cooperate, give information and make introductions for the police in return for these first-time charges being dropped against the clients. Since the defendants were not citizens, even a plea to a first-degree misdemeanor was a deportable offense.

28. At the time of the first pretrial in September 13, 2000, the prosecution, represented by Corinna Vaughan would not consider dismissal until the defendants actually met with the police and were "debriefed". Vaughan and Edwards appeared at the pretrial and asked Judge O'Neill for a 2–4 week continuance of the trial to accomplish that debriefing session. Judge O'Neill refused a continuance and reminded the parties of her procedure that she will entertain pleas only at the pretrial and after the pretrial she will only accept a plea to the indictment. Counsel were unsuccessful at persuading Judge O'Neill to alter her policy or grant a continuance. In conversations at the sidebar, Judge O'Neill became frustrated and angry with counsel. Edwards's clients overheard the discussions and were disturbed and expressed concern about the Judge's anger and their status. Edwards and Vaughan were unsuccessful at scheduling the debriefing and several days before trial Edwards was informed that Nezvalova and Stasko had retained their own counsel who entered appearances and requested continuances of the trial date of November 28, 3000.

29. On the scheduled trial date the defendants appeared each with their own lawyers, Edwards, Dennis Belli and David Rieser. Renee Amblin, a new prosecutor was assigned on rotation to the trial and appeared with Vaughan available in the courtroom as backup. In a series of discussions at the sidebar and on the record among counsel and Judge O'Neill the unopposed Motions for Continuance made by new counsel were denied by Judge O'Neill who mentioned concerns about controlling her criminal docket. Prosecutor Amblin's attempts to offer misdemeanor or no-contest pleas were denied by Judge O'Neill. (Transcript Vol. V—79–81) (Exhibit 47, p. 12) Counsel were told by Judge O'Neill that only guilty pleas to the indictment would be considered. Judge O'Neill's demeanor was described by Amblin as, "I felt like we were being yelled at ... I was about to cry, because I didn't know what to do. I felt as if she were upset about things that shouldn't be the cause of being so upset." Her demeanor was

described by Edwards as, "very tense" and by Vaughan as "very angry, very loud, very demeaning to the defense counsel, very frustrated with the prosecutor's office ... It was a very hostile courtroom." (Transcript Vol. I—216, 240–242, 268–269) All three defendants plead to the indictment. Judge O'Neill denied being angry, loud, frustrated or demeaning to defense counsel. (Transcript Vol. V—72–79)

30. Nezvalova and Stasko appealed and their convictions were reversed by the Tenth District Court of Appeals on grounds that the trial court's refusal to accept no contest pleas was an abuse of discretion, which prejudiced appellants' rights. "Appellants sought to enter no contest pleas to preserve the appealability of pretrial evidentiary decisions. The trial court repeatedly advised appellants' new defense counsel that appellants either had to plead guilty to the indictment or proceed forward with trial. In addition, the court suggested that a failure to enter pleas would result in an abbreviated period of time in which the court's staff could have lunch. As a result, appellants plead guilty. Therefore, the trial court, by injecting itself into the plea bargain process, affected the voluntariness of appellants' decision to plead guilty." (Exhibit 52 p. 9)

31. The Court of Appeals opinion was filed on May 21, 2002. (Exhibit 52) On May 24, 2002, a Friday afternoon, Corrina Vaughan received a phone call at her office from Judge O'Neill about the Nezvalova case. She testified that Judge O'Neill was agitated and angry and stated: "You're not going to believe this. They overturned that Russian case. We're going to have to do something about this. We're going to have to fight this. We're going to have to do something about this. I think we did everything right. I don't think we did anything wrong." (Transcript Vol. I—273–274)

32. Vaughan testified that she said very little in response and was horribly uncomfortable with Judge O'Neill's statements "as if we were on the same team, meaning me and Judge O'Neill, is how she kept phrasing these discussions or these comments." Judge O'Neill did not discuss scheduling or procedural matters in this call. (Transcript Vol. I—274–275) Judge O'Neill admitted that she made a single phone call to Vaughan but maintained that it only concerned scheduling matters and nothing else. Judge O'Neill testified that she made the phone call because her bailiff was out that day and she was concerned that the matter be scheduled as quickly as possible although Judge O'Neill's bailiff did not enter such an order until more than a month later on June 27, 2000. (Exhibit 65) (Transcript Vol. V—87–91) Vaughan testified that several days later she did receive a voicemail message from Judge O'Neill, which did ask what the prosecutors' office intended to do with the case and whether it should be scheduled back on the docket. Vaughan deliberately did not return the call to Judge O'Neill based on her discomfort with the first phone call. Instead, after consulting

others in her office she left a message with the bailiff directing the inquiry to attorneys in the appellate division of the office, which had handled the appeal. (Transcript Vol. I—275–276).

33. *MONTOYA*: Testimony was taken from Rebecca Pokorski (Franklin County Public Defender)(Transcript Vol. I—287, II—8–41), Kevin Mulrane (Head of the Common Pleas Unit, Franklin County Public Defender)(Transcript Vol. 41–91), Michael Jakubow (Assistant Franklin County Prosecutor)(Transcript Vol. II—91–125), Professor Lewis Katz (Transcript Vol. IV—8–80), Judge William J. Corzine (Transcript Vol. XI—155–183), Judge Richard E. Parrott (Transcript Vol. XI—183–212), former Judge Ann Marie Tracey (Transcript Vol. XII—35–87) Judge O'Neill (Transcript Vol. V—91–113, VI 202–210, VII—7–8,117,134–135) (Exhibits 76–102).

34. Lozaro Montoya was charged with multiple felony counts related to witness intimidation. He did not speak English. At arraignment he was unable to make the bail set of $20,000 and was in jail when the case was assigned to Judge O'Neill. The Franklin County Public Defender was assigned to represent him on October 13, 2000. The public defender assigned, Rebecca Pokorski (a staff attorney with the office since 1991), requested discovery from the prosecution. The case was set for a pre-trial on October 24, 2000. Pokorski, who had not received discovery, met with her client in the holding cell for the first time that day and spoke with him through an interpreter. Pokorski met with Michael Jakubow, the assigned prosecutor who consented to a continuance of trial. The defense orally requested and presented an agreed entry to Judge O'Neill allowing a continuance of the trial date then set for November 15, 2000. Pokorski explained that she had not received any discovery from the prosecution and that all the witnesses and her client were Spanish speakers and that complicated contact with them. Judge O'Neill denied the continuance.

35. After the October 24, 2000 pretrial, Pokorski filed a written Motion for Continuance, a Motion for Recusal of Judge O'Neill and a Motion to Substitute Counsel, which were all denied. On the trial date of November 15, 2000 Jakubow had not been able to locate his witnesses. As a result of discussion between Judge O'Neill and counsel it was agreed that Montoya would waive speedy trial time and in return he would be released on a personal recognizance bond with house arrest and orders not to contact the complaining witnesses. Judge O'Neill told the parties that the trial was rescheduled in two weeks on November 28, 2000. Pokorski advised the Court that two weeks was insufficient time to prepare: the prosecution witnesses still had to be found and made available for interview, the Thanksgiving holiday and a two-day death penalty seminar and other previously scheduled cases would not allow preparation within that time.

234

Judge O'Neill declined to adjust the date any further stating that counsel would be prepared and trial would proceed on that date.

36. On the November 28, 2000, Pokorski was not prepared to try the Montoya case. She had discussed the options available if trial commenced to preserve Montoya's rights with her supervisor, Kevin Mulrane, and planned to refuse to participate in the trial should Judge O'Neill begin the trial. She had 3 other cases set for jury trials that day. That morning she checked the availability of the other judges set for jury trials and learned the Judge Johnson was available on a case older than Montoya. She told Judge O'Neill's bailiff that she was starting a jury trial with Judge Johnson and went to clear her last case, a revocation hearing before Judge McGrath. Returning to the ninth floor she was told that Judge Johnson had decided to start another jury trial. At that point she went into Judge O'Neill's courtroom and spoke to Judge O'Neill informing her if the Montoya trial commenced Pokorski would not participate in the trial. She recalls a brief, nervous but respectful exchange. She left to do a bond revocation hearing elsewhere (Transcript Vol. I—306–310) Montoya was present sitting in Judge O'Neill's courtroom with some family members and the interpreter.

37. Completing her work, Pokorski returned to Judge O'Neill's courtroom and was met by the interpreter who told her that after she left, the judge revoked Montoya's bond and had him arrested. (Transcript Vol. I—311) In a transcript recorded outside the presence of counsel, Judge O'Neill stated, "The Court has been informed by defense counsel that she will not participate in the trial. I gave the defendant a bond last week over the objection of the prosecutor under the condition that she knew it would go to trial today or be nollied. The bond is therefore revoked. This is a witness intimidation case and it will be either tried today or it won't; but in any event the Court did not intend for this person to be out on bond any longer than today, so the bond is revoked." (Exhibit 94, p. 1) Judge O'Neill also completed a case-processing sheet that noted "Bond revoked. Ct only gave short bond b/c defendant would not waive time at the last trial date, defendant and counsel knew this was a definite trial date." (Exhibit 78)

38. At the time Judge O'Neill revoked Montoya's bond and had him arrested in the courtroom no request for revocation had been made. Judge O'Neill admitted that no conditions of Montoya's bond had been violated. Judge O'Neill admitted that she did not record in any document when the bond was issued that this was a "short bond", only good until the trial date. Neither Jakubow nor Pokorski recall any discussion about a time limitation on the bond when it was issued. Neither had ever heard of a "short bond" in name or concept. The only thing that had changed, as stated by Judge O'Neill on the record was Pokorski's refusal to participate in the trial because she had not had the opportunity to

prepare. Judge O'Neill denied that she never saw or spoke to Pokorski before going on the record that morning. (Transcript Vol. V—99–111)

39. Montoya was held in the courtroom lockup until noon when the prosecution "nollied" the case because of defects in the indictment. At that time he was ordered released after he was processed through the jail. Pokorski characterized the incident as frightening for him, being Spanish-speaking and not understanding why he was being arrested. (Transcript Vol. II—31) Pokorski's supervisor, Kevin Mulrane was present in the courtroom at the conclusion of this matter. Later that day Mulrane was called to meet with Judge O'Neill who complained that Pokorski treated the judge with disrespect and shadily. Mulrane discussed problems created for the Public Defender by Judge O'Neill's practice of holding very early pretrials and only accepting pleas at the pretrial. According to Mulrane, Judge O'Neill's courtroom is the only courtroom he could recall in which public defenders have refused to participate on the trial date. He testified that the office takes a very conservative position on continuance requests and rarely has any difficulty. He believed that Pokorski had done what she had to do to preserve her client's right to effective assistance of counsel in the circumstances. (Transcript Vol. II—80–81)

40. Professor Katz testified that the purposes of bond are to set an amount of and with conditions that will assure the defendant's presence at a later time. Bond is typically set at the first court appearance and continues until the disposition of the case by plea or verdict. It was his opinion that Montoya's bond was revoked because the defendant's attorney was not willing to proceed to trial and that was inappropriate. He was unaware of any citations to the concept of a short bond in Ohio or anywhere covered by the Westlaw database. (Transcript Vol. IV—29–34)

41. Respondent called Judges Corzine and Parrott and former Judge Tracey. They testified that factors regarding setting bond involve what is necessary to secure the appearance of the defendant. Bond revocation occurs primarily when a defendant fails to appear and usually any other factors causing revocation are brought up by the prosecution. Depending on the particular case revocation can occur as a result of specific acting out or threats made by the defendant or complaints of harassment made by victims or witnesses. The actions of counsel do not affect bond revocation. (Transcript Vol. XI—168, 178 197, 199–200, XII—50–51)

42. *RIGHTER*: Testimony taken on behalf of the Relator from Sean Dominy (defense attorney)(Transcript Vol. II—173–193), Douglas Righter (defendant)(Transcript Vol. II—193–211), Trent Turner (prosecutor)(Transcript Vol. II—211–237), Sandy Grego (court reporter) (Transcript Vol. IV—162–166) Judge

O'Neill (Transcript Vol. V—113–133, VI—176–186) and Carolyn Bostic. (deputy sheriff)(Transcript Vol. XVIII—7–13) (Exhibits 103–114)

43. Douglas Righter was indicted on multiple felony counts related to a drive-by shooting. Earle "Duke" Frost and Shawn Dominy represented him. His case was set for trial before Judge O'Neill on Monday, March 20, 2000. Several sidebar conferences occurred that morning among Frost, Dominy, Trent Turner, the prosecutor, and Judge O'Neill. Righter was also present in the courtroom with family members. The prosecutor offered a plea to the indictment dropping the gun specification but Righter wanted to go to trial. Judge O'Neill told counsel that the case must be submitted to the jury by Wednesday because she was going on vacation. Judge O'Neill admonished counsel to have their witnesses ready at the courthouse and stated that they would work till midnight each day if necessary. Judge O'Neill then stated to Dominy in the presence of Turner "if he's going to trial today, I am going to—I am going to revoke his bond." (Transcript Vol. II—221, 179–180) Turner recalled Dominy stated that his client was on bail and had appeared both times as required and asking how his client would be able to assist him in trial preparation if he is in jail. Judge O'Neill stated that Dominy can speak to his client "in the back," the courtroom lockup, and repeated, "Well, I'm going to revoke him." Turner testified that the judge's statements about bond revocation surprised him since he did not request it and he was not aware of any reason for a bond revocation. (Transcript Vol. II—221, 223–224)

44. Righter was in the courtroom and observed the sidebars and partially heard Judge O'Neill say something about a vacation. Righter's counsel then conveyed to him that Judge O'Neill would revoke his bond if trial started. Shortly thereafter Righter, Turner and Dominy noticed a group of deputies enter the courtroom and after asking about the reason for their presence were told that the deputies were called to take someone into custody for a bond revocation. (Transcript Vol. II—186, 197, 223) Righter overheard part of another sidebar discussing the prosecution witnesses and then Judge O'Neill said directly to Righter "you get your witnesses down here today." (Transcript Vol. II—208–209). Dominy described his client as "probably anxious" that morning. (Transcript Vol. II—189) Further plea negotiation occurred between counsel as voir dire began and the prosecution offered a plea with reduced charges and a sentence of 18 months. Righter accepted. "Based on the advice from my counsel, and the fact that I couldn't have my witnesses there and I was going to be sitting in jail regardless until the case was over until she got back from vacation which could have been, I didn't know when, but I had to do something or I was going to do 12 years in prison for something that wasn't my fault. I couldn't prepare a defense." (Transcript Vol. II—203)

45. Turner believed the plea was reasonable and fair but was concerned that it was coerced by Judge O'Neill's threats to revoke the defendant's bond during trial. (Transcript Vol. II—234-235) Turner was contacted and interviewed by private counsel for Righter's family investigating the circumstances of the plea several months later but the matter was not appealed. (Transcript Vol. II—227, 234-235)

46. Judge O'Neill testified that she had noticed that Righter exhibited a lot of "agitation or tension" and "in and out activity" in the courtroom the morning of March 20, 2000. She maintained that she stated her concerns about his conduct and behavior to Dominy, Frost and Turner (Transcript Vol. VI—180) but did not ask his lawyers to calm him down. (Transcript Vol. V—123) She testified that she said: "If he wants to go to trial, we're going today. And that basically if he continues to act that way, or I continue to have concerns about that, then, yes, that is a possibility. I could revoke his bond, not would revoke his bond if he went to trial." (Transcript Vol. VI—128) She acknowledged that she did not make any note of the behavior she described. She testified that Courtroom Deputy Carolyn Bostic told her that she called for additional deputies that morning due to Righter's behavior. (Transcript Vol. V—122) Carolyn Bostic testified that she was on a medical leave of absence from January 25 through April 25, 2000 and could not have been present for these events. (Transcript Vol. XVIII—3-5)

47. **COX**: Testimony taken on behalf of Relator from Allison Cox (defendant)(Transcript Vol. II—237-266), Ronald Welch (prosecutor)(Transcript Vol. II—266-276), Judge O'Neill (Transcript Vol. V—14—14) and on behalf of the Respondent from Ronald Janes (defense attorney)(Transcript Vol. VII—247-289) and Judge O'Neill (Transcript Vol. VI—168-177) (Exhibits 115-128).

48. Allison Cox, a registered nurse, was charged with one count of burglary and one count of domestic violence against one of her adult daughters in September 1999. Mrs. Cox had a three-month old nursing baby and two other children at home at the time. Cox had a previous criminal conviction from 1990 relating to this daughter who had a behavioral history of ADHD, explosive temper and depression. Cox had spoken to the victim the evening before trial and was not sure she would appear and testify. Cox arrived at 7:30 am with nursing infant and husband. Waiting in the courtroom, she observed Judge O'Neill's demeanor as varied, from just facts and business and then screaming and yelling at persons appearing before her. Cox informed her lawyer, Ronald Janes that she won't accept the plea, which had been previously offered. This was a disposition day in Courtroom 9A. When her case was called Cox observed Janes and the prosecutor approach the bench. Cox saw Judge O'Neill become irate, and she heard something about "dispo day". The court transcript records

that Judge O'Neill chastised counsel for appearing on a disposition case with a case that Janes had assured the court would be a plea. (Exhibit 116 p. 1–5) In a later sidebar conference Cox heard Judge O'Neill say in a loud and harsh tone that if trial started Cox would sit until jail until every witness was called. (Transcript Vol. II—244)

49. Cox had later discussions with Janes and was told her options were to plea to original felony offer or sit in jail during trial and possibly the judge's vacation and face more jail time if she was convicted. Cox felt she had no choice with a baby at home she was nursing. She plead to the indictment and was sentenced to probation. (Transcript Vol. II—244-246) (Cox visibly lost her composure while testifying to these events at this disciplinary hearing). Four days after her plea she filed a written grievance with the Columbus Bar which stated "Judge O'Neill became enraged and said that we would go to trial today and that I could sit in jail until all witnesses were contacted if we had to do the trial one hour a day. I would have my bond revoked and I would stay in jail until the trial was complete if I did not accept a plea bargain." (Exhibit 115) The grievance was considered to be filed against Janes since Cox listed him as "the respondent" on the grievance form.

50. Prosecutor Ronald Welch (admitted in 1998, with the Franklin County Prosecutor since 1999) appeared that morning as a last minute substitute for assigned prosecutor, also believed it would be a plea. When Cox rejected the plea, Welch told Judge O'Neill he was not prepared for trial and he asked for a continuance. Judge O'Neill told Welch, "in no uncertain terms that it was my file. I was going to try the case." (Transcript Vol. II—270) Welch then offered a misdemeanor plea and Cox refused. At the next sidebar Welch testified Judge O'Neill became more belligerent and screaming. Judge O'Neill stated "we were going to proceed to trial, that if Mr. Janes' client chose to go forward with the trial that she would revoke her bail, that she would then be taken into custody and that there would be no one to take care of her child." (Transcript Vol. II—272-273)

51. Judge O'Neill testified that while the Cox case was scheduled on a disposition day, she was not upset or angry when Cox didn't want to accept a plea and go to trial. The docket was free for the afternoon, a trial was no problem at all and she advised the parties to notify her bailiff to request a jury for after lunch. (Transcript Vol. VI—171-172) As to the testimony that she would revoke Cox's bond, she maintained that was incorrect. She testified that she observed Cox in the courtroom that morning and that she was "agitated" and "disruptive" with "a lot of in and out activity". She believed despite Cox's family status she was a flight risk. She also recalled "vividly" that Janes at a sidebar conference disclosed that Cox and another daughter were putting significant and inappropri-

ate pressure on the victim to drop her charges and that Cox was requesting a continuance of the trial. (Transcript Vol. VI—172–173) As to any statement about revoking bond she testified, "I said to Mr. Janes and Mr. Welch, on maybe their third time up, because it was after the misdemeanor was rejected, which was the second side-bar, they came back at a later time that morning, and said, "Judge, she won't take the misdemeanor, and she's still wanting a continuance, but I'm ready to go. I'm ready to do whatever you want to do." I recall saying to Mr. Janes and Mr. Welch, "Look, if she keeps that type of conduct up, I've been watching her all morning, the court can revoke her bond and put her in jail while we're trying this case."..." It's going to be a situation where—that has happened with other judges and other courtrooms. I mean, there is a lot of case law on that when you're dealing with a difficult defendant, you do whatever you can to make sure you keep control of the courtroom. And if—I pretty much—it was just more of a warning. It certainly was not a threat." (Transcript Vol. VII—175–176 and Vol. V—147–149)

52. Janes (admitted in 1969, in private criminal practice) was called to testify by Respondent. He related discussions with Cox in which it was his suggestion to Cox that persuading the victim to appear in court and request that the charges be dropped would be the most effective way for Cox to get rid of these charges. (Transcript Vol. VII—263–266) He had expected Cox to accept a plea and testified that Cox's choice to reject a plea on June 26 was contrary to his advice. He testified that he heard Judge O'Neill state that Cox's bond would be revoked if she went to trial. Although Cox had been agitated in private conversations with him Janes had not observed any agitated behavior in the courtroom and was aware of no reason why Cox bond should be revoked that day. He corroborated that Judge O'Neill was angry and upset, adding that everyone was upset that morning. (Transcript Vol. VII—266–267) Janes was concerned that the threat by Judge O'Neill to revoke Cox bond when trial began was not appropriate and had influenced his client to accept the guilty plea. (Transcript Vol. VII—270, 278–282)

53. *NASH*: Testimony taken from Timothy Pritchard (prosecutor) (Transcript Vol. II—158–172), James Tullis Rogers (defense attorney)(Transcript Vol. II—125–158) and Judge O'Neill (Transcript Vol. V—151–158) (Exhibits 129–146).

54. Ronald Nash was indicted in 1996 on a F–5 possession of a trace amount of heroin. The case was assigned to Judge O'Neill but Nash never appeared for a pretrial scheduled in 1996. He was represented by James Tullis Rogers (admitted in 1968, served as Ohio's first Public Defender 1975–82, since then in private criminal practice in Columbus). A bond forfeiture and capias were issued. In November 2000, Nash was arrested on the capias. Rogers moved to withdraw as counsel (Exhibit 137) but remained counsel when he learned that

Nash's non-appearance in 1997 resulted from extradition to and imprisonment in New York. After serving his sentence in New York, Nash had returned to Ohio. Rogers met with the prosecutor and his client agreed to accept a misdemeanor plea with a maximum 6 months sentence less time served. (Exhibit 130).

55. On January 9, 2001 Timothy Pritchard, the assigned prosecutor, Rogers and Nash appeared before Judge O'Neill to present the plea. Rogers testified that at the sidebar conference Judge O'Neill stated she would not accept the plea. "He'll eat the indictment or go to trial today. I'm bored today anyway." Rogers testified that he explained the reason for Nash's absence in 1996 but Judge O'Neill said if he doesn't plea to indictment she would sentence him to the maximum after trial, which was 18 months. Rogers testified that the judge spoke loudly enough that Nash heard the comments. Nash was very alarmed and suspicious of Rogers but agreed to plea to the indictment. (Transcript Vol. II—133–135) Judge O'Neill denied that she said anything about being bored: "I'm never bored." (Transcript Vol. V—154)

56. Pritchard, (admitted in 1992, with the Franklin County Prosecutor til 2002, now with the Ohio Attorney General) testified that the harsh tone and content of Judge O'Neill's rejection of the plea was striking particularly because Rogers had a reputation as extremely respectful and professional lawyer (Transcript Vol. II—162–163). Rogers discussed the two choices with Nash: plea to the indictment or trial. Nash was very alarmed and suspicious of Rogers but agreed to plea to the indictment. (Transcript Vol. II—133–135) (Exhibit 135)

57. Judge O'Neill sentenced Nash to 12 months and concluded by stating; "He will be doing less than five months, which is less than he would have gotten if we had done the misdemeanor." (Exhibit 146 p. 9) Rogers testified that this was wrong since jail time credit would have reduced a six-month sentence on the misdemeanor to less than 3 months. Rogers was disturbed that Judge O'Neill made that comment in front of his client who then wanted to complain. Rogers testified that while he wrote letters defending Judge O'Neill from criticism in earlier years now he testified, "I would prefer to avoid that courtroom. . . . It's an uncomfortable courtroom. . . . And it's very volatile." "I fear that something will be said to scare my clients or embarrass me." (Transcript Vol. II—140–141, 152–153)

58. *BURTON V. NICHOLSON*: Testimony taken from John Waddy (plaintiff's attorney) (Transcript Vol. III—68–117), Shelia Vitale (Judge O'Neill staff attorney) (Transcript Vol. III—117–149), Judge O'Neill, (Transcript Vol. V—159–177), (Exhibits 147–166)

59. John Waddy represented Laura Burton in a civil case regarding an auto accident claim. He had received a policy limits offer from the defendant's insurer but could not accept it and dismiss the pending case until he received consent

from the plaintiff's underinsurance carrier. At a final pretrial with Shelia Vitale, Judge O'Neill's staff attorney, he explained the situation and Vitale made a note on the file that it was resolved but cannot be dismissed yet. The case file went through normal processing and a dismissal entry was posted. Waddy tried unsuccessfully with phone calls to Vitale and the bailiff and a written motion to vacate the dismissal entry. He filed an appeal and the Tenth District Court of Appeals reversed the dismissal. Judge O'Neill testified that this matter "fell through the cracks" and that there were some communication problems due to a death penalty case and other events occurring in this time period. Upon remand the case was stayed until completely resolved. Waddy testified that the appeal delayed resolution of the case since the underinsurance insurance carrier would not negotiate until the appeal about the dismissal entry was resolved.

60. **BIVENS**: Testimony taken from David DeVillers (prosecutor) (Transcript Vol. III—8–35), Timothy Pierce (public defender)(Transcript Vol. III—35–68), Sandy Grego (Court reporter) (Transcript Vol. III—19–35) and Judge O'Neill (Transcript Vol. V—177–187 and VII—9—13), (Exhibits 169–179)

61. Brandon Bivens, 19 years old, was indicted on two drug possession charges (F–4 and F–5). Trial was scheduled for June 3, 1999 before Judge O'Neill. Bivens was represented by Public Defender Timothy Pierce (admitted 1989, with Franklin County Public Defender since 1990). Prosecutor David DeVillers (admitted 1992, Franklin County Prosecutor's Gang Unit 1997–2001, U.S. Attorney's Office, Criminal Division since 2002) was assigned to the case since Bivens was identified as a gang member ("The choke and kill bloods"). Pierce contacted DeVillers the day before trial and conveyed that Bivens would accept the plea offer of an F–5 and an M–1 but Pierce wanted to have a Presentence Investigation or "PSI" to determine if the sentence could be probation. Pierce sought and received DeVillers' consent to a PSI as well as to Pierce approaching Judge O'Neill ex parte to seek her approval to order a PSI. Pierce went to Judge O'Neill's courtroom on June 2, 1999. Pierce met with Judge O'Neill as she was leaving the bench, explained his request for a PSI for Bivens who was scheduled for the next morning and asked if Judge O'Neill would continue bond for Bivens during the PSI. Pierce testified that it was not a passing conversation; "she had my attention and I had hers." Judge O'Neill said 'that's fine'. (Transcript Vol. III—48) Pierce called Bivens and told him about the judge's response and that the next day he should not expect sentencing; his plea would be entered and the PSI would be ordered.

62. . On June 3, 1999 Bivens was two hours late for the 9:00 am court hearing. DeVillers was in trial and sent Jeff Reichel to cover, understanding that this was just a plea and it had been arranged to order a PSI. Neither Pierce nor Devillers had Bivens' juvenile record, however, a juvenile record would not exclude

ordering a PSI. Pierce was in and out of Judge O'Neill's courtroom that morning waiting on Bivens who arrived at 11:00 am. Pierce was in the courtroom, when he saw Bivens arrive and he walked back toward him. He heard behind him tumultuous noises, a book slamming down, and loud voices not understandable. (Transcript Vol. III—40–41) Sandy Grego, the court reporter testified at that time Judge O'Neill was throwing her keys and a book down on the bench, slamming drawers and screaming. (Transcript Vol. III—22–23) Bivens told Pierce he had transportation problems as Pierce realized that Judge O'Neill was demanding they approach the bench. Pierce described Judge O'Neill's demeanor as "very, very loud, very, very, very ugly and very intimidating." Pierce was demeaned. Pierce unexpectedly lost his composure at this disciplinary hearing describing this situation, stating, "This was not the only time that this kind of thing had happened." (Transcript Vol. III—42). Grego testified that Judge O'Neill "wanted an explanation as to why he (Bivens) was two hours late, that she wanted to leave at 11:00 and she would be really late for whatever she had to do." Grego described Judge O'Neill as "clearly irate and definitely screaming." (Transcript Vol. III—22–23)

63. Pierce stood respectfully during the plea and when Judge O'Neill proceeded to sentencing he tried several times to request a PSI and to refer to his conversation with Judge O'Neill the day before. Judge O'Neill refused to order a PSI and ordered Pierce to speak in mitigation on sentencing. (Exhibit 167 p. 10, 11,13) Pierce testified he was not prepared to address sentencing or speak in mitigation. Bivens was sentenced to 6 months with jail time credit. Pierce never before had a judge agree to order a PSI and then renege on the agreement without any notice to the lawyer or client. (Transcript Vol. III—47,55,65) Pierce went to visit Bivens the next day in the jail highly concerned that Bivens would file a grievance against him. Pierce offered to file a motion to withdraw the plea or appeal but Bivens declined. By the time such a motion or appeal would have been decided, Bivens would have served his sentence. (Transcript Vol. III—58–59)

64. Judge O'Neill testified that she had no recollection of any conversation with Pierce a day earlier about ordering a PSI for Bivens. In addition to a lack of recollection she testified that it was not a conversation that she would participate in since she believed that by ordering a PSI a judge indicated that they would be willing to consider probation for an offender. She would not give that kind of indication unless and until she had reviewed the Court's file. She would not have had seen the Bivens file at the time Pierce testified he spoke to her. She testified that after review of Bivens prior juvenile and adult record she concluded this case was in a category in which she would not have considered

probation as part of a sentence and a PSI was unnecessary. (Transcript Vol. V—179–181, VII—9–13)

65. **LANE**: Testimony taken from Sue Ann Reulbach, (prosecutor)(Transcript Vol. III—149–176), Jeffrey Bobbitt (public defender)(Transcript Vol. III—176–206), Sandy Grego (Court reporter)(Transcript Vol. III—189–206), Sheryl Pritchard (prosecutor)(Transcript Vol. III—206–214), Dan Cable (prosecutor)(Transcript Vol. III—216–219) and Judge O'Neill (Transcript Vol. V—186–199, VI—VII—13–19, 137, 169–172, 175–176). (Exhibits 180–188)

66. In February 1999, William Lane was indicted for multiple felonies relating to a bank robbery in Columbus. Because of his habit of committing robberies in nightwear, he had gained notoriety as the "pajama bank robber." At the first pretrial before Judge O'Neill on March 25, 1999 Lane unexpectedly offered to plea to the indictment. Jeffrey Bobbitt (admitted 1982, Franklin County Public Defender, Staff Attorney since 1982) was defense counsel and Sue Ann Reulbach (admitted 1985, Franklin County Prosecutor's Office since 1991, Senior Trial Staff) was the assigned prosecutor. Around 9:30 am counsel approached and informed Judge O'Neill there would be a plea. When Judge O'Neill wanted to proceed to sentencing, Reulbach explained that the victim, a bank teller, requested to be present and to make a statement at sentencing as required under the Ohio Victims Rights Act. (O.R.C.2930.14) Reulbach requested that the matter be continued to that afternoon or the next day to secure the attendance of the victim. Judge O'Neill asked Reulbach why the victim was not subpoenaed that morning. Reulbach explained that the plea was not expected and victims are not usually present at the first pretrial. Reulbach testified that Judge O'Neill denied the request to reschedule and stated, "Absolutely not, we are going to proceed. I'm going to get this case off my docket." (Transcript Vol. III—154–156) Reulbach called the victim who was at work at the bank but she could not leave her job at that time.

67. When Judge O'Neill requested that counsel take their places to do the plea and sentencing, Reulbach refused to proceed until she put on the record that she was not able to comply with the victim's rights statute. Reulbach and Bobbitt testified that a back and forth banter ensued between Judge O'Neill and Reulbach. Reulbach requested to make a record on the victim issue and Judge O'Neill refused to go on the record. As this back and forth continues, Bobbitt observed that the court reporter Grego looked like a marionette with her hands going on and off on the stenotype machine as Reulbach requested a record and Judge O'Neill ordered the record not be taken. Reulbach respectfully but insistently refused to proceed with plea and sentencing until the victim's presence was arranged or she made a record on the absence of the victim. Both counsel testified that Judge O'Neill, not the court reporter, determined that no record

would be made. None of these conversations appeared in the transcript. (Transcript Vol. III—182–185, 156–158) (Exhibit 186) Judge O'Neill stated in her Answer to the Amended Complaint at Para. 207 that "Ms. Reulbach could proffer anything at any time with the court reporter. She additionally avers that the court reporter, Sandy Grego, refused Ms. Reulbach an opportunity to proffer." Grego testified that she did not take a record that day because Judge O'Neill "said no" and at that time, "you couldn't make a proffer unless Judge O'Neill agreed." If Reulbach had asked for a proffer, Grego would have had to ask Judge O'Neill for permission. (Transcript Vol. III—25, 194, 203)

68. Reulbach left the courtroom and returned with Ron O'Brien, the Franklin County Prosecutor. O'Brien gave Judge O'Neill a copy of the victims' rights statute and requested that Lane's plea be postponed until 3:00 pm when the victim could be present. Judge O'Neill agreed to postpone the plea but offered Bobbitt the opportunity to withdraw Lane's plea based on the morning's events. Bobbitt refused this offer at Lane's insistence and the plea and sentencing take place that afternoon, including testimony from the victim. (Exhibit 186) Judge O'Neill testified that Reulbach was posturing and delaying to allow time for the news media to arrive for the sentencing. (Transcript Vol. V—193–195). Reulbach denied calling any media, believed they were already in the building that morning and when the plea did take place, no media were present. (Transcript Vol. III—168–173)

69. The following morning Judge O'Neill observed Reulbach and Grego conversing briefly. Judge O'Neill then told Grego that Reulbach was considering charges against Grego for her failure to take a record in the Lane case. Grego asked Reulbach about this a couple days later and Reulbach stated she had no intention of making any charges against Grego. (Transcript Vol. III—198) (Exhibit 197)

70. **WOERNER**: Testimony taken from Michael Siewert (defense attorney)(Transcript Vol. IV—80–139), Christian Domis (prosecutor)(Transcript Vol. IV—139–155), Brenda Judy (Courtroom Deputy)(Transcript Vol. IV—181–202), Sandy Grego (Court reporter)(Transcript Vol. IV—156–163, 175–178), Judge O'Neill (Transcript Vol. V—199–229, VI—163–167) (Exhibits 189–214).

71. Roger Woerner was originally charged with a misdemeanor domestic violence charge and arraigned in Franklin County Municipal Court. He attended two court dates in Municipal Court. The misdemeanor indictment was then dismissed in favor of a two felonies filed in Franklin County Common Pleas Court, which is located in the same courts complex, but in a different building. Woerner's first appearance on the felony charges was in the Municipal Court building. Woerner was released on a $5000 personal recognizance bond. The felony case was assigned to Judge O'Neill and set for a pretrial on March 2, 2000.

The pretrial was scheduled for 9:30 am. The defense attorney was Michael Siewert (admitted in 1984, private practice criminal defense and traffic). Siewert arrived that morning before 9:30 am, checked in and left his associate, Gary Dicker in the courtroom while he checked on other cases he had that morning. Siewert had learned from Christian Domis, the assigned prosecutor (admitted 1998, Franklin County Prosecutor since 1998, then assigned to the abuse unit) that the plea offer was an F–5.

72. Woerner arrived at 9:55 am, 25 minutes late. His explanation was that he had gone to the Municipal Court building. Siewert conveyed the plea offer, which his client rejected. The case was called for the pretrial around 11:00 am. In the transcript Judge O'Neill learned that the plea had been rejected and consistent with her policy that there would now either be a plea to the indictment or a trial, Judge O'Neill then stated: "Okay. March twenty-second is the trial date, and bond is revoked and the deputy is ordered to take him in. I need a deputy here." Woerner asked what that meant and Siewert told him he was being arrested. Judge O'Neill then volunteered, "Because you are late. You should have been here at nine-thirty." (Exhibit 200, p. 3) Siewert and Woerner explained to Judge O'Neill that Woerner went to the Municipal Court building and Judge O'Neill stated, "His notice was for this building. I'm getting tired of this." Grego, the court reporter, made a contemporaneous record in her diary of these events and testified that when Woerner refused to take the plea the judge revoked his bond and put him in jail. Grego was not surprised because "she had made remarks like that before to other defendants, that if they didn't take the plea, that she would revoke their bond." (Transcript Vol. IV—159)(Exhibit 250)

73. On the criminal case processing sheet Judge O'Neill entered a capias and bond forfeiture order and but also noted: "Defendant appeared at 9:55.' (Exhibit 209) On March 9, 2000 Judge O'Neill signed an order of forfeiture that falsely stated that Woerner had not appeared on March 2, 2000. (Exhibit 210)

74. Siewert testified he was 'stunned'. He testified that the appearance of these events and his belief was and is that his client had his bond revoked for rejecting the plea bargain. (Transcript Vol. IV—99,130–131) There were no other explanations given to the parties at any time that day by Judge O'Neill for the revocation other than lateness. Siewert had never had a defendant's bond revoked for less than half-hour tardiness anywhere. He testified that the rule of thumb in Common Pleas and Municipal Court was that if a client was more than a half-hour late there could be problems. Christian Domis was surprised when Judge O'Neill revoked bond, he had never seen it before or since; the victim was not concerned for her safety and he knew of no reason for revocation from the prosecution's position. (Transcript Vol. IV—142)

75. Siewert had smelled alcohol on Woerner when he arrived that morning and said the judge's bailiff, Karen Moore, had remarked on it. When Siewart first spoke to his client he was agitated because he was late and "it took a second to calm him down" but Siewert didn't see any other notable behavior after that. (Transcript Vol. IV—126-127) Siewert never thought that Woerner was intoxicated or not capable of making decisions that morning. Siewert testified that his client was never closer to Judge O'Neill than 20 feet away and Woerner was silent and respectful in the courtroom. (Transcript Vol. IV—105)

76. Deputy Brenda Judy took Woerner into custody and was with him in the lockup about one-half hour. She didn't smell alcohol and had no issues with Woerner's behavior. Siewert spoke to his client in the lockup once. He sought out Judge O'Neill's bailiff, Karen Moore, and asked that Woerner be returned the next day to the court in hopes that he might do something regarding the bond revocation to help Woerner's situation. Siewert believed that Woerner's situation couldn't get any worse than it was at that point. (Transcript Vol. IV—97-98, 124) Deputy Judy testified that after Siewert left Karen Moore returned to the lockup 3 times and each time asked Mr. Woerner about accepting a plea to avoid jail. Judy believed this was being done at the direction of Judge O'Neill. These visits all took place before 11:35 am, the time on the U-10 form the Deputy filled out just before the Woerner was taken to the jail. (Transcript Vol. IV—199-200) Grego testified per her diary that Judge O'Neill left that day for lunch at 11:35 am (Exhibit 250) Judge O'Neill testified that she had no knowledge of Moore's visits which would have been inappropriate and believed Judy's testimony about both Moore's visits and about Woerner's general condition was incorrect. (Transcript Vol. V—215-216)

77. The next day, March 3, 2000, Woerner was returned to Courtroom 9A. Domis recalled being paged around lunchtime. In an off the record conversation Siewert and Domis testified that Judge O'Neill suggested that the prosecution offer a misdemeanor plea and stated that the sentence would be the same as if he plead to the F-5. Domis offered a misdemeanor, which was accepted and Woerner was sentenced by Judge O'Neill to probation and released that day. (Transcript Vol. IV—100-101,144-146) (Exhibit 201)

78. The Answer to the Amended Complaint about the Woerner case stated," The defendant was obviously intoxicated" (¶ 216) "Even if the defendant wanted to plea she (Judge O'Neill) would be unable to accept the plea, since the defendant was under the influence." (¶ 217) "Woerner was immediately taken into custody, out of concern for the victim's safety. (¶ 218) "Judge O'Neill did not revoke his bond solely because he was late for Court; rather the bond was revoked after she had an opportunity to observe his demeanor and after affording the defendant an opportunity to provide just cause for his actions." (¶ 218) "Mr.

Woerner was indignant, refusing efforts to resolve the case between the State and his counsel." (¶ 218)

79. Judge O'Neill was asked: "What about his conduct and demeanor said to you he was intoxicated? A. Agitated, agitated just—I guess I use the words earlier under Righter, kind of gave the impression like he was there to take issue with everything, pick a fight, kind of just not happy he was there, and, quite frankly, what was going through my thought process is this individual is going to leave here, and he's going to go home and take it out on the person who caused this complaint to be filed. That's the kind of air that I felt." (Transcript Vol. V—205)

80. Judge O'Neill testified that her bailiff slipped her a post-it note that said she smelled alcohol on Woerner, (Transcript Vol. VI—164–165) Judge O'Neill testified that the reasons the bond was revoked, "were not as much the lateness issue, although that certainly is a grounds to revoke a bond, but also his conduct, his demeanor, the whole circumstances of his appearance on that day." (Transcript Vol. VII—128) Judge O'Neill acknowledged that none of her concerns about his demeanor or appearances were stated to counsel or put in the record and that it was only after the grievance was filed that she learned the Siewert had smelled alcohol on his client. (Transcript Vol. V—113, 219)

81. On April 17, 2000 Judge O'Neill's signed an Entry of Judgment for $5,000.00 against Woerner for the bond forfeiture. That judgment remained on the record at the time of this hearing. Judge O'Neill testified that this was an error and should not have happened. While testifying about this situation she asked this hearing panel's approval to enter an order vacating the judgment against Woerner.

82. **SMILEY**: Testimony taken from Angela Bolognone (prosecutor) (Transcript Vol. IV—202–243), Ralph Kerns (defense attorney)(Transcript Vol. IV—243–278), Angela Canepa (Supervising prosecuting attorney, Abuse Unit)(Transcript Vol. IV—278–305), Judge O'Neill (Transcript Vol. V—232–248, VII—19–32, 139, 176–182) (Exhibits 227–249).

83. James Smiley was an 18 year old indicted on two counts of corruption of a minor, fourth degree felonies. Smiley had had a liver transplant in 1995 and was basically homebound and home-schooled. (Transcript Vol. IV—244) The case was scheduled for trial on October 5, 2000. Ralph Kerns (admitted 1981, general private practice since then) represented Smiley. At the pretrial Judge O'Neill granted leave for Smiley to consider a plea offered to a single felony count through the trial date. (Exhibit 235) Smiley agreed to accept the plea and Kerns told the assigned prosecutor, Angela Bolognone (admitted 1997, Franklin County Prosecutor's office from 1997–October 2001, abuse unit, now inactive status for family reasons). Parties and counsel appeared on the day of trial at 9:00 am to

enter the plea. Bolognone advised the victim's family that because both parties have requested a PSI and HB 180 a sexual predator status hearing was required and that sentencing would not take place that day. Under the Ohio Sexual Predator law (R.C. 2950.09) when a defendant pleads guilty to a felony sexual offense, the statute proscribes that a hearing be held to determine the defendant's sexual offender classification. Notice is required to the parties and counsel of the date and time of the hearing and the State has the burden of proof. (Transcript Vol. IV—209–211, 213–214, 272, 280–281)

84. Judge O'Neill was not present at 11:30 am and Bolognone told the victim's family they could go home and they could be heard at the HB 180/sentencing hearing, which would be scheduled another day. Judge O'Neill took the bench at 1:40 pm and appeared to Kerns and Bolognone to be agitated and angry. (Transcript Vol. IV—215, 249) Bolognone specifically requested a PSI and an HB 180 hearing, stating that there has to be formal notice given. Judge O'Neill stated, "We're going to do that now—at the time of sentencing, which is now. The parents want jail time, or are they interested in probation, or what is their position?" (Exhibit 22, p. 14) Bolognone apologized for the parents' absence and again requested a PSI and that an HB 180 hearing be set. Judge O'Neill then stated "The statute makes it very clear that the House Bill 180 is at the time of sentencing and nobody should count on a presentence investigation. So I take it you are in favor of jail time, because you are not waiving a PSI?" Bolognone stated: "I was hoping to find out more about this individual from the PSI, Judge. I know very little about this individual." Bolognone repeated her request for the HB 180 hearing and Judge O'Neill replied: "No, you have the House Bill 180 hearing at the time of sentence. If you've said all you're going to say, I need to fill out these forms before I proceed." Bolognone apologized again and testified she sensed the judge was angry and the hearing was "starting to spin out of control." (Transcript Vol. IV—215–216) When asked again, Bolognone declined to say anything about sentencing. Judge O'Neill went on to sentence Smiley to six months in prison finding that a prison term was consistent with the purposes of R.C. 2929.11, Smiley was not amenable to community control and "because of the nature of the case involving intercourse with a 13–year–old child, that it would demean the seriousness of the offense by giving him probation." (Exhibit 277 p. 17, 18) Judge O'Neill then proceeded in a soliloquy to enumerate the factors for the sexual offender classifications and make findings without asking for any evidence from the prosecutor. (Exhibit 227 pp. 18–22)

85. Kerns went with Smiley into the lockup to discuss with him what had happened. When he returned to the courtroom, Kerns saw Judge O'Neill talking to two women near the bench and he heard Judge O'Neill state at a volume, "fully sufficient for my client's mother to hear that had I taken the matter to trial and

this girl taken the stand and testified that my client wouldn't have been convicted. ...And then I approach the judge, I'm stunned that she's made that statement. I'm stunned at everything that has taken place. And she says, "You should have been offered a better deal. Go up and talk to Angie Canepa and if you can get a better deal or a misdemeanor in this case, I'll let you withdraw your plea and come back." (Transcript Vol. IV—254) Kerns did speak to Canepa who refused to change the plea.

86. Kerns then returned and asked to talk to Judge O'Neill. Kerns was concerned because dispensing the medications Smiley required due to his transplanted liver had been a problem when Smiley was briefly in jail when he was originally arrested on these charges. Kerns testified, "... By that time, the only thing that was left was to remind her of my client's issues medically. Q. Did you do that? A. Yes, I did. ...Her initial reaction to me was to look me dead in the eye and tell me that he should not have had sex with a 13–year–old if he didn't intend to go to jail, and that it wasn't her issue, that she guessed the sheriffs would have to handle it. Then she indicated that she would dash off some kind of entry that would be sure and enforce the Franklin County Sheriffs to make sure that they gave him seven pills a day." (Transcript Vol. IV—256) Kerns, along with Smiley's mother, took the seven medications Smiley took every day to the jail and Judge O'Neill did enter a special order regarding Smiley's medications (Ex. 241).

87. Judge O'Neill requested to speak later that afternoon with Canepa, who was Bolognone's supervisor. Canepa testified: "she was indicating to me that on this particular case, she was upset with (Bolognone) for a number of reasons. The fact that she had let the victims leave, the fact that she would not waive her right to the pre-sentence investigation, and the fact that she did not offer her— this particular defendant a better deal, that she (Bolognone) should have offered him a nonsex misdemeanor because this kid was not the type of kid that should have spent a day in jail for this offense. ... She (Judge O'Neill) wanted for us to change the plea post—you know, to change even though it had already been entered. She wanted me to have her do that." ..."Her indication to me was that because Angela wouldn't waive the pre-sentence investigation that she was compelled to do the only thing she could do, which was to impose a prison term; and that was upsetting to her." (Transcript Vol. IV—282–283) Canepa did not believe that Judge O'Neill was forced to impose a prison sentence: "it is true that she could not have imposed community control on that date, but she certainly could have simply ordered the pre-sentence investigation, set it down for sentencing on another date, and done whatever she felt was appropriate at that time." (Transcript Vol. IV—285)

88. Judge O'Neill's Answer to the Amended Complaint states: "Judge O'Neill orders a PSI if it is requested." (¶ 250) "Her conversation with Ms. Canepa had nothing to do with the merits of the case." (¶ 254) "At the time of Mr. Smiley's sentencing, Judge O'Neill had been informed of all facts concerning Mr. Smiley and the offense. In her judicial experience, a PSI in such a case would not yield any additional findings ... Because Ms. Bolognone would not waive the PSI, the sentencing statutes would not permit Judge O'Neill to sentence the defendant to probation and she therefore sentenced him to the minimum prison term." (¶ 256) The answer does not mention any other justification for the sentence.

89. Canepa discussed Smiley's case with Bolognone. Bolognone was not disciplined or sanctioned—Canepa advised her for the future that Judge O'Neill did refuse to do PSI's. Canepa explained that because of Judge O'Neill's concern about her docket she will want a case off her docket that day, she will not want a PSI and she will sentence the day of the plea. Bolognone should never allow victims to go home on trial dates in Judge O'Neill's courtroom. (Transcript Vol. IV—288–291, 298) Bolognone was "floored" when Canepa told her that Judge O'Neill blamed the prison sentence on Bolognone's refusal to waive a PSI: "It was hard for me to believe that instead of ordering a pre-sentence investigation, instead of having a hearing, instead of following the law and doing the hearing the way the legislature said we should do, instead of doing that, she would send this person to prison who she thought deserved a misdemeanor." (Transcript Vol. IV—219)

90. In her testimony at this hearing Judge O'Neill stated that she knew Smiley's medical condition and history before sentencing (Transcript Vol. VII—21–22) She believed the problem in this case was the inexperience of the prosecutor. (Transcript Vol. V –139) She testified that her reason for sentencing Smiley to prison was to utilize a "scared straight" approach and that was why she had ordered a post-sentence investigation. (Transcript Vol. VII—25) "I ordered a PSI, which is the post-sentencing investigation, but I didn't have any intentions at the time that I sentenced him to give him probation." (Transcript Vol. V—247)

91. Judge O'Neill denied making the statement Kerns heard that Smiley would have won at a jury trial. She admitted that she was at the bench having a conversation that she shouldn't have been having but she believed one of the others may have made the statement. (Transcript Vol. V—238–239) Judge O'Neill did tell Kerns to ask Canepa about a misdemeanor plea and suggested that she would entertain a motion to withdraw his plea as allowed by Criminal Rule 32. (Transcript Vol. V—239–240) She admitted saying to Kerns that Smiley should have considered the consequences of having sex with a 13 year old. She differed with Canepa on her recollection of meeting the afternoon of October 5th.

It was much shorter, more general and policy oriented. She denied that she said Smiley should never have been incarcerated. (Transcript Vol. V242–244) She denied she advised Canepa to offer a misdemeanor. (Transcript Vol. V—247)

92. Smiley's medications were not given by jail personnel as ordered and within a couple days he had a medical emergency at the jail and was admitted to Grant Medical Center. (Transcript Vol. IV—256–258) Kerns was contacted by Judge O'Neill's courtroom and attended on October 11, 2000 a hearing before Judge O'Neill. (Exhibit 228) Judge O'Neill stated that the hearing was on the Court's own motion in light of Smiley's medical emergency, reviewing that the prosecution did not waive the PSI but had no objection to probation but now the prosecution had indicated it would waive the PSI so Smiley could receive immediate probation. (Exhibit 288 p. 3) Ken Mitchell who appeared on behalf of the prosecution had been contacted by Judge O'Neill and asked to handle the hearing for the state. Bolognone testified that she was notified of the hearing by a page that day and only when she reached the courtroom did she learn that Judge O'Neill had contacted Mitchell who had already agreed to waive the PSI. (Transcript Vol. IV—221–224)

93. ***VIOLATIONS CHARGED ON COUNT 1:***

a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;

b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;

c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;

d) Canon 3(B)(2)—A judge shall be faithful to the law and maintain professional competence in it;

e) Canon 3(B)(4)—A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and other with whom the judge deals in an official capacity;

f) Canon 3(B)(7)—A judge shall not initiate, receive, permit or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding.

g) Canon 3(E)(1)—A judge shall disqualify herself in a proceeding in which the judge's impartiality might reasonably be questioned;

h) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

i) DR 1–102(A)(4)—Engaging in conduct involving dishonesty, fraud deceit or misrepresentation;

j) DR 1–102(A)(5)—Engage in conduct that is prejudicial to the administration of justice.

94. In considering the violations alleged in Count 1 the Relator argues that these incidents comprise a pattern of misconduct and that each individual incident on its own may not be a violation of the Code of Judicial Conduct or the Disciplinary Rules. There are no Ohio cases brought to the panel's attention, which have used this approach, however, the Preamble to Code of Judicial Conduct provides the following guidance to the panel. "It is not intended, however, that every transgression will result in disciplinary action. Whether disciplinary action is appropriate, and the degree of discipline to be imposed should be determined through a reasonable and reasoned application of the text and should depend on such factors as the seriousness of the transgressions, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system and for the protection of the public." As detailed below, the panel majority concludes that each incident which is found to violate the Canons or Disciplinary Rules will stand on its own merits.

95. Respondent has argued that throughout the Amended Complaint any conduct which involves the exercise of judicial discretion by Respondent cannot be the subject of disciplinary action and that an appellate reversal of any judicial decision by Respondent for an abuse of discretion cannot be the basis for disciplinary action. In considering Respondent's actions throughout this Amended Complaint while the panel majority has considered the existence and effect of judicial discretion where it is relevant, it does not find that such discretion is an absolute bar to examining Respondent's conduct under the Canons of Judicial Conduct or the Disciplinary Rules. The panel majority likewise does not find that an appellate court reversal of Respondent's decisions mandates the existence of misconduct. The panel majority concludes that judicial discretion and appellate court reversals are but two of many factors to be considered in judging each incident alleged in the Amended Complaint on the specific facts presented.

96. The panel majority concludes in multiple incidents in Count 1 that in criminal cases Judge O'Neill used improper means to coerce pleas or to retaliate for the actions of counsel. The panel finds these actions to be some of the most serious charges in the Amended Complaint. In *Righter, Cox,* and *Woerner,* the panel majority finds by clear and convincing evidence that the Respondent coerced pleas from criminal defendants by threatening to or actually revoking their bond if they chose to refuse pleas and go to trial. In *Montoya,* the panel majority finds by clear and convincing evidence that the defendant's bond was revoked to retaliate for his counsel's refusal to proceed with trial without an opportunity to prepare. The panel majority makes these findings based on an assessment of the credibility of all of the witnesses who testified, their appear-

ance and demeanor at hearing as well as the extant records of proceedings in these cases. The panel majority acknowledges that Judge O'Neill in each instance either outright denied having made such threats or testified that she had facially justifiable reasons for revoking a defendant's bond. The only non-party fact witness called by Respondent in this matter, defense attorney Ronald Janes, corroborated the testimony of Relator's witnesses that Judge O'Neill had threatened to revoke bond when his client, Cox, wanted to go to trial. The panel majority did not find Respondent's testimony credible in *Righter, Cox, Woerner* and *Montoya*.

97. The panel majority concludes that the justifications Respondent proffered for to justify her actions in *Righter, Cox Woerner* and *Montoya* were not genuine but rather pretexts for her improper activity. The defendants' behavior described by Respondent in *Cox, Righter* and *Woerner* to justify bond revocation were strikingly vague and similar for example, "lots of in and out activity" and "stress or agitation." Although Judge O'Neill claimed she had serious concerns with the behavior of each defendant, the record of each proceeding contains no reference to any concerns much less a specific threat, even though in each instance there was ample opportunity for Respondent to state those concerns if they truly existed because all proceedings were taking place in the courtroom with a court reporter on duty. The panel majority does not believe any of the concerns actually existed on the day of these hearings. A decision on bond is committed to the discretion of a judge and testimony offered that flight risk and safety are considerations. However, every witness who testified on this subject in this hearing agreed that it is improper for a judge to threaten to revoke bond to affect or coerce a plea or because a defendant chooses trial and the panel majority concludes by clear and convincing evidence that it was Respondent's reason for these bond threats and revocations.

98. After revoking *Montoya*'s bond, Respondent fabricated the concept of a "short bond" in court entries to justify her actions. In *Woerner*, Respondent misrepresented on the record that the bond revocation was for "being late" and signed an order that falsely stated Woerner did not appear on March 3, 2000. The panel majority concludes by clear and convincing evidence that these two acts violate DR 1–102(A)(4).

99. In these incidents the panel majority does not find that Judge O'Neill abused her judicial discretion but rather that her conduct was outside any permissible discretion and totally improper. The panel majority concludes that Respondent's conduct in *Cox, Righter, Woerner* and *Montoya* violated Canons 1, 2, 3, 3(B)(2), 3(B)(4), 4 and DR 1–102(A)(5).

100. In *Nash*, the panel majority finds by clear and convincing evidence that the Respondent used a threat to coerce the Defendant's plea. After refusing the

misdemeanor plea offered by the parties and only allowing a plea to the indictment Respondent threatened that if the defendant chose trial he would receive the maximum sentence. The panel majority finds by clear and convincing evidence that Respondent made such threat and coerced defendant's plea with said threat. Respondent's conduct in Nash interfered with the defendant's rights in the plea process, destroyed the voluntariness of the plea so obtained, adversely affected the administration of justice, was contrary to law and was improper. The panel majority find by clear and convincing evidence such conduct in Nash by Respondent violated Canons 1, 2, 3(B)(2), 3(B)(7) and 4 and DR 1–102(A)(5). See, *In the Matter of Cox*, 680 N.E.2d 528 (Indiana, 1997)

101. In *Nezvalova* and *Smiley*, the panel majority finds by clear and convincing evidence that the Respondent engaged in improper ex-parte conversations and abandoned the ethical obligation of impartiality, advocating for action on behalf of one party over the other. In *Nezvalova*, when the case was reversed and remanded to her from the Tenth District Court of Appeals, Respondent discussed the merits of the case with Prosecutor Vaughan and encouraged the pursuit of an appeal by the state. In *Smiley*, immediately following the felony plea the Respondent directed defense counsel to seek a reduction in the plea offer from Canepa, the supervising prosecutor. Then Respondent advocated with Canepa herself to have the plea changed from a felony to a misdemeanor. Respondent misrepresented to Canepa that she was "forced" to sentence Smiley to prison because of Bolognone's refusal to waive a PSI. Judging the credibility of the witnesses and their demeanor at hearing the panel majority finds by clear and convincing evidence that Judge O'Neill's testimony regarding these incidents was not credible. The respondent's actions in *Nezvalova* and *Smiley* violated Canons 1, 2, 3, 3(B)(7), 3(E)(1) and 4 and DR 1–102(A)(5) and in *Smiley*, the statement to Canepa that the Respondent was forced to sentence Smiley to prison was a misrepresentation and violated DR 1–102(A)(4). Such advocacy by a judge was sanctioned in *Disciplinary Counsel v. Ferreri*, 88 Ohio St.3d 456 [727 N.E.2d 908] (2000). See also, *In re Complaint against White* [264 Neb. 740], 651 N.W.2d 551 (Nebraska, 2002), *Ryan v. Comm. on Judicial Performance* [45 Cal.3d 518, 247 Cal.Rptr. 378], 754 P.2d 724 (California, 1988).

102. In *Smiley*, Respondent also refused the parties the PSI they requested, then proceeded without statutory notice or opportunity to prepare and made findings under HB 180 without allowing the state to present any evidence. The panel majority finds by clear and convincing evidence that such conduct violates Canon 2 and 3(B)(2).

103. In *Birchler*, another of the more serious incidents in this Complaint, the panel majority finds by clear and convincing evidence that the Respondent abandoned impartiality, failed to follow the law and interfered as an advocate in

proceedings that deprived a defendant of his rights. The Respondent had a mandate from the Court of Appeals that the sex offender counseling condition of Birchler's probation was not enforceable. Nevertheless, in the remand hearing she labeled the defendant a rapist despite the non-sex offense Alford plea she had accepted and stated on the record that the state would file a motion to withdraw his plea which was not only false and legally impossible but also highly threatening and coercive to the defendant. Her lack of impartiality is apparent on the record and corroborated by the testimony of witnesses. Respondent's lack of impartiality in this matter should have resulted in her recusal from the case. Respondent's improper actions resulted in *Birchler* abandoning his right to probation and serving the remainder of his prison term. The Respondent's conduct in this matter violated Canons 1, 2, 3, 3(B)(2), 3(B)(4), 3(E)(1), 4 and DR 1–102(A)(4) and DR 1–102(A)(5). See, *Roberts v. Comm. on Judicial Performance* [33 Cal.3d 739, 190 Cal.Rptr. 910], 661 P.2d 1064 (California, 1983), *In the Matter Of David M. Cox*, 553 A.2d 1255 (Maine, 1989), *In re Hammermaster* [139 Wash.2d 211], 985 P.2d 924 (Washington, 1999)

104.   In *Bivens,* the panel majority finds by clear and convincing evidence that Pierce did obtain Judge O'Neill's agreement to order a PSI a day earlier. On the day of the plea while Bivens was late that fact could not justify Respondent denying a PSI with no notice to Bivens' counsel, Pierce. Respondent's unexpected action was retaliatory, and deprived Bivens' counsel Pierce of preparation to adequately represent his client. The panel majority concludes that Respondent's conduct in *Bivens* violates Canons 2, 3, 3(B)(2) and 3(B)(4).

105.   In *Lane,* the Respondent's conduct was abusive to litigants, lawyers and court employees, was contrary to law, prejudiced the rights of the defendant and, but for the stubborn insistence of the prosecutor, would have prejudiced the rights of the victim as well. The panel majority finds by clear and convincing evidence that the Respondent's conduct violated Canons 3, 3(B)(2), 3(B)(4), 4 and DR 1–102(A)(5).

106.   In *Burton v. Nicholson,* the panel majority finds that Relator failed to prove by clear and convincing evidence that Respondent violated any Canons or Disciplinary Rules. Respondent admitted that communication problems caused this case to fall through the cracks and that she had changed her office policies and procedures to prevent another such misadventure.

107.   *COUNT 2* alleged that Judge O'Neill refused to allow attorneys to go on the record to preserve their objections to Respondent's rulings.

108.   *DENNIS*: testimony taken from Myron Shwartz, (defense attorney)(Transcript Vol. VII—197–211), Sandy Grego (court reporter)(Transcript Vol. III—25, VIII—205, 215) and Judge O'Neill (Transcript Vol. X—219–223)(Exhibits 253A–275)

109. Arica Dennis was indicted on three counts of receiving stolen property, all F–5's. She was represented by Myron Shwartz (admitted 1967, Public Defender, private practice since 1969).

110. On August 20, 1998 at a pretrial, the prosecutor offered a plea to a single F–5. Dennis refused the plea. The trial was set for September 14, 1998 and Shwartz orally requested a continuance that Judge O'Neill denied. Shwartz then requested that the court reporter, Sandy Grego make a record and Judge O'Neill told Grego she could not take it. (Transcript Vol. VII—198) As Shwartz was leaving the courtroom he testified that Judge O'Neill remarked that if Shwartz wasn't prepared for trial maybe she (Dennis) should get another attorney. Dennis' family discussed getting another attorney because they didn't feel Dennis was being treated fairly in Judge O'Neill's courtroom. (Transcript Vol. VII—198–199)

111. Shwartz filed an Affidavit of Prejudice less than a week later with supporting affidavits.(Exhibit 262) On September 10, 1998 in her written response to the Supreme Court about Shwartz's Affidavit of Prejudice, Judge O'Neill stated "I denied Mr. Schwartz's request to put the bench conference on the record as I did not find it necessary to record my denial of his request for a continuance. . . I refused to allow him to argue with me by demanding that the conversation be recorded." (Exhibit 254 p. 2) Grego, the court reporter testified that Judge O'Neill did refuse to allow Shwartz to make a record saying that there was nothing to put on the record. At that time Grego testified that parties could not make a proffer for the record unless Judge O'Neill gave permission. (Transcript Vol. III—25, VIII—205–206) The Affidavit of Prejudice was denied. Dennis' case was transferred to Judge Fais who had prior charges pending against Dennis and was resolved. (Transcript Vol. VII—200–201)(Exhibit 261) Schwartz testified that he did not file a written motion for continuance because it was not the custom to do so. (Transcript Vol. VII—205–207)

112. In her Answer to the Amended Complaint Judge O'Neill, "denied that she ordered the court reporter, Sandy Grego, not to make a record when Mr. Shwartz asked her (the court reporter) to go on the record after Judge O'Neill denied his request for a continuance." (¶ 274) At hearing she was asked "Q. Do you stand by your assertion in your answer? A. Yes. I did not deny him a record." (Transcript Vol. X—221)

113. O.R.C. 2301.20 provides that upon trial of a civil or criminal action the trial judge shall grant any party's request for a reporter. Crim. Rule 22 provides that all proceedings in felonies shall be recorded and in misdemeanors proceedings shall be recorded at the request of a party.

114. Testimony regarding the practices of Common Pleas judges as to making a written record described some variation in how it is to be accomplished but

affirmed a litigant's rights to have a court's decisions evidenced in the written record. Judge Corzine testified that while some judges allow it at any time, others are more strict. It was never his practice or experience to deny an attorney the opportunity to make a record. (Transcript Vol. XI—165,178–179) Judge Parrott testified that attorneys have a right to make a record but a judge has the right to manage when the record is made. For example in criminal cases, he allows attorneys to make whatever record they desire before trial begins, "That's their protection., and mine, and everyone's there." (Transcript Vol. XI—196) Former Judge Tracey testified a record should be made of what a judge decides, however, the judge can control when that occurs so as not to disrupt ongoing proceedings. (Transcript Vol. XII—46)

115. *LANE*: "Pajama bank robber case" reported at ¶s 65–69 above regarding prosecutor Reulbach's attempt to make a record at sentencing about compliance with the victim's rights statute.

116. *CRUTCHER, FOSTER, TRIPLETT*: Testimony taken from Jeffrey Scott Weisman (Transcript Vol. VII—212–246) Judge O'Neill (Transcript Vol. X—223–254) (Exhibits 276–346).

117. Michael Crutcher was represented by Jeffrey Scott Weisman (admitted 1990, Franklin County Public Defender) regarding a probation violation. On March 1, 2000 Weisman filed a Motion for a Recognizance Bond to get Crutcher out of jail. The first motion was set for hearing before Judge O'Neill on March 7, 2000 at 9:30 am and Weisman was in trial on March 7th in another courtroom. He checked in with Judge O'Neill's bailiff during breaks in his trial but later learned the motion was dismissed when he was not present when the motion was called. He refiled the Motion for Crutcher and it was set for hearing at 9:00 am on March 13, 2000. At the same time he had another client, William Foster, who was also in jail and had a Motion for a Bond Reduction scheduled in front of Judge O'Neill for 9:30 am on March 13, 2000. (Exhibits 280, 285, 304) Weisman checked in at Courtroom 9A with the bailiff at 9:00 am and learned Judge O'Neill was not present. (Transcript Vol. VII—217–223) At 10:20 am Judge O'Neill was present and on the bench. Weisman requested that the bond hearings be held for his two clients and Judge O'Neill stated that his hearings could not proceed that day because a jury trial was starting. Judge O'Neill denied Weisman's request to take the motions to the duty judge and told Weisman to re-file or re-set the Motions.(Transcript Vol. VII—223–225) At the same time Regina Grenauer, another public defender (who was medically unavailable to testify) had a bond hearing before Judge O'Neill postponed. Weisman asked to make a record of these matters and Judge O'Neill refused and had the jury brought into the courtroom. (Exhibit 276 p. 6)

118. Weisman, Grenauer and Trent Turner, the prosecutor, proceeded to Judge Michael Watson who was the duty judge. Judge Watson notified Judge David Cain who was the administrative judge. Counsel made a record before Judge Cain regarding their efforts to have these bond hearings held that morning. Judge Cain determined that Wesiman had to obtain hearing dates from Judge O'Neill as the assigned judge. (Exhibit 276 p. 11) Weisman returned to Judge O'Neill's courtroom and received hearing times for the next day. On March 14, 2000 the Crutcher and Foster matters were resolved.(Transcript Vol. VII—231–235)

119. Judge O'Neill completed criminal case processing sheets for the Crutcher and Foster motions on March 13, 2000. For Crutcher she recorded:" Pass on bond until defendant gets verification of address and employment information." (Exhibit 284 p. 2) Weisman testified he never agreed to "pass on bond" or said anything about address or employment information to Judge O'Neill on March 13, 2000. For Foster Judge O'Neill recorded "Pass on bond until 3–14–00. For plea." (Exhibit 306) Weisman testified he never agreed to pass on bond for Mr. Foster on March 13, 2000. (Transcript Vol. VII—229–230) Judge O'Neill testified she completed the forms after she knew the hearings had been rescheduled for March 14, 2000. (Transcript Vol. X—247–250)

120. Judge O'Neill testified at hearing when asked about Weisman's testimony that she had refused him the right to make a record: "I think that there is some misunderstanding that that means I denied him a bond hearing or I denied him an opportunity to go on the record to record that he was denied a bond hearing. And that's not the case." Judge O'Neill testified that these motions were "add-ons" and the day's schedule could not accommodate them but they were heard the next day. (Transcript Vol. X—240)

121. **_VIOLATIONS CHARGED ON COUNT 2_**:

a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;

b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;

c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;

d) Canon 3(B)(2)—A judge shall be faithful to the law and maintain professional competence in it;

e) Canon 3(B)(4)—A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and other with whom the judge deals in an official capacity;

f) Canon 3(E)(1)—A judge shall disqualify herself in a proceeding in which the judge's impartiality might reasonably be questioned;

g) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

h) DR 1–102(A)(4)—Engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;

i) DR 1–102(A)(5)—Engage in conduct that is prejudicial to the administration of justice.

122. As to the *Dennis* and *Lane* cases, the panel majority finds by clear and convincing evidence that Respondent's conduct violated Canons 1,2,3,3(B)(2), 3(B)(4) and 4 and DR 1–102(A)(5). A Court must allow a party the means to preserve the Court's decisions. When Judge O'Neill ruled on Shwartz's oral motion to continue the trial he had a right to create a record of that ruling. Simply because Shwartz could resubmit the Motion in written form didn't abrogate the Respondent's obligation to follow the law. In *Lane,* Respondent also clearly denied a party a record. The stand-off between Judge O'Neill and Reulbach vividly described as the court reporter being a marionette taking and not taking down their words is not excused or diminished by the "circular" justification that a record can be postponed until a case is called. As long as Reulbach insisted on recording the victim's absence, Judge O'Neill was not going to call the case. The fact that the standoff was resolved does not diminish the impropriety and the prejudicial appearance of such actions in open court. Since Respondent's practice at that time prohibited proffers without her permission her denial of a record to *Dennis* and *Lane* could not be solved by those means.

123. The panel majority finds by clear and convincing evidence that Judge O'Neill misrepresented her actions in *Dennis* and *Lane.* In her Answer regarding *Lane* Respondent placed the blame on the lack of a record on her court reporter Grego who "refused to take a proffer.". This directly contradicted Grego's testimony that Grego could not take a proffer without Judge O'Neill's permission and Grego's actions in the courtroom in response to Respondent's orders. Respondent's false statements to Grego regarding a claim by Reulbach are covered in Count 4, below, in this Panel Report. In *Dennis,* a letter to the Supreme Court in 1998 Judge O'Neill admitted she refused Shwartz a record. In her answer and in testimony herein she adamantly denied that she refused to allow Shwartz to make a record. Both statements cannot be true, one is clearly a misrepresentation, either to the Supreme Court or to this Panel.

124. As to *Crutcher, Foster and Triplett,* the panel finds that the Relator did not prove by clear and convincing evidence that Respondent denied the litigants a record. While it was clear that Wesiman was frustrated by the postponement of

his motion hearings and sought assistance from the court's administrative judges, it is not clear that creating a record of his efforts to hold the hearings was the real issue. It was not clear that in these circumstances there was a ruling or decision to record rather than rescheduling a hearing on a pending motion.

125. The panel does not find a violation of Canon 3(E)(1) or DR 1–102(A)(4) in Count 2.

126. **COUNT 3** alleged that Respondent denied requests for Continuances without exercising her judicial discretion.

127. **FIFTH THIRD BANK V. MARGOLIS**: Testimony taken from James Leickly (defendant's counsel)(Transcript Vol. VIII—115–159), Michael M. Schaeffer, (plaintiff's counsel)(Transcript Vol. VIII—168–189), Judge O'Neill (Transcript Vol. X—264–297, XI—67–69)

128. This civil case involved the collection on cognovit notes with allegations that the Margolises had made fraudulent conveyances. There were contested issues involving the valuation of the property allegedly fraudulently conveyed by the Margolises. Michael Schaeffer (admitted 1975, private practice commercial litigation) represented Fifth Bank and James Leickly (admitted 1986, private practice, commercial litigation) represented the Margolises.

129. Judge O'Neill scheduled the case for trial on March 10, 1997. Parties and counsel appeared and were ready to proceed on that date, however, Judge O'Neill was involved in a criminal trial. The parties were kept on standby for 3 days and then released and told that they would receive a new trial date. Counsel were not consulted about their availability for a rescheduled date. (Transcript Vol. VIII—119–120)

130. The Court sent notice dated March 14, 1997 that the trial was reset for April 22, 1997. Leickly sent the notice to his clients who promptly told him that April 22 was the first day of Passover and their religious practice would not allow them to attend. On March 24, 1997 Leickly filed a Motion for Continuance explaining his clients' religious obligations. On April 7, on Leickly's suggested entry granting the continuance Judge O'Neill writes:" Denied, at time case was continued on 3/10/97 and new date given, counsel did not notify the court of any conflicts. The case is overage by 2 months and burgeoning dockets do not allow for short continuances." (Exhibits 354, 355)

131. Leickly discussed the ruling with his clients and was instructed to appear at the trial date to repeat the request for a continuance but not to defend the Margolises if the trial proceeded. On April 22, 1997 Leickly appeared and renewed his request for a continuance which was denied. Schaeffer, plaintiff's counsel, stated on the record that he had no objection to the continuance. Judge

O'Neill proceeded to trial and granted judgment to the plaintiffs for approximately 2 million dollars and ordered Schaeffer to prepare an entry.

132. Shortly thereafter Judge O'Neill and counsel received phone calls from a reporter from the Columbus newspaper "The Other Paper" which lead to a story published on April 24, 1997 with the headline "Debbie Doesn't Do Passover" reporting these events. (Relator's Exhibit K)

133. On April 30, 1997 Judge O'Neill filed a five page "Entry" in the Margolis case which related in detail the progress of the litigation and stated in pertinent part: "the defendant's counsel failed to zealously defend his clients as required by Canon 7 of the Code of Professional Responsibility, especially in light of the Court's willingness to excuse the defendants from the trial and instruct the jury that their absence was in observance of their religious holiday and use their deposition in lieu of live appearance which is permitted by Civ. Rule 32, the court had not other evidence before it and therefore rendered judgment in favor of the plaintiff.". Both Leickly and Schaeffer testified that Judge O'Neill never discussed talking to the jury or excusing defendant's absence on the day of trial (Transcript Vol. VIII—136,173). The entry further stated, "The Court's denial was based upon defendant's failure to comply with Sup. R. 7 and Loc. R. 45.01 and the Court's belief that the request was based on delay and dilatory tactics. With the burgeoning civil docket, the Court is unwilling to grant continuances due to a party's failure to be prepared to proceed." Neither Leickly nor Schaeffer ever heard Judge O'Neill mention compliance with the Local Rules as the reason the continuance was denied nor is that stated in the transcript from the trial date (Transcript Vol. III)(Exhibit 356) Judge O'Neill concluded this "Entry" by directing plaintiff's counsel to once again prepare the judgment entry and submit it to the Court. (Exhibit 357)

134. Leickly appealed the judgment to the Tenth District Court of Appeals which reversed the judgment as an abuse of discretion and remanded the matter. (Exhibit 362) The case was settled.

135. *NEZVALOVA*: Reported at ¶ 26–¶ 32, above.

136. *SMILEY*: Reported at ¶ 82–¶ 92, above.

137. *MONTOYA*: Reported at ¶ 33–¶ 41 above.

138. *GOSNELL V. KIRKBRIDE* (Attorney Dan More) Testimony taken from James Gilbert (plaintiff's counsel), Jeanine Amid (plaintiff's counsel), Christina Corl (defendant's counsel) and Judge O'Neill (XI—248-256 X—252-264)

139. Attorney Dan More represented the City of Upper Arlington in this civil litigation which involved an off-duty officer who shot 2 civilians after a car chase. The officer, Kirkbride, faced criminal charges for this same incident. Both the criminal and civil case were assigned to Judge O'Neill. James Gilbert (admitted

1975, Private practice, partner at Crabbe, Brown) and Christina Corl (admitted 1985, associate, now partner at Crabbe, Brown) represented the plaintiffs who had filed the civil suit in 1998.

140.  In mid-November 1999 Dan More began having health problems which started as severe back aches which had affected his ability to work. He handled all of the labor negotiations and civil litigation for the City of Upper Arlington. He was the only counsel assigned to the Gosnell case with total responsibility for the case. Janine Amid (admitted 1985, private practice, Staff with the City Attorney of Upper Arlington, now City Attorney) was the staff attorney who handled their criminal prosecutions and served as civil backup when needed. The City Attorney, Sharon Pfancuff, handled city council and managed the office.

141.  In November 1999 Dan More was also involved in negotiations with the Teamsters for a new city contract in a situation in which there had already been a strike. On November 24, 1999 the Gosnell parties filed a Joint Motion to Continue Trial Date which was then scheduled for February 2, 2000. The motion did not mention More's health but cited timing issues related to More's involvement in labor negotiation. (Exhibit 374) Shortly after the November 24th motion was filed Attorney More learned that his illness was a rare and lethal form of cancer. Plans were made for aggressive intervention and treatment which was predicted to disable More for 3–6 months. (Transcript Vol. VIII—25–29)

142.  The assistant city attorney, Janine Amid filed on December 1, 1999 a Motion to Extend the existing case schedule, asking that discovery and motion deadlines be delayed. Amid sent a copy of the motion directly to Judge O'Neill accompanied by a letter which stated that Attorney More had "an unexpected and serious illness" and this was "an unusual request based on extraordinary circumstances." (Relator's Exhibit I) Judge O'Neill granted the Motion Extending the Case Schedule on December 7, 1999 (Exhibits 375, 376). On December 8, 1999, counsel for both parties learned that Judge O'Neill had granted a 30 day continuance of trial to March 6, 2000.

143.  Amid realized that with More's grave prognosis and the situation at the Upper Arlington City Attorney's office transferring More's caseload that they could not be ready for trial on March 6, 2000. Counsel consulted and a second joint Motion for Stay or to Continue the Trial was filed on December 8, 1999.(Exhibit 378) The second motion specifically referred to Attorney More's serious and life-threatening illness and asked for a 6 month stay or six month extension on the case schedule and trial date. (Exhibit 367)

144.  Attorney More was married to a Columbus Municipal Court judge, Janet Grubb. She had taken a leave of absence from Municipal Court and More's grave prognosis was freely disclosed in the legal community by early December. (Transcript Vol. VIII—21, 75) Judge O'Neill testified that Judge Grubb was a

friend and colleague of hers and she had met Dan More through her. (Transcript Vol. XI—255) Christina Corl testified she hand-delivered the Joint Motion for Stay or Continuance to Judge O'Neill's staff attorney, Shelia Vitale. Corl testified she called Vitale afterwards to insure that Judge O'Neill was told just how serious More's condition was. Vitale assured Corl that Judge O'Neill knew and Vitale would convey the message. (Transcript Vol. VIII—160)

145. Christina Corl contacted Judge O'Neill's courtroom and obtained an appointment for Gilbert and Amid to speak to Judge O'Neill regarding the Motion to Continue. (Transcript Vol. VIII—28) Amid has the appointment recorded in their office court calendar as 12/8/99 at 10:00 am. (Transcript Vol. VIII—78–79) Gilbert arrived early. He recalled that he waited in the bailiff/secretary's area in the back and was later joined by Amid. (Transcript Vol. VIII—31–32) Gilbert testified "I heard conversation between the bailiff and what I would have to believe was Judge O'Neill in chambers, yes. Q. And what was that conversation? A. Just that conversation was that there wasn't going to be any continuance granted on this case. The City of Upper Arlington's problem, the fact that someone is dying is not my problem. And that they need to address this case. This has been scheduled. It got a continuance. It needs to go." (Transcript Vol. VIII—34)

146. Amid testified that when she arrived and was waiting she observed the bailiff twice call to Judge O'Neill and state that they were waiting, explaining that was about Dan More "and you know how sick he is." (Transcript Vol. VIII—109–110) Amid and Gilbert are present for 45 minutes to an hour. According to Gilbert: "The bailiff came back into the secretary's office where Jeanine and I was standing and said, "No, we're not going to—The case is not going to be continued. You're going to have to figure out what to do with it." (Transcript Vol. VIII—34) Gilbert and Amid walked out into the courtroom. Amid expressed concern over the City's position and Gilbert assured her that as plaintiff, he would dismiss the case without prejudice if that was necessary.

147. Judge O'Neill's written order denying the continuance was filed on January 11, 2000. (Exhibit 379) When Corl learned of entry she called Shelia Vitale to question what information had gotten to Judge O'Neill. Vitale confirmed she had told Judge O'Neill about More's condition and Judge O'Neill's reply was that no one can tell me that Dan More could try this case in 6 months therefore they don't need a continuance. (Transcript Vol. VIII—162)

148. Judge O'Neill testified that she arrived at court late that morning. "And I know specifically I did three pleas, one at 11:00 o'clock, or 11:30, 12:00 o'clock, and 12:40." (Transcript Vol. X—258) She had absolutely no idea anyone was there to see her that day and never spoke to her float bailiff, Pam Boughner, that day. (Transcript Vol. X—259) "I know Sheila Vitale didn't say anything to me

about this either. And I know at that time I did not know about Mr. More's medical condition as well." (Transcript Vol. X—254) "What I recall is the critical dates that are involved in this are December 8th, and I've just addressed that. I do not know of any motion for stay that was dropped off. I don't have any communication from a staff attorney. (Transcript Vol. X—262–263) Shelia Vitale testified that she did recall there was period of time in which Christina Corl was calling and speaking with her about Dan More's condition after a motion had been filed. She testified she knew she spoke with Judge O'Neill about Dan More's condition but she did not have a specific recollection of the dates. (Transcript Vol. XVIII—100–102)

149. Gilbert dismissed the *Gosnell v. Kirkbride* case without prejudice on January 13, 2000 and refiled the case less than 2 weeks later. The case was settled after arbitration and before a trial. Dan More died in August 2000. Amid testified that Judge O'Neill was the only judge who would not accommodate Attorney More's illness with a stay or continuance. The Teamsters even gave consideration in the ongoing labor negotiations which were taken over by Attorney Amid. (Transcript Vol. VIII—110–111)

150. Practices of Common Pleas Court judges in Ohio vary widely on the granting and denial of continuances of trial dates. They range from courts in which trial dates are strictly enforced to courts in which judges are far more flexible. What constitutes the "good cause" required in civil and criminal rules to justify a continuance varies depending on the facts and the practice of each individual judge. (Testimony of Judges Corzine and Parrott, former Judges Tracy, Tyack and Williams)

151. ***VIOLATIONS CHARGED ON COUNT 3:***
   a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;
   b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;
   c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;
   d) Canon 3(B)(2)—A judge shall be faithful to the law and maintain professional competence in it;
   e) Canon 3(B)(4)—A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and other with whom the judge deals in an official capacity;
   f) Canon 3(B)(8)—A judge shall dispose of all judicial matters promptly, efficiently and fairly;

g) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

h) DR 1–102(A)(5)—Engage in conduct that is prejudicial to the administration of justice.

152. The panel finds that Respondent has not proven by clear and convincing evidence that Respondent's denial of continuances in Count 3 violated the Canons or Disciplinary Rule as alleged. Judges are granted wide discretion to determine whether good cause exists to grant a continuance. The panel is disturbed by the contradictions between the testimony of Judge O'Neill and all other witnesses about the events surrounding these continuances, however, Respondent has not been charged with any violations of DR 1–102(A)(4) in this Count. While the respondent's statements and actions as described by the witnesses evidence errors of judgment and insensitivity by the Respondent, the panel finds they do not rise to the level of an ethical violation in an area where judges are granted such wide discretion.

153. **COUNT IV**: Respondent has repeatedly made misrepresentations in her interactions with lawyers, other judges and court personnel.

154. **FREEMAN V. HOPKINS**: Testimony taken from Stacy Simendinger (victim advocate)(Transcript Vol. VIII—239–255), Sandy Grego (Transcript Vol. VIII—212), Judge David Cain (Transcript Vol. X—79–89, 167–170), Judge O'Neill (Transcript Vol. X—297–319, XI—54–57, 65–68, 69–72, 85–96) (Exhibits 409–423)

155. On January 24, 2000, Sarah Freeman filed a petition for an ex-parte emergency civil protection order per O.R.C. 2903.213(B), a "CPO" against Matthew Hopkins, an ex-boyfriend. At the time the petition was filed in Franklin County Common Pleas Court, the procedure was that these emergency petitions were to be handled by the duty judge assigned on the day they were filed.

156. Stacy Simendinger was a non-lawyer victim's advocate with the Stalking Unit of the prosecutor's office. She was assigned to assist Freeman with this petition as permitted by O.R.C. 2903.214(L). Simendinger accompanied Freeman to the Clerk's Office to file the petition. (Transcript Vol. VIII—250–252) There were criminal trespass charges against Hopkins. Hopkins had been arrested but refused at the jail for medical reasons, was transported to a hospital and then released. At the time Freeman filed for a CPO, Hopkins had not been re-arrested or arraigned. While Freeman could have obtained a stay-away order as a condition of bond on the criminal charges, Hopkins had still not been arrested and arraigned on those charges. A stay-away order connected with criminal charges is in effect only as a condition of bond. If a criminal defendant violates a stay-away order, the prosecution can make a motion to revoke bond. A stay-

away order ends with the resolution of the criminal case. In contrast, a CPO gives police authority to make an immediate arrest of a defendant when they violate the terms of the CPO. After an evidentiary hearing, a CPO can be effective for up to 5 years. (Transcript Vol. 245–247)

157. That Monday afternoon, January 25, 2000, the matter was assigned to Judge O'Neill as the duty judge. Freeman's petition stated "the respondent is responsible for many unwanted phone calls and unwanted visits to the petitioner's home and workplace and well as written correspondence." (Exhibit 410)

158. In the hearing transcript Judge O'Neill asks Freeman 'why are you filing this?' and she relates "I continue to have unwanted phone calls, unwanted visits to my home."(Exhibit 421 p. 2) Judge O'Neill asks when the last incident occurs and Freeman discloses the last incident had occurred "just this past Wednesday" and that Freeman had called the police and Hopkins had been arrested. Judge O'Neill asks for no other information about the ex-boyfriend's harassment. Instead, the remainder of the hearing involved Judge O'Neill taking issue with the ex-boyfriend's arrest on the criminal trespass charge and questioning why the ex-boyfirend had still not been arrested by Columbus Police. Judge O'Neill advised "Well I think you need to work with the Columbus Police. How are you going to serve him with notice of this? .... You have far greater power if you just do your job right, that is to contact the police, they go out, arrest him, they bring him to jail, arraign him and they issue a no-contact order as a condition of his bond. It makes all of this unnecessary because this is not going to be any good if I sign it because you have no way of serving it on him if you don't think he lives at this address." (Exhibit 421 p. 5) When Simendinger stated that they knew where Hopkins lived, Judge O'Neill again asked "Why don't you call the police?" Simendinger then explained that her supervisor, Leslie Ashworth of the Domestic Violence Unit advised Simendinger to obtain a CPO because a criminal stay-away order doesn't give the police power to arrest on the spot like a CPO. Judge O'Neill agreed but again advised Freeman to file a criminal complaint stating, "It's much stronger if you have criminal charges pending." She finally advised them "Get the police to arrest him, sign a complaint with a warrant for his arrest, and then put on the file to the police that the victim insists on having no contact with him, a Stay–Away order. Okay." (Exhibit 421 pp. 6–8) With that comment, the hearing ended.

159. Simendinger testified that Judge O'Neill never invited them back and did not say "if you can't get what you need in criminal court come back and see me." (Transcript Vol. VIII—248–250) Sandy Grego, the court reporter, likewise recalled no off-the-record conversations or invitations for Freeman to return. (Transcript Vol. VIII—212)

160. On the following day, January 26, 2000, Freeman, accompanied by Simendinger, returned to Court and had another hearing on her CPO petition before Judge David Cain, the administrative judge. This hearing was arranged by Leslie Ashworth. Judge Cain granted an ex parte CPO. (Transcript Vol. VIII—248)

161. Judge David Cain testified that the Freeman matter was brought to his attention as administrative judge. He was told by Freeman and Simendinger that Judge O'Neill had not given Freeman a chance to explain why she wanted this CPO and had told her to go back to Municipal Court and get a stay-away order in the criminal case. (Transcript Vol. IX—82). Judge Cain testified that the last time Judge O'Neill had been duty judge in October 1999 a problem had occurred with Judge O'Neill's handling of another CPO. The previous incident involved float Bailiff, Wanda Karns and her efforts with Judge O'Neill to obtain a hearing for a man who had petitioned for a CPO. (Transcript Vol. IX—84–85) (See Panel Report ¶ 232–¶ 236, below for details)

162. Judge Cain wrote a memo to Judge O'Neill about the Freeman case and copied it to all the judges. (Exhibit 419) In the memo he stated, "Yesterday I handled a petition for a Stalking Civil Protection Order necessary only because you refused to do so the day before despite the fact that the petitioner and witness assistants were in your courtroom with the properly completed forms." ... "Your refusal to properly address the matter caused a woman to go another day without her right to protection ... A problem arose out of a similar matter the last time you were duty judge. When you are duty judge in the future, please give these people the attention they deserve and the law demands."

163. Judge O'Neill wrote a memo in response to Judge Cain on January 26, 2000 which began, "Again I have to respond to a memorandum from you that inaccurately accuses me of failing to perform my duties." Judge O'Neill stated: "The record, under oath by the complainant reflects that she had not been contacted in any manner by the alleged stalker (her ex-boyfriend) in a week, the last contact was a call to her place of employment, that menacing by stalking criminal charges had been properly filed but not served because the police had not located him yet, that she didn't know she could get a stay away order or Temporary Protection Order through the Municipal court case etc,etc." The hearing record Judge O'Neill specifically invoked states that the last contact had been 5 days before, that the charges were criminal trespass and that an arrest had been made but the defendant was mistakenly released from the hospital and that the victim knew about criminal case orders. (Exhibit 420)

164. The memo goes on: "I did not refuse her or any other petitioner a hearing. I held the hearing. I did not find that she met the burden, but I told her to come back to me, that I would be here, if she couldn't obtain a stay away."

"In this case I clearly told her the petition was denied but I would issue one if a stay-away or temporary protection order could not be obtained through the municipal case"... At no time did I refer her to you nor did she lead me to believe she would 'judge shop.' I left the courtroom under the impression that she would come back that afternoon or the next morning if she could not obtain the above-mentioned relief." (Exhibit 420) The hearing record does not contain any ruling on the petition, any reference to the burden of proof much less any invitation to Freeman to return to Judge O'Neill for further proceedings. (Exhibit 421) There was likewise no written order entered by Judge O'Neill denying or granting this CPO.

165. Judge O'Neill's memo concluded with a pointed criticism of Simendinger. "The City Attorney's Victim Assistant (not a lawyer) did not ask a single question of the complainant and could not answer any of my questions other that to say her supervisor told her to come down here. She didn't know what the procedures were or the facts of the case." (Exhibit 420) The actual hearing record indicates that Simendinger answered all of Judge O'Neill's questions and clearly knew the procedures.(Exhibit 421)

166. Judge Cain testified Judge O'Neill's written response "made no sense." "... one of the reasons why Miss Freeman was so upset, she didn't want to miss another day of work. And if she (Judge O'Neill) wasn't going to give it to her in the first incident, I don't know why she's (Judge O'Neill) saying, "I told her she could come back and I'd give it to you tomorrow". ...." (Transcript Vol. IX—86–87)

167. Judge O'Neill was asked about the contradictions between the actual record of the hearing and what she wrote about the record in her memorandum to Judge Cain. She stated had not seen the actual transcript of the Freeman hearing until discovery in this disciplinary proceeding and the memo was based on what she remembered when she wrote the memorandum. (Transcript Vol. X—304–305)

168. **BIGGS**: Testimony taken from Robert Schopis (defense attorney)(Transcript Vol. IX—8–70), Judge O'Neill (Transcript Vol. XI—9–29) (Exhibits 424–453)

169. Tracy Lee Biggs was indicted on one count of possession of Cocaine, an F–5. She was represented by Robert Schopis (admitted 1982, Franklin County public defender). Biggs refused the plea offered at the pretrial and the case was set for trial on Judge O'Neill's docket on August 7, 2000. Schopis had a one-month vacation set which conflicted with that date, therefore Judge O'Neill granted a continuance until September 4, 2000, the day Schopis was scheduled to return to his office. Schopis asked that the trial be reset to September 5 and Judge O'Neill refused. During Schopis' vacation a series of entries are sent on

July 26, August 3, August 16 by the Franklin County Common Pleas Court Assignment office rescheduling either the trial or a motion in the Biggs case for September 4 or 5, 2000. (Exhibits 428, 431, 432, 434 and 435)

170. Schopis returned from his vacation and was in his office on Sunday and learned that the Biggs trial was set for September 5th but he appeared in Judge O'Neill's courtroom on September 4, 2000 to be certain. Schopis met Marla Farbacher, the prosecutor who was handling the trial who confirmed that she had subpoenaed witnesses for trial on September 5, 2000. (Exhibit 433).

171. On the morning of September 4, 2000 Schopis testified that Judge O'Neill took the bench and announced that the trial would start that day. Judge O'Neill threatened to issue a capias and bond forfeiture for Biggs if she did not appear that day. Schopis called Biggs who made the 2 hour drive from Ray, Ohio to Columbus and arrived at court around 1:00 pm. At that time Judge O'Neill was in another proceeding, so Biggs sat with Schopis in the front seat of the gallery. After some time Judge O'Neill's bailiff sent back to Schopis an entry signed by Judge O'Neill that stated that "on the motion of the defendant. because the defendant was late and by the time she arrived the Court was in a 2 co-defendant criminal trial, the trial is continued to September 25." (Exhibit 436)

172. On September 25, 2000 the suppression hearing and trial began for Biggs. (Exhibit 450) At close of trial that day Judge O'Neill warned the jury that there was a large docket the next morning and that there would be frequent interruptions in the morning. On September 26, Schopis checked in at 9:00 am, Judge O'Neill was not present and Biggs was not present and the courtroom was full of people for the criminal docket. Schopis left to do other assignments, checked back in before noon and Judge O'Neill was on the bench doing the criminal docket. Schopis met Biggs outside the courtroom who advised him Judge O'Neill was "madder than hell." Biggs explained that because of a car breakdown and bus schedules she had arrived about 10:00 am. Biggs' trial concluded the next day with a guilty verdict. Judge O'Neill proceeded to sentencing. (Exhibit 448 p. 268) In sentencing Judge O'Neill stated that Biggs was an hour late for trial on September 26 without just cause or apology and that Biggs had been engaging in disruptive behavior throughout the trial. When challenged by Schopis about Biggs' lateness Judge O'Neill stated in the record, "... That's not exactly what was said, and you weren't here, and I was here before 9 o'clock yesterday, and when she walked in here, you were not here." (Exhibit 452 p. 273) The parties stipulated that the court parking garage records show that Judge O'Neill arrived at 9:30 am on the morning in question. Schopis also took exception on the record with Judge O'Neill's characterization of Biggs behavior as disruptive and testified that Biggs was no more disruptive or reactive

than any other unsophisticated client sitting at a trial table. (Transcript Vol. IX—33–37) (Exhibit 452 p. 272–273)

173. ***July 22, 1999 Judges Meeting***: Testimony taken from Judge David E. Cain (Transcript Vol. 187), Judge Nodine Miller (Transcript Vol. IX—X—94–107, 142–144), Judge Patrick McGrath (Transcript Vol. X—175–161, 194–197), (Exhibits 454–457)

174. On the agenda for the Franklin County Common Pleas Court monthly judges meeting on July 20, 1999, was a motion by the Rules Committee to amend Local Rule 81 concerning a litigant's right to make a record. Judge Nodine Miller, chair of the Rules Committee had prepared a memorandum about the proposed rule change dated July 12, 1999 which was distributed to all Common Pleas Court judges in advance of the July 22, 1999 meeting. (Exhibit 457) The memo stated that "Within the last several months there have been at least three serious incidents involving a trial judge's dictatorial control over the official court record which has resulted in prejudice to the rights of the parties. In two instances, prosecutors demanded the right to include judicial action on the court's record. In one instance a defense attorney made the same demand." The proposed amendment to the Local Rule expressly granted parties the right to memorialize for the record any action taken in a criminal or civil case and also provided guidance for a court reporter if the reporter was instructed by the trial judge not to record any action taken or request made. Judge Miller testified that she was aware of complaints from Myron Shwartz (see *Dennis,* Panel Report at ¶ 108–¶ 114), Sue Ann Reulbach and Dan Cable (See "pajama bank robber"/*Lane,* Panel Report at ¶ 65–¶ 69) and Joe Landusky about Judge O'Neill's control of the record. (Transcript Vol. IX—199)

175. At the July 22, 1999 meeting Judge O'Neill asked if the proposed amendment was in response to something Judge Sheward had done. (Transcript Vol. IX—73–74,206–207) Judge Miller stated in response, "No, the complaints we've gotten concern you." (Transcript Vol. IX—74, 206–207, X—159–160) Judge Miller, Judge Cain and Judge McGrath testified that in reply Judge O'Neill stated that she had never denied anyone the opportunity to make a record. (Transcript Vol. IX—74,207, X—161) Judge Miller challenged Judge O'Neill's assertions and Judge O'Neill asked, "Are you calling me a liar?" (Transcript Vol. IX—74) Judge Miller responded, "Well, you're lying right now." (Transcript Vol. IX—206, X—157) Proposed Local Rule 81 was passed by a vote of 10–2 with one abstention.

176. ***March 26, 1999***: Statements made by Judge O'Neill to Sandy Grego about Sue Ann Reulbach bringing charges against Grego for Grego's failure to make a record in *Lane,* reported in detail at Panel Report ¶s 65–69, above.

177. *March 29, 1999*: Testimony taken from Joan Richards (court administrator)(Transcript Vol. VIII—185–195, 198–200), Sandy Grego, court reporter (Transcript Vol. VIII—208–212), Judge O'Neill (Transcript Vol. XI—259–260)

178. When Sandy Grego was assigned as Judge O'Neill's court reporter in January 1996 she testified that she informed Judge O'Neill that on Thursdays she had a hair appointment at 5:30 pm and needed to complete her work on Thursday at the usual end of the workday at 5:00 pm. Judge O'Neill indicated at that time that she understood and it was not a problem. (Transcript Vol. VIII—209–210)

179. In March, 1999, Joan Richards was the Franklin Common Pleas Court Director of Court Services and was Sandy Grego's supervisor. She received a phone call from Judge O'Neill who complained that Sandy left every Thursday at 4:30 pm for a 5:00 pm hair appointment. Richards testified that Judge O'Neill was upset and said "she was tired of having to run my courtroom around Sandy's schedule" (Transcript Vol. VIII—191–194).

180. Joan Richards spoke to Sandy Grego on March 29, 1999 and learned from Sandy that she had to leave at 5:00 pm, not 4:30 pm and that she had an earlier agreement with Judge O'Neill about this appointment. Richards believed Grego and took no action on the complaints made by Judge O'Neill. Richards testified that Judge O'Neill had a history of making complaints to Richards regarding employees which were not true. (Transcript Vol. VIII—194) Judge O'Neill testified that she did speak to Joan Richards about the hair appointments and a particular case in which there was a child witness at the end of the day. Judge O'Neill testified that it was an "end-of-the-day" issue rather than any particular time. Grego would be cleaning up her office at 4:40 pm if they were not in trial and the time she stated may have come from that practice. (Transcript Vol. XI—259–260)

181. *VIOLATIONS CHARGED ON COUNT IV*:

a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;

b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;

c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;

d) Canon 3(B)(2)—A judge shall be faithful to the law and maintain professional competence in it;

e) Canon 3(B)(4)—A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and other with whom the judge deals in an official capacity;

f) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

g) DR 1–102(A)(4)—Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

h) DR 1–102(A)(5)—Engage in conduct that is prejudicial to the administration of justice.

182. The panel majority finds by clear and convincing evidence that in each incident in Count 4 the Respondent made misrepresentations. The panel majority considers the incident involving *Freeman v. Hopkins* to be the most troublesome of these incidents. Respondent made detailed representations of what the court record contained the day after the events occurred because she maintained that Judge Cain had inaccurately accused her of failing to perform her duties. She copied those representations to every judge to defend her actions. Every representation she made was contradicted by the actual court record and established that she had not performed her duties—she had neither granted nor denied the CPO, leaving the victim in limbo. Although the tone of Judge Cain's memo was not particularly collegial, that tone in no way justified Respondent's misrepresentation of the events of the previous day to make it appear that she had in fact, heard and ruled on an ex-parte petition assigned to her as the duty judge.

183. In *Biggs*, the Respondent's misrepresentation of the time of her arrival at court may seem trivial but Respondent relied on it to find that the defendant was tardy as a sentencing consideration. In the same way the time of Grego's hair appointment may seem totally irrelevant until it became the basis for Respondent seeking employee discipline for a court employee whose regular working hours end at 5:00 pm. Maintaining that Grego left once a week at 4:30 pm was not only false but accused a court employee of shorting her hours every week. Respondent's statements to Grego regarding charges being brought against her by Reulbach for failing to take a record in the "pajama bank robber" case were doubly false because they not only accused Grego of being the person who failed to take a record but also represented that Reulbach blamed Grego for the lack of that record.

184. Respondent's statement in the July 20, 1999 judges' meeting that she never denied any person a record is contradicted by her written statements in September 1998 to the Supreme Court responding to Myron Shwartz's Affidavit of Prejudice in *Dennis* admitting that she had denied him a record as well as her conduct in the *Lane* matter in March 1999, when Judge O'Neill refused to allow the prosecutor to make a record about the victim's absence at sentencing.

185. These multiple misrepresentations, along with other misrepresentations found to violate DR 1–102(A)(4) in Counts 1 and 5 of this Complaint are considered by the panel majority to be the most serious charges against the Respondent. Dishonesty and misrepresentation are antithetical to the integrity of the judiciary and prejudicial to the administration of justice. By clear and convincing evidence the panel majority concludes that Respondent's conduct in every incident in Count IV has violated Canons 1, 2, 3, 3(B)(2), 3(B)(4) and 4 and Disciplinary Rules DR 1–102(A)(4) and DR 1–102(A)(5).

186. *COUNT V* alleged that Respondent has consistently displayed rude behavior toward her own staff, other court personnel, attorneys, litigants as well as members of the public. This includes undignified and discourteous statements to or about deputy sheriffs, probation officials, jury commission staff and other judges.

187. *CARRINGTON*: Testimony taken from Denise Schwaigert (deputy sheriff) (Transcript Vol. XII—87–135), Michael Herrell (deputy sheriff) (Transcript Vol. XII—135–160), Charles Austin (deputy sheriff)(Transcript Vol. XII—160–175), Judge O'Neill (Transcript Vol. XVI—184–193), and on behalf of Respondent, Sheriff James A. Karnes (Transcript Vol. XVII—40–46), (Exhibits 471–473), (Relator's Exhibits U—X)

188. On October 27, 1999, Ricky Carrington had a scheduled court appearance in Judge O'Neill's courtroom. He faced charges of theft, an F–5. Deputy Sue McCoy was assigned to Judge O'Neill's courtroom. Deputy Denise Schwaigert (17 years deputy sheriff, retired 2003) arrived at Judge O'Neill's courtroom that morning to assist.

189. At the time of her arrival Schwaigert testified that Judge O'Neill was upset and angry. Schwaigert tried to whisper to McCoy to sort out what was happening and Judge O'Neill yelled at them, slamming files down on the bench. (Transcript Vol. XII—91–92) Judge O'Neill was starting a trial and the defendant, Ricky Carrington, was not dressed in street clothes. According to a policy adopted with the Common Pleas Court Judges a month earlier, (Exhibit 473) the deputies had a record from the jail that Carrington had refused to dress. (Exhibit 471 p. 8) McCoy tried to tell Judge O'Neill that Carrington had refused to dress out at the jail. According to Schwaigert, Judge O'Neill again yelled in a loud voice at McCoy, whipped around in her chair, pulled open a file drawer to get a copy of memo from the month before and ordered her bailiff to make copies for the deputies. Judge O'Neill stated that she wanted someone reprimanded about this incident. (Transcript Vol. XII—97–98) (Exhibit 471 p. 8, U p. 2) McCoy then called for her supervisor, Lieutenant Michael Herrell (22 years sheriff, now a Major, Lieutenant in charge of Court Services in 1999). Herrell arrived and investigated, obtained the "refuse to dress" record from their office

and gave a copy to Judge O'Neill's bailiff. (Exhibit W p. 3) Sgt. Charles Austin testified that he arrived at the courtroom and found that "Deputy McCoy was still upset so I relieved her and stayed in the courtroom" (Transcript Vol. XII—165)(Exhibit X). McCoy, Schwaigert, Herrell and Austin all wrote up incident reports reporting these events. (Exhibits U, V, W X)

190. Herrell concluded in his report that policy was followed by the deputies and staff involved. (Exhibit W p. 3) No reprimands were issued. Herrell has never had an incident with a judge he had to write up in this way. (Transcript Vol. XII—155)

191. Judge O'Neill testified that she did not yell and did not behave in an unprofessional manner with the deputies or attorneys that morning. She testified she was upset that Carrington was not dressed and did not learn until 'substantially later' why he was not dressed. She did not demand that someone be reprimanded. (Transcript Vol. XVI—185–188) In her Answer at ¶ 451 she plead that "Sgt Austin has indicated to me that the events as alleged are inaccurate and if he relieved Deputy McCoy it was for a break as is customary." Judge O'Neill testified she "specifically recalled talking to Austin either later that day, the next day or shortly thereafter where he indicated to me exactly what I had alleged in my response." (Transcript Vol. XVI—191) As to the statements attributed to him in the Answer, Sgt Austin testified that "I don't think I said anything in that verbiage like that . . . . there's a chance I might have said something like don't worry about it . . ." (Transcript Vol. XII—165)

192. *NOVEMBER 30, 1999*: Testimony taken from Denise Schwaigert (Transcript Vol. XII—101–122), Judge O'Neill (Transcript Vol. XVI—193–197)

193. On November 30, 1999, Schwaigert was assigned to Judge O'Neill's courtroom. Jury selection in a criminal trial was going on. Schwaigert had observed the defendant's interaction with Judge O'Neill as getting hostile. The defendant kept talking over Judge O'Neill. An attorney from an earlier plea walked up rapidly and asked as he passed Schwaigert if he could enter the lockup. Schwaigert nodded "yes" and from bench Judge O'Neill shook her head "no." Schwaigert recognized that she should not have allowed this and arranged for the attorney to leave the lockup through the adjoining courtroom. Judge O'Neill had her bailiff go over to remind Schwaigert that no one is to go into the lockup when a jury was present.

194. When break in the trial was taken, Judge O'Neill came off the bench as Schwaigert had the defendant unrestrained walking back to the lockup. Judge O'Neill walked toward Schwaigert with the defendant between them. The defendant was within arms length of Judge O'Neill with Schwaigert behind him. Judge O'Neill yelled at Schwaigert about allowing the attorney into lockup while the jury was present. Schwaigert was shocked and alarmed, as Judge O'Neill

had compromised Schwaigert and her ability to control the defendant for the purpose of yelling at her about the earlier incident. The defendant was free and unrestrained and he was a defendant who had just had words with the judge. Schwaigert pushed the defendant through the door to lockup as quickly as she could as Judge O'Neill continued to walk toward her and yell her comments. She was embarrassed by Judge O'Neill yelling at her and she felt like a kid in school but she was far more concerned that Judge O'Neill had compromised courtroom security by her actions. (Transcript Vol. XII—101–122) Schwaigert waited several days but made an incident report expressing her security concerns. (Exhibit Y)

195. Judge O'Neill testified that she was not upset with Schwaigert but was upset with the attorney. She did not yell or say that Schwaigert was rude to her. She was never in the immediate vicinity of the defendant and had no reason to be concerned that the defendant was angry with her—he was angry with his attorney. (Transcript Vol. XVI—193–194)

196. James A. Karnes (sheriff of Franklin County since 1992) testified that their department policy regarding inmates brought to court is that they are brought in jail clothes unless there is a request to dress them for trial. He was aware of no standard policy regarding attorneys being allowed in a courtroom lockup during a trial. He became involved in problems between his deputies and Common Pleas Court judges only if their immediate supervisors couldn't handle the problems. He was personally unaware of any issues between deputies and Judge O'Neill (Transcript Vol. XVII—40–46).

197. *ZAZWORSKY V. PETRELLA*: Testimony taken from Mary Jane McFadden (defense attorney)(Transcript Vol. XIII—85–175), Robert Cohen (plaintiff's counsel)(Transcript Vol. 177–216), Mary Jane Martin (prosecutor)(Transcript Vol. 217–229), Judge O'Neill (Transcript Vol. XVI—212–224, XVII—175–177) (Exhibits 474–497)

198. This was a civil case which involved a reverse stock split relating to the buyout of a bank. It presented issues regarding Delaware law and conflicts of law and battling expert testimony relating to the valuation of bank stock. At the time of the scheduled trial date before Judge O'Neill on December 14, 1998 counsel testified there were three Motions in Limine pending. (Transcript Vol. XIII—100)

199. On Monday morning December 14, 1998, counsel checked in at Judge O'Neill's courtroom and were told that the case would be heard by Visiting Judge Paul Martin. Judge Martin was a retired judge, having served 22 years on the Franklin County Common Pleas Court.

200.  Counsel met with Judge Martin who reviewed the court's case file with the parties.  Judge Martin declined to hear the trial and advised them to go back to Judge O'Neill.  The reasons he stated were pending undecided Motions in Limine, the estimated length of case (counsel predicted 2 weeks) given Judge Martin's limited availability for only that week due to a previously scheduled vacation and his lack of resources such as access to staff attorney or law library to address the out of state legal issues presented.  (Transcript Vol. XIII—107–108) Parties and counsel returned to Judge O'Neill courtroom and met with Judge O'Neill and advised her of Judge Martin's position and reasons.  Judge O'Neill ordered them to go back to Judge Martin and deliver the message that he had to hear the case.  McFadden delivered the message and Judge Martin declined to hear the trial again.  (Transcript Vol. XIII—112–114)

201.  The parties returned once more to Judge O'Neill.  Judge O'Neill was angry, placed a call to Judge Cain, spoke to both attorneys and then had them take places in her courtroom.  Judge O'Neill made a record of the events of the morning.  She stated that all the motions were ruled on, that after checking with Judge Cain she was told that Judge Martin did not have vacation until the following Wednesday and that the parties assured her trial would be complete by Friday, and asserted that even if Judge Martin was leaving Friday that "what we routinely do in the court because we are busy" is to break the trial over the holidays and come back in February to complete the trial.  She went on to state that Judge Martin refused to accept case because "he did not feel qualified or competent to handle a case of this magnitude."  She related that she had spoken to Judge Cain and that "I'm going to move that he (Judge Martin) be terminated from the visiting judge program for refusing to take the case that he does not have authority to refuse to take."  (Exhibit 478 pp.  4–5) Judge O'Neill testified at hearing that all motions "filed in accordance with the pretrial order" had been ruled on by the morning of trial.  She admitted that there was no entry filed, however, she recalled she and her staff attorney working on them and printing them off when all of "the confusion" occurred as to whether the case was going to be heard or be continued.  (Transcript Vol. XVI—214–215).

202.  McFadden and Cohen described Judge O'Neill's demeanor while she made these statements as harsh and angry.  Judge Martin's daughter, Mary Jane Martin was sitting in the "very crowded" courtroom waiting for a criminal case she was assigned as an assistant county prosecutor.  Mary Jane Martin described Judge O'Neill's tone as castigating and chastising and when Judge O'Neill stated the reason that her father had refused the case her tone changed to "pitying this poor, old, doddering fool who is not competent."  (Transcript Vol. XIII—221–223).  Mary Jane Martin got up and left the courtroom, and asked a colleague to handle her case before Judge O'Neill that day because she "was

going to say something and I didn't think that prudent in my professional career." (Transcript Vol. XIII—223)

203. **STATE V. CRIBB**: Testimony taken from Marielle Dimitrew (victim assistant)(Transcript Vol. XII—175–207) David Zeyen (prosecutor)(Transcript Vol. XII—207–238), Judge O'Neill (Transcript Vol. XVI—197–212, XVII—126–128) (Exhibits 498–504) (Relator's Exhibit AA)

204. Andre Cribb was indicted on multiple counts of attempted murder, felonious assault and abduction. His victims were a mother, Leslie Seals and her daughter, Laura Seals. Cribb was the boyfriend of the daughter. Cribb beat the daughter and mother in one incident. Leslie Seals had clumps of her hair torn out then Cribb broke a toilet top over her head and cut her neck with shards of broken porcelain.

205. Leslie Seals was present for the trial accompanied by a victim assistant, Marielle Dimitrew (Franklin County prosecutor's office, victim witness assistant since 1999, M.S. in Social Work) as well as her daughter Laura Seals and her (new) boyfriend. On the morning of trial David Zeyen, the assigned prosecutor (admitted 1997, Franklin County prosecutor since 1997) offered a plea to Cribb and discussed it with Seals and Dimitrew. (Transcript Vol. XII—196–197, 211–212)

206. Leslie and Laura Seals and the boyfriend were sitting in the courtroom waiting for the plea to occur. Dimitrew sat directly behind them in the courtroom for 10 to 15 minutes. Dimitrew saw them whisper to each other but could not hear what they said. As Zeyen stood up to begin to read the plea, Judge O'Neill, on the bench, screamed in an angry, explosive voice that there is no talking in her courtroom and that they are to leave. Zeyen turned and saw the boyfriend leaning over covering his mouth to whisper and realized "they" were the Seals party. Zeyen and Dimitrew quietly walked out of the courtroom with the Seals party to the witness conference room. (Transcript Vol. XII—180–185, 212–215)

207. Zeyen returned to the courtroom with Leslie, asking the daughter and boyfriend to wait in the conference room. He believed that Judge O'Neill was yelling at the boyfriend and that Leslie, as the victim had the right to be present.

208. The plea transcript (Ex. 498) reflected that as the plea began Judge O'Neill stated, "I said out of the courtroom" and Zeyen said, "Judge, this is the victim". At sidebar, Judge O'Neill told Zeyen "I don't blame you but there was an incident earlier and I ordered them out of the courtroom." Zeyen asked that the victim be allowed to be present and Judge O'Neill refused. (Transcript Vol. XII—220) Zeyen completed the plea without Leslie Seals' presence. (Transcript Vol. XII—224) Zeyen wrote on his case file that day "Judge O'Neill screamed at

victim for 'talking' in courtroom and wouldn't allow her in courtroom for plea." (Exhibit AA)

209. When Zeyen returned to the conference room he described Leslie Seals as "completely broken down." Dimitrew and Zeyen arranged and transported Laura Seals for emergency consultation at Healthnet, a local mental health facility. Laura Seals did not appear at the subsequent sentencing of Cribb. Neither Zeyen nor Dimitrew had ever observed a crime victim treated in this fashion in a courtroom, nor had they ever had to arrange mental health treatment for a victim after a court appearance. (Transcript Vol. 191–193, 203, 221–224)

210. Judge O'Neill testified that over the course of the morning between 9:00 am and 11:00 am when Zeyen and Dimitrew were not in the courtroom she had to ask for quiet repeatedly. She believed she had asked the Seals party to leave more than once. She denied that she ever yelled or screamed. (Transcript Vol. XVI—202–203) In her Answer she plead at ¶ 479 that "the victim at one point did re-enter the courtroom and was present for the plea." At hearing she testified that Seals was not present for the entire plea colloquy. (Transcript Vol. XVI—204–207)

211. **HUDSON/JASON YOUNGER**: Testimony taken from Jason Younger (probation officer)(Transcript Vol. XII—238–269), Scot Weisman (defense attorney)(Transcript Vol. VII–212–246), Jessica Flaherty (Transcript Vol. XIII—6–43), Sandra Hicks, (Transcript Vol. XIII—43–65) Dane Chavers (Transcript Vol. XIII—65–84), Judge O'Neill (Transcript Vol. XVI—225–236, XVII—125–126) (Exhibits 459–470), (Relator's Exhibit R)

212. On January 31, 2000 Jason Younger (Franklin County Probation Officer since 1994, BA in Criminal Justice, working on a master's degree) appeared at a probation revocation hearing for Hudson. At the hearing Hudson was represented by Scot Weisman. (Exhibit 460).

213. Judge O'Neill revoked Hudson's probation and ordered him to serve his one-year sentence less 199 days of jail time credit. Weisman appealed Hudson's revocation. In December of 2000 the Tenth District Court of Appeals reversed the revocation and remanded the case for further proceedings. (Exhibit 459) At that point Hudson had served 517 days of jail time credit, in excess of his original sentence. (Transcript Vol. XII—243–244)

214. The case was set for a miscellaneous hearing before Judge O'Neill on December 15, 2000. Younger and Weisman had a discussion with Judge O'Neill at sidebar. Weisman, with Younger's consent, explained that Hudson had surpassed his jail time credit and asked for a dismissal. Younger testified that Judge O'Neill stated that this was another example of the probation department 'cowering down' to the public defender and she wanted to make a record.

(Transcript Vol. XII—244). Judge O'Neill asked if Younger had more evidence and witnesses to present relating to the grounds for revocation. Younger said that nothing had changed since the previous revocation hearing in January and he had no new witnesses. Judge O'Neill then suggested to Younger, "If you have no new evidence then you should just withdraw the statement of violations." Younger "had a strong feeling that I should do this" and "that I had to make a decision right there." (Transcript Vol. XII—249-250, 265)

215. In the transcript of the record Judge O'Neill stated "It's my understanding the Probation Department is caving into the Public Defender's office as usual, Jason. So, you're going to withdraw your request for revocation and we're going to release this guy for time served; is that right?" Younger agrees and Judge O'Neill continued: "I'll make sure that your supervisor knows about this one as well. This is adding to the growing list of cases in which—never mind." (Exhibit 460 p. 2) Younger testified that Judge O'Neill appeared flustered and upset and that he was embarrassed by her statements. (Transcript Vol. XII—248) Younger testified that he was unaware of any list of cases or problems with his work for Judge O'Neill. Dane Chavers (admitted 1981, Franklin County Public Defender's office) was in the courtroom at the time and described Judge O'Neill's demeanor as disrespectful and unprofessional.

216. Jessica Flaherty and Sandra Hicks were summoned to Judge O'Neill office that afternoon, Hicks was the 9th floor supervisor and Flaherty was Younger's direct supervisor. Both testified that Judge O'Neill closed the door to her office and said: "this will not be pleasant." Judge O'Neill expressed in an upset and loud tone that she was angry about Jason Younger "cowering down" to the public defender's office. She told them both unequivocally that she wanted Jason terminated from the probation department and that he was barred from her courtroom. There was no discussion or back and forth. (Transcript Vol. XIII—9-12, 17, 51-52, 61-62) Flaherty felt as if they were being disciplined as if they were children. (Transcript Vol. XIII—27-28) When Judge O'Neill was done they just got up and left. (Transcript Vol. XIII—48-50). Flaherty prepared a report of the meeting as an incident expressing concern about the unprofessional way that Judge O'Neill conducted the meeting and their lack of participation or input to resolve any issue. (Relator's Exhibit R) Department policy about supervisory approval to withdraw a Statement of Violations was not discussed with Judge O'Neill. (Transcript Vol. XIII—19, 33)(Relator's Exhibit R)

217. Hicks and Flaherty discussed this matter with Younger but he was not suspended or terminated. He was orally reminded of department policy to get a supervisor's approval before withdrawing a statement of violations on a probationer. Hicks felt Younger had appropriately exercised his discretion and did nothing wrong. (Transcript Vol. XII—263, XIII—16, 50-51)

218.    In the Answer, Judge O'Neill plead at ¶ 492 that Wesiman and Younger had a conversation before they went on the record but ". . . she was not aware of the substance of the conversation.  Had Mr. Weisman or Mr. Younger asked to approach the bench to discuss the proposed resolution before the case was called, this matter would not have occurred."  In ¶ 493 she plead" After review of the one page transcript she recalls that Mr. Younger surprised and embarrassed the Court with his request to withdraw the Statement of Violations, without prior consultation and direction from the Court."

219.    At ¶ 498 of the Answer Judge O'Neill plead "She additionally denies that she told them (Hicks and Flaherty) that he needed to be terminated or suspended because he withdrew a statement of violations on Hudson and "cowers down" to public defenders.  She averred it is possible that she requested that he no longer be assigned to her caseload because of several instances that reflected poorly on his performance and work ethic."

220.    At this hearing Judge O'Neill testified regarding the sidebar conference: "Q. But you did have a side bar conference and there was a discussion off the record about the withdrawal of the violation?  A. Right.  I recall them telling to me, Mr. Weisman starting it off with, I believe Mr. Younger wants to inform the court that he's going to withdrawn the request to revoke or statement of violations, something, and then there was a side bar discussion.  We had a discussion as to whether they were able to proceed, was he able to proceed with his evidence, did he have his witnesses available, that kind of thing and then we went on the record and—and resolved the case."  (Transcript Vol. XVI—226) "Did you say to that them at that time "if you have nothing more than what was presented at the first hearing, then you should just withdraw the statement of violations"?  A. Yeah. Certainly.  He said to me, "I don't have my witnesses, Judge".  And I said, "Well, then, what are we going to do?  You're going withdraw the statement of violations".  (Transcript Vol. XVI—234) "Q. And you also denied in that Answer that you told them that he (Younger) needed to be terminated or suspended?  A. I indicated to them that I felt that he needed to be disciplined for it because he clearly violated the rules.  The rules are that he should not have withdrawn a statement of violations without express approval of his supervisor and, at the very least, should have at least brought it to my attention."  (Transcript Vol. XVI—228)

221.    *RUDENESS TO STAFF*:

222.    *Elizabeth Peterman*: After 20 years as a private legal secretary, Libby Peterman became the secretary for Judges Johnson and O'Neill in January 1994 and Peterman became Judge O'Neill's bailiff in July 1995.

223.    Describing the general atmosphere of the courtroom Peterman testified: "I mean, she could come in and say good morning and five minutes later she

would come out and she would just be all over you. You never knew what to expect. And so, consequently, not only myself, but the other staff members were on edge all of the time, all the time she was there because you didn't know what was going to come next." (Transcript Vol. XIII—252)

224. In December 1996 Peterman had an uncontrollable nosebleed at work and was taken to the emergency room by Judge O'Neill's secretary Karen Tomacelli. She was released after medication to control high blood pressure. She called and told Judge O'Neill what had happened and spent the rest of the week at home.

225. In 1997 Peterman decided to resign. She testified it was a hard decision because she loved the job but hated the atmosphere. She submitted a letter of resignation dated March 25, 1997. (Exhibit 505) Peterman had interviewed but had no offers when she turned in her resignation. Her last day was April 4, 1997. On that day in the late morning, the new bailiff, Karen Moore arrived. Peterman showed her where everything was kept and the pad on which all courtroom procedures were written for use by float bailiffs. Peterman then took lunch expecting Moore would be present in the afternoon but she never returned. She received one phone call at home from Karen Moore with a question Peterman answered. (Transcript Vol. XIII—268–270)

226. Peterman had interviewed with Judge Nodine Miller after she had submitted her resignation to Judge O'Neill. She was offered the position with Judge Miller while at home after her last day with Judge O'Neill. (Transcript Vol. XIII—270–271) Peterman began work as Judge Miller's bailiff on April 14, 1997 and remains in that position at present.

227. Peterman received from Joan Richards a copy of a letter dated April 14, 1997 that Judge O'Neill requested be put in Peterman's personnel file. Peterman testified the letter is incorrect when it stated that Peterman refused to train the new bailiff or provide transition materials. Peterman also testified that the accusation made that Peterman tried to take court property or court manuals is false. (Transcript Vol. XIII—265–270)

228. **Dorothy Gass:** Gass worked as Judge O'Neill's staff attorney from May 1996 until September 1997. Near Gass' one-year anniversary in the position Judge O'Neill told Gass that while the staff attorney position usually lasted one year, Judge O'Neill was happy with Gass and she could continue for another year.

229. In August of 1997 Gass was approached by an attorney who told her she had interviewed with Judge O'Neill for Gass' position. (Transcript Vol. XIII—300–302) Gass then asked Judge O'Neill what was happening. Judge O'Neill told her that she was just checking out the applicant pool in anticipation of being in a re-election campaign when Gass would be leaving. A month later, September 16,

1997, Gass got a letter from Judge O'Neill stating that Gass' replacement had been hired effective October 14, 1997 and stating that Judge O'Neill had told her in May 1997 she should start looking for another position. (Exhibit 508) Gass was very upset and after consulting with Joan Richards, who was deputy court administrator, she wrote a response to Judge O'Neill detailing the inaccuracies in Judge O'Neill's letter. (Exhibit 509)

230. Gass found a new job, requiring that she start right away. She told Judge O'Neill but offered to stay as long as Judge O'Neill needed her. Judge O'Neill said that it was fine if Gass left the following Monday. Judge O'Neill later told Gass that the new attorney could start earlier and Gass could leave that Thursday, September 26, 1997. Gass drafted a letter of resignation for the day she left. (Exhibit 512) After Gass left she learned from Joan Richards that Judge O'Neill had put a memo in her personnel file on the day they agreed about her departure which stated that "she quit without sufficient notice" which was "wholly insufficient and unprofessional." The memo concluded that Gass had been warned, "to take only her personal property and nothing else." (Exhibit 511) Gass found the memo contradicted the arrangements which Judge O'Neill herself had proposed. Gass was not surprised by the memo finding it in keeping with her assessment of Judge O'Neill's character and testified that "she believes that every—believes the worst in everybody, but I think it's just a reflection of herself." (Transcript Vol. XIII—310–313)

231. **Wanda Karn**: In October 1999 Karn was a "float bailiff" with the Franklin County Common Pleas Court. She had worked at the Court since 1991 beginning in the assignment office and had been a float bailiff since 1995. Float bailiffs provide temporary coverage in all the courtrooms.

232. Beginning Monday, October 18, 1999 Karn started working a week for Judge O'Neill while her regular bailiff was on vacation. Judge O'Neill was the duty judge that week. Around 3:00 pm a woman from the prosecutor's office brought over a man with a civil protection stalking order. (Exhibit QQ) Karn received the pleadings and informed Judge O'Neill and asked what she would like to do. Judge O'Neill replied, "I don't have to do that now. I have ten days." (Transcript Vol. XIV—19–20). Karn stated that she thought that they had ten days to get it to a magistrate after the judge granted the CPO. Judge O'Neill became very angry, challenged Karn that she was telling her how to do her job and screaming that she knew how to do her job, had done several in the past and 'didn't need me telling her what to do'. With those statements, Judge O'Neill returned to her office and shut the door. (Transcript Vol. XIV—19–20)

233. Karn then took the petitioner with her to the prosecutor's office to check her understanding of the timing of the process. Karn was told and given memos that the judge must hear the petition ex-parte within 24 hours. Karn returned to

Judge O'Neill, asking the petitioner to wait in the courtroom. Karn attempted to tell Judge O'Neill what she had learned about the CPO timing or give her the memo. She testified that Judge O'Neill reacted "very angry that I was trying to tell her how to do her job or trying to help her at all and really pretty much was throwing a huge fit." There was no discussion about what would happen to the petitioner; Judge O'Neill returned to her office and slammed the door. (Transcript Vol. XIV—24–25) Karn returned to the courtroom and told the petitioner to hold on that she was working on things. She returned to the bailiff's office to think about what else to do and next heard Judge O'Neill from the bench asking 'where is a court reporter?' As the court reporter arrived Judge O'Neill stated to Karn "and you can get out of here." (Transcript Vol. XIV—27–29)

234. Karn called Joan Richards her supervisor to come to the courtroom. When Richards arrived Judge O'Neill stopped the CPO hearing and demanded to speak with Richards without Karn's presence. Judge O'Neill took Richards into her office and slammed the door in Karn's face. Karn stood outside the office as she told Judge O'Neill she would and heard some of Judge O'Neill's statements: that Karn did not work all day, was rude and insubordinate and refused to do what she was asked. Karn challenged Judge O'Neill about these lies when she and Richards left the office. Richards asked that Karn get her things and accompany her to see the Administrative Judge. (Transcript Vol. XIV—32–33). Karn and Richards met with Judge Cain and Judge Cain told Karn that she would not have to work in that courtroom again. That evening Karn wrote a memo to Judge Cain, which recorded the events of the day. (Exhibit PP)

235. Joan Richards, Director of Court Services and Karn's supervisor testified to being called by Karn in October 1999 to come to Judge O'Neill's courtroom. She stated that Judge O'Neill came off the bench shouting and wanted to speak to her alone without Karn's presence. When Karn tried to join them Judge O'Neill slammed the door in her face. Judge O'Neill screamed and shouted that Karn doesn't tell the judge what to do and no one tells the judge what to do. Judge O'Neill wanted Karn out of there and complained that Karn was lazy and wasn't doing work. When Richards tried to say something, Judge O'Neill shouted over her. Richards told Karn to get her things because she didn't think it right that employees be abused like that. (Transcript Vol. XV—78–80) Richards testified that Karn was an excellent employee, "someone you wish all your employees would be like. She was always willing to help out." (Transcript Vol. XV—81–82)

236. In her Answer, Judge O'Neill plead that she did not know about the CPO until 3:50 pm (¶ 543). Karn testified that the motion was at the courtroom by 3:00 pm. In ¶ 546 Judge O'Neill plead that Karn refused to ask the petitioner if he could return for hearing the following morning and that "it is insubordination

for a float bailiff with a history of disrespect towards her to go over her head in an effort to embarrass Judge O'Neill in the presence of the petitioner and court personnel." Karn testified she was never told to ask the petitioner for another hearing date, she was totally unaware of any history with Judge O'Neill and none of her conversations with Judge O'Neill took place in front of the petitioner. ¶ 546 also stated "She (Karn) created a scene by melodramatically claiming in the petitioner's presence, 'He needs you." Karn testified that this was 'absolutely ludicrous' because she never said anything like that and never spoke to the petitioner in Judge O'Neill's presence. (Transcript Vol. XIV—40–42)

237. *Pam Boughner*: Boughner had been employed by the Franklin County Common Pleas Court since 1985. She became a float bailiff in 1991. She had served in Judge O'Neill's courtroom numerous times and she trained four of Judge O'Neill's bailiffs.

238. According to Boughner, Judge O'Neill was exceptionally difficult to work with and "she demands respect, yet she doesn't give respect to people. She's rude. She's controlling. It's always, always about her and her agenda." Boughner described Judge O'Neill as changing rapidly. She can be "semi-tolerable at one point and the next minute she's seemingly out of control and you may or may not know why she feels that way or why she's doing that." (Transcript Vol. XIV—90–93)

239. Boughner had spoken about her concerns in working with Judge O'Neill to Joan Richards. When she heard in October 1999 that Karn did not have to cover that courtroom she considered making the same request but decided against it because that would leave Karen Moore, Judge O'Neill's regular bailiff, with no coverage. Six months later in March 2000, after seeing more instances of "forcing people to dismiss cases or intimidating them or trying to intimidate them into taking plea offers" Boughner asked to be relieved from Judge O'Neill's courtroom in a general letter to Judge Cain. (Transcript Vol. XIV—97–101)(Exhibit 516)

240. Boughner discussed her request with Judge Cain. Boughner was asked to prepare a more detailed request. She submitted the letter and Judge Cain told her she was relieved of duty with Judge O'Neill. (Transcript Vol. XIV—104–106)(Exhibit 517)

241. In October 2000 Judge Cain informed Boughner that she would be re-assigned to Judge O'Neill's courtroom. Boughner talked with Judge O'Neill about the concerns she had including mutual respect and returned to work as a float bailiff. In October 2001 Boughner discovered that Judge O'Neill had memoranda placed in her personnel file criticizing and inaccurately reporting her performance while serving as a float bailiff. (Exhibits 519 and 520)

242. *Sandy Grego*: Sandy Grego accepted a position as Judge O'Neill's court reporter in 1996. At that time Peterman was Judge O'Neill's bailiff. Grego testified that Judge O'Neill's treatment of Peterman was deplorable including screaming and yelling.

243. Grego testified between 1996 and 2000 she developed physical problems she attributed to the stress of working for hours with five-minute or no breaks under Judge O'Neill. In January 1999 she began keeping a private diary about her working conditions. The diary recorded an incident in 1999 in which Grego asked for a break to use the restroom and Judge O'Neill argued with her about it in front of the jury: "I was embarrassed. I felt like I was five years old asking for permission to have a hall pass." (Transcript Vol. XIV—187–188)

244. After unsuccessfully trying to resolve break and lunch issues with Judge O'Neill, Grego consulted with Joan Richards about her problems, especially having to work extended periods without a break. Richards told her that there was nothing further she could do and Grego went to Judge Cain as the Administrative Judge. In December, 1999, Grego submitted a letter to Judge Cain from her doctors which requested that she be given regular breaks and lunch times (Relator's Exhibit HH). Judge Cain sent a memo to Judge O'Neill regarding this letter and requesting that Grego be given the breaks recommended by her doctor. Judge O'Neill responded to Judge Cain in a memo which stated "Sandy has never been denied a lunch break or regular breaks during trials, pleas and hearings." The memo went on to assert that Grego was insubordinate, had a poor attitude, regularly took 2 hour lunches, enjoyed a minimal schedule of work and that she made the most money of any reporter because of her longevity and the high volume of transcript orders. (Relator's Exhibit O) Grego testified that all of these statements were inaccurate and that it was Judge O'Neill's habit of making inaccurate statements that caused Grego to begin keeping a diary in the first place. After these memos there was no change in Judge O'Neill's practices in regard to breaks or lunch. Grego testified to multiple incidents involving lack of breaks or lunch recorded in her diary (Transcript Vol. XIV—193–212)

245. Judge O'Neill testified that Grego's attitude and behavior began to deteriorate in August or September 1998 when Grego had a falling out with the bailiff Moore over opinions on raising children. After that things were very tense and Grego would not participate in lunches, birthdays and other celebrations. Judge O'Neill did not investigate Grego's medical concerns after the first doctor's letter but after that whenever Grego wanted a break, she got a break. (Transcript Vol. XVI—244–252)

246. In June, 2000, Grego submitted a second letter from her doctor stating there had been no improvement in her condition and again requesting 15 minute

breaks and lunch and suggesting she should seek another position in the Court if these requests cannot be met. (Relator's Exhibit II) Judge Cain sent another memo to Judge O'Neill, describing the doctor's letter and informing Judge O'Neill that effective July 10, 2000 her courtroom would be covered by float court reporters and Grego was thus relieved of her assignment with Judge O'Neill. Grego received a voicemail message from Judge O'Neill that she recorded and was played at the hearing and transcribed in the record. Judge O'Neill's tone was curt and nasty and she stated in part: "you have again gone behind my back"; "how am I supposed to be a mind-reader that you need a break every five minutes?"; "I expect you to have your office cleared out by Friday, otherwise I'll have maintenance clear it out." (Transcript Vol. XIV—215–216)

247. After consulting with Karen Casey, the Court Director, Grego learned that her furniture could not be moved until a week later. On that Friday, Grego removed her personal items and what she could carry then turned her key into Karen Casey, Court Administrator per court policy the next day she was at work, Tuesday July 10. Grego never returned to the office in Courtroom 9A.

248. Grego testified that in 27 years as court reporter she had worked for virtually every judge in Franklin County. She had never been treated like that by any judge, had never seen staff, counsel and litigants treated by any judge like that. Judge O'Neill was not accessible, and she ran her criminal docket only concerned about having the lowest numbers. "It's like a different world." (Transcript Vol. XIV—223–226)

249. *Sheryl Nyce*: Nyce has 34 years experience as a court reporter and has been with the Franklin County Common Pleas Court since 1977. She became Judge O'Neill's reporter in the summer of 2000. Before beginning to work for Judge O'Neill, Nyce met with Judge O'Neill and Karen Casey, the Court Director. Nyce stated three concerns: her longstanding commitment teaching court reporting school 3 evenings a week which required her to leave at 5:00 pm; her known medical issues that could require her to take sick leave; and her five weeks of vacation that Nyce did take every year. Judge O'Neill stated at the meeting that none of those situations would be a problem and Nyce began working in Judge O'Neill's courtroom (Transcript Vol. XIV—243–250).

250. Within weeks of starting with Judge O'Neill on a day she had a class to teach, Judge O'Neill assured Nyce at an afternoon break that trial would not last until 5:00 pm. Nyce did not arrange for float coverage. The afternoon break lasted an hour because of Judge O'Neill's extended conversation in Nyce's presence about a shopping trip. At 5:00 pm Judge O'Neill instructed the defense to call their next witness. Nyce approached the bench and stated directly to Judge O'Neill that Nyce had a teaching commitment. Judge O'Neill ignored Nyce and Nyce sat down and took the witness which lasted 10 minutes. Judge

O'Neill again asked for the next witness and Nyce stood up and said, "I cannot stay. I have to go." Judge O'Neill only looked at Nyce, "It was kind of like a stand-off at that time." The defense then rested and Judge O'Neill asked them "Well, what about that last witness? I thought you had one more witness?" and the defense again rested. The next morning Nyce saw Karen Casey and wanted to tell her what happened the previous afternoon. Casey told her that Judge O'Neill had already called asking that Nyce be reprimanded because Nyce had walked out on her in trial the previous afternoon. (Transcript Vol. XIV—250–257)

251. Judge O'Neill testified that she likes Nyce personally and she is a team player but there are problems with her timeliness. (Transcript Vol. XVI—251, 258)

252. Nyce testified to an incident in 2003 with Myron Shwartz in which Judge O'Neill had to go home and asked if Shwartz could do his client's plea tomorrow. Shwartz agreed and with the other lawyer picked a time. After Shwartz left Judge O'Neill had Shwartz's client brought out and on the record told the client that Mr. Shwartz had left and it was his idea to do the plea tomorrow. Nyce now keeps notes on her docket sheets regarding off the record agreements and conversations "because there's always so much controversy in that courtroom ... to have a second pair of eyes and ears paying attention to what's been said between the court and the attorneys." (Transcript Vol. XV—15–19) Nyce testified that during pleas and sentencing Judge O'Neill doesn't look at a defendant or give them the respect and attention she had seen given by every other judge she worked with in the past. Nyce observed that Judge O'Neill yelled at her bailiff, Karen Moore all the time and is continually unpleasant. Nyce testified that her blood pressure medication has been doubled in the last six months and she attributed it to the stress of her position with Judge O'Neill. (Transcript Vol. XV—20–23)

253. *Jennifer Goodman*: Goodman is the Finance and Purchasing Director of Franklin County Common Pleas Court since 1995. The Court had a three-year plan to replace all the judges' furniture which Goodman directed. Goodman testified that all the judges except Judge O'Neill were cooperative with and appreciative of the program. The judges were afforded a certain range of choices within a furniture line which had been selected for the whole court. On December 13, 2000 Goodman and a vendor representative met with Judge O'Neill to discuss her choices. Goodman testified that Judge O'Neill had many complaints and used an angry tone throughout the meeting. Judge O'Neill asked why she was always the last judge to get anything and was upset that she could not keep or match her existing furniture. Goodman brought Judge O'Neill to the fourth floor and Goodman's office to look at other samples and options. Judge

O'Neill stated that she wanted the side chairs in Goodman's office (which were 30 years old) or something similar. When Goodman concluded the meeting with promises to try to talk to Casey and the administrative judge about making special provisions for her but Judge O'Neill was still "very upset." (Transcript Vol. XV—39–50)

254. Goodman reported on her meeting with Judge O'Neill to Karen Casey as she had after every meeting with a judge. Goodman conveyed Judge O'Neill's dissatisfaction and relayed the special provisions she wanted. Goodman and Judge O'Neill exchanged several voicemails and on December 20 had a conversation in which Judge O'Neill remained very upset about her choices and asked to have Goodman's furniture. Goodman agreed but Judge O'Neill only became more upset and demanded that Goodman come to her chambers immediately with a catalog. Goodman did not report to chambers but consulted with Casey. She was advised not to go to Judge O'Neill's courtroom. After those conversations Judge Cain sent Judge O'Neill a memo explaining that all judges have a limited choice and if those choices are not satisfactory to advise Judge Cain and furniture will not be ordered. (Transcript Vol. XV–52–55)(Exhibit 526)

255. Goodman received a subsequent voicemail from Judge O'Neill which began very upset and accusing Goodman of going over her head and then ended by asking to meet after the first of the year to work things out. The meeting was scheduled for January 10, 2001. Goodman attended the meeting accompanied by Judge Michael Watson who was the new Administrative Judge. Goodman testified Judge O'Neill's demeanor was completely different and there seemed to be no problems whatsoever. When Goodman finished her business she left and Judge Watson stayed to talk to Judge O'Neill (Transcript Vol. XV—52–57).

256. **Joan Richards**: Richards retired in 2002 after 30 years with Franklin County Common Pleas Court. She was Director of Court Services who supervised float bailiffs, court reporters, float court reporters, secretaries, grand jury, visiting judges, arbitration and jury commissioners. As Director of Court Services she received complaints from Judge O'Neill about Karn, Boughner, Nyce and Grego and Moore. Richards sent a memo to Karen Casey in January 2001 detailing all of Judge O'Neill's complaints about Judge O'Neill's court reporter, Nyce. (Relator's Exhibit OO) Richards testified that in her experience with past incidents that what Judge O'Neill said was not really accurate. Richards had concerns about the potential of a hostile work environment in connection with Judge O'Neill's courtroom. In six years as Director of Court Services Richards did not have the same or similar issues arise with court reporters or bailiffs in any courtroom except Judge O'Neill's. Richards did not discipline or sanction any employee she supervised who was the subject of complaints from Judge O'Neill. (Transcript Vol. XV—79, 82–83, 96–97, 104–105)

257. **Gretchen Roberts**: Roberts has served as Jury Manager, Franklin County Common Pleas Court for eight years. On the morning of July 11, 2001 Judge O'Neill's bailiff called about 10:00 am for a jury. It had been a busy morning, the jury pool was in great demand and all panels had been taken. Judge O'Neill then called Gretchen very upset and demanding to know why didn't she get a jury panel and where had they all gone? Roberts tried to explain the first-come, first served policy but Judge O'Neill wanted to know why visiting judges were included. Roberts tried to explain but was not sure Judge O'Neill was listening to her. Judge O'Neill told Roberts she was not to go anywhere or take a lunch until Judge O'Neill had a jury. Roberts reported to Joan Richards and then to Karen Casey and found Casey on the phone with Judge O'Neill. Roberts reported what happened and Casey advised her to do the best she can.

258. Roberts returned to her office and was called again by Judge O'Neill who was a little calmer asking if anything has changed. By 12:33 pm there was a panel sent up to Judge O'Neill's courtroom.

259. **Karen Casey**: Casey is presently Court Director of the Franklin County Domestic and Juvenile Court. Through September 2003, she served eight years as Court Director of the Franklin County Common Pleas Court and preceding that for four years as its Assistant Court Director. Before coming to the Court she had fifteen years experience in community mental health. Casey holds a nursing degree, law degree and a masters in public administration. Casey was responsible for all non-judicial functions of the Common Pleas Court and supervised approximately 240 employees with another 100 employees under the direct supervision of the judges. She had served with Administrative Judges Johnson, McGrath, Cain, Sheward and Watson.

260. Casey described her working relationship with Judge O'Neill as variable "just the erratic nature of not knowing what to expect in terms of Judge O'Neill's behavior and her expectations of administration." Casey had experienced difficulties working with Judge O'Neill and testified that her behavior relating to employees created problems for the Court. She testified that the Administrative Judges were "very frustrated in knowing how to respond to numerous complaints that were coming in from court employees and knowing how to adequately respond to them." (Transcript Vol. XV—144–145)

261. As a result of her involvement with the situations involving float bailiffs Karn and Boughner and court reporter Sandy Grego and court secretary Elsa Cunbow she was concerned regarding Judge O'Neill's behavior because, "I felt that at some point it had almost reached sort of a hostile environment situation. And I was concerned about what that meant for the court in terms of the court's own liability because so many of—I had had frequent complaints from employees about their interactions with Judge O'Neill." "... it was a very difficult situation

for the administrative judge and maybe the—the court as a whole in trying to work through some of these issues to make sure that coverage is available. The court is very busy and, frankly, this was just one of those problems that kept cropping up that was creating a difficult situation in trying to manage coverage." Casey had never seen the kind of friction which occurred between Judge O'Neill and her staff with any other judge. (Transcript Vol. XV—145, 151, 210–211)

262. Casey testified that it was difficult to communicate her concerns to Judge O'Neill because "too many times it wasn't a dialog." (Transcript Vol. XV—146) Asked about Judge O'Neill's credibility she testified: "Q. Based on your numerous dealings with Judge O'Neill, had you developed some concerns regarding her credibility? A. I had in the sense that I was reluctant to have conversations where it was just me being present or having employees have conversations on their own because oftentimes the information that came back was not exactly as I had remembered it. Q. And you would instruct your employees to have people present when speaking with Judge O'Neill? A. That's correct." . . . "She doesn't exactly have the best track record with me in terms of her veracity because, again, I've experienced situations where one thing is said and then something else is conveyed later on." (Transcript Vol. XV—160)

263. Casey believed that problems with Judge O'Neill were very significant in 2000 to 2001, however, the behavior she spoke about occurred from the time that Judge O'Neill came on the bench. (Transcript Vol. XV—192) ". . . if you look at sort of a time frame of June of 2000 through the end of that year, you see a number of incidents, some of which we've talked about, that occurred. It was rather unsettling because obviously we're all—we're very busy in that court and it seemed as if, you know, it was just another added stress for everybody who had to deal with the outbursts and the issues that seemed to keep cropping up." (Transcript Vol. XV—171)

264. Casey testified regarding a phone call she received from Judge O'Neill on Sunday July 2, 2000 regarding float bailiff coverage. Several months before there had been verbal and memo exchanges with Judge Cain regarding Judge O'Neill's behavior towards the float bailiffs and the current issue was whether there would be coverage for Karen Moore on her July vacation. (Transcript Vol. XV—148) After talking about how unfair it was that Moore would not have coverage for her vacation, Judge O'Neill stated that "even though the courthouse rumor had it that she was prompting Karen to file some sort of legal action, that, in fact, she hadn't—was not. But she went on to say that if, in fact, Karen did file an action and she was talking about filing it in Federal Court, that I would be a named party in that action." Casey took this as "a bit of a threat." (Transcript Vol. XV—148–149)

265. Casey described the phone call as lengthy, nearly an hour and rapid fire and non-stop on Judge O'Neill's part. Casey said no more than a few sentences. Judge O'Neill asked her to call a meeting of the personnel committee and Casey stated she had no authority to do so. Judge O'Neill claimed that the only reason that there was a problem with float bailiff coverage was that Judge Cain was still angry with her for his defeat in the 1992 election. At the end of the call, Judge O'Neill suddenly shifted her demeanor and was very apologetic and sorry that she called at home and ended the call. Casey had experienced this sudden shift before: "She can be very engaging and pleasant and then all of a sudden ..almost within the blink of an eye her personality changes and she can be very angry, very loud." (Transcript Vol. XV—150)

266. In July 2000 Casey approached Sherry Nyce about becoming Judge O'Neill's court reporter. She attended the meeting between Nyce and Judge O'Neill and corroborated Nyce's stated concerns about her teaching, medical problems and vacation and Judge O'Neill's statement that there was no problem with these issues. (Transcript Vol. XV—156) Shortly after Nyce started Casey received a call from Judge O'Neill displeased with Nyce's performance specifically because she had to leave at 5:00 pm and she wanted Nyce disciplined. (Transcript Vol. XV—157–158) Casey was not surprised by these calls. "What I had found particularly predictable is that over time new employees coming in to work for Judge O'Neill, she's always had a very high opinion ... as the months go by, there's a complete change of heart about their capabilities, how they relate to her and just their overall effectiveness. It goes from being very positive to being very negative." (Transcript Vol. XV—159)

267. When Sandy Grego moved out of Judge O'Neill's courtroom, Casey arranged for the move. She made arrangements with the county's Public Facilities Management department. By court policy Casey handled all communication between the Court and other County departments. Judge O'Neill was notified of the date and time of the move which was a Saturday. Casey received a call from Mary Ann Barnhardt in Public Facilities Management on July 11, 2000 about a memo sent by Judge O'Neill to her demanding that the move take place that day. (Exhibit 514) Casey notified Judge Cain who sent a memo to Judge O'Neill on July 12, 2000 asking her not to communicate directly with another branch of county government. (Relator's Exhibit N) On the following day, July 13, 2000 Casey was attending a 40 person meeting with a vendor about a new computer system in an adjacent building. She was alerted that Judge O'Neill had been to her office upset and agitated about the furniture move and was on her way over to meet with Casey. Casey asked Judge Bessey to accompany her when Judge O'Neill arrived because of her discomfort at having one-on-one conversations with Judge O'Neill. Casey and Judge Bessey left the

meeting.  Judge O'Neill was very upset and angry, demanded the key to Grego's office and stated that nobody is going to tell her who she can call.  Casey did a lot of listening and in the end told Judge O'Neill that she would retain Grego's key as per standard policy and the move would take place as scheduled.  (Transcript Vol. XV—162–171)

268.  In July 2001, Casey also was involved in phone calls regarding Gretchen Roberts and jury panel availability with Judge O'Neill.  She took a call from Judge O'Neill, who was angry and upset about the situation that morning regarding jury panels.  Casey could only listen, and couldn't participate in the conversation.  Judge O'Neill made the same call that morning to Casey, Roberts and Joan Richards.  In Casey's experience it was not uncommon for Judge O'Neill to make multiple phone calls about an issue, repeating the same subjects in each call.  (Transcript Vol. XV—171–174)

269.  Casey worked closely with Jennifer Goodman regarding the furniture replacement project.  She was aware of the issues regarding Judge O'Neill's furniture that had come up at Judge O'Neill's meeting with Goodman on December 13, 2000.  On December 20, 2000 she received a voicemail message from Judge O'Neill about the furniture issues.  Casey recorded the voicemail message and it was played at the hearing.  In the message Judge O'Neill stated: "I've had it with Jennifer.  I—I don't want that crap, that new desk.  .... I don't understand why she's got better furniture than I do, and she's basically telling me that I have to either take what she's offering or do without.  And then basically telling me that I'm the last one on a three-year phase-in plan.  .... I really resent the fact that she has better furniture than I do and I'm a judge.  ....I  didn't pick out this—this carpeting.  Whoever picked out this carpeting obviously, you know, picked it out without all of the other judges in mind.  ....Could you call me and please explain that to me?  I'd like to know why I'm the only one with the crap furniture."  (Transcript Vol. XV—179–181)

270.  Casey testified that county records indicated that Judge O'Neill had approved the carpet color she complained about.  (Relator's XX) Casey advised Goodman not to attend any other meetings with Judge O'Neill alone.  (Transcript Vol. XV—182–186)

271.  As part of her duties, Casey attended and kept minutes for the court's personnel committee meetings.  She attended the July 26, 2000 meeting.  The personnel committee laid out concerns regarding the float bailiff situation and the fact that it was becoming increasingly more difficult to make sure Judge O'Neill had adequate coverage.  Judge O'Neill spoke at that meeting and acknowledged that there were problems with her employees and acknowledged that she was really going to try to do a better job and work with the court to limit those issues (Transcript Vol. XV—152–154)

272. On June 6, 2001 Casey attended and prepared minutes of a court personnel committee meeting. Two issues related to Judge O'Neill. First the judges discussed the situation which existed with Elsa Cunbow, the secretary Judge O'Neill shared with Judge Johnson. Elsa had been undergoing chemotherapy for breast cancer and had missed some work. Judge O'Neill was very upset and felt that not only was Elsa taking long lunches and missing work but that her work product was inferior. There had been instances in which Judge O'Neill asked that she be removed from her position or terminated. Judge Johnson did not share Judge O'Neill's feelings about Elsa's performance. Both judges had to agree to take any action against Elsa. Casey testified she was aware of Judge O'Neill's complaints about Elsa but that Judge O'Neill and Judge Johnson were Elsa's supervisors. (Transcript Vol. XV—197) After considerable discussion about the situation, Judges Pfeifer and Connor moved and Committee unanimously approved that Elsa's office would be moved from the ninth floor to the fourth floor, "fearing the ramifications of being unresponsive to what could be considered a hostile work environment and therefore potentially subjecting the Court to liability for failure to address the same." Elsa's office was to be in the Court's Administrative offices where "the Administrative Director could intercede on behalf of Cunbow, when appropriate in both interacting with and performing her secretarial duties for Judge O'Neill. (Relator's Exhibit QQQ)

273. The second motion, made by Judges Pfeifer and Connor and approved unanimously was that the Administrative Judge Watson contact Chief Justice Moyer "with respect to the power of the Administrative Judge . . . to address the erratic and non-judicious conduct of Judge O'Neill or to ask Chief Justice Moyer to appoint a visiting judge to take over Judge O'Neill's docket to enable her to seek the assistance of a mental health professional." (Exhibit QQQ)

274. In January 2001 after expressing concerns to Judge Watson as Administrative Judge about all of the complaints about Judge O'Neill as related to the employees, Casey attended a meeting with Judges Miller, Cain and McGrath in which she learned for the first time that grievances were to be filed with Disciplinary Counsel about Judge O'Neill.

275. **Judge John A. Connor** (Transcript Vol. XV—227–266) (admitted 1966, private practice until 1992, elected to Franklin County Common Pleas Court in 1992, a Democrat) testified he was a member of the court personnel committee. In summer 2000 Judge O'Neill attended a meeting and stated she knew she was having problems and that she would do better with her employees and staff. (Transcript Vol. XV—229)

276. In June 2001 Judge Connor also attended a personnel committee meeting in which personnel issues relating to Judge O'Neill were discussed. He testified that the reason for the discussions, "was that the court, at least the

personnel committee, was concerned about civil lawsuits being filed against us. As a court for, you know—you know, constructive discharge of some type of employment cases is what we were worried about. And then we were worried that some of these individuals, if we didn't address the situation somehow, would—would retain counsel and we would be the subject of lawsuits." (Transcript Vol. XV—232-233) Judge Connor seconded and voted for the first Motion made in regards to moving the office of Elsa Cunbow. (Transcript Vol. XV—231)

277. Judge Connor recalled that Judge Watson wanted to go over and talk to the Chief Justice about the situation with Judge O'Neill and see if he had suggestions. Judge Connor made the second motion, it was seconded by Judge Pfeifer and unanimously passed to have Judge Watson contact the Chief Justice. Judge Connor did not recall that the Motion included anything suggesting that Judge O'Neill was not judicially competent, including a visiting judge or asking for the assistance of a mental health professional. He testified: "it was getting serious enough that we felt that there should be some maybe—maybe that some outside, you know, help. And—and, yet, we didn't feel that if we suggested it, you know, that it would—that it would necessarily be taken in a positive way. So I think that's why we said to Judge Watson, well, see what the Chief Justice thinks." (Transcript Vol. XV—263-264) "Q. ...Motion 2 was directed more toward counseling in the sense of having Judge O'Neill be counseled as to how to deal with staff and with people, it was more directed toward her people skills as opposed to some sort of mental issue? A. Yeah. I don't—Q. Is that a fair way to say that? A. Yeah. I think that's a fair way to say it." (Transcript Vol. XV—263) "Q. So the idea of approaching the Chief Justice, you agreed with. The exact language of what you were asking him to help you with is a little bit different in your recollection than what the notes are? A. I think that's fair. Q. But it was clear to everybody, it sounds like, that something had to be done? A. Yeah, I think that's fair." (Transcript Vol. XV—264)

278. Judge Connor testified that while Judge O'Neill had a good reputation with civil attorneys, "her reputation as—and the way she handles her criminal docket is—I would say, is not favorable, ... I don't hear that many bad reports as to how she tries her criminal cases either, it's just how the docket is handled. Q. That she runs a tight ship? A. That she—Well, that and she forces pleas they say that shouldn't be forced. I mean, you know, that comes up a lot." (Transcript Vol. XV—246-247) Judge Connor was asked if he had counseled or helped Judge O'Neill and responded: "... if Judge O'Neill and I were talking and, let's say, as an incident would come up, Judge O'Neill would always have an explanation of what happened. And the facts that were presented by the employee or whatever would not be the same. In other words, Judge O'Neill would say, no, that's not exactly what happened, here is what happened and here is why I did

this or took this action. So—so she would—she would always have a—an explanation or a reason or why the assumed facts were wrong. And—and to tell you the truth, a lot of times I didn't—you know, I wasn't sure which facts were right." (Transcript Vol. XV—264–265)

279. **Judge Michael H. Watson** (Transcript Vol. XVI—11–156) (admitted 1988, private practice, Department of Commerce Counsel, Counsel to Governor, Appointed and elected to Franklin County Common Pleas Court 1995–2003, Tenth District Court of Appeals, 2003–present) served as Administrative Judge of the Franklin County Common Pleas Court from January 2001 to April 2003.

280. In 2000, Judge Watson was chair of the court personnel committee. Judge O'Neill requested to attend a personnel committee meeting in July 2000 and admitted there were problems with her employees and she pledged to try to do better. When Judge Watson became administrative judge in January of 2001 he accompanied Goodman to a meeting with Judge O'Neill about court furniture choices. He remained to have further discussion privately with Judge O'Neill. He was concerned about the belligerent way that she was treating certain members of her staff, the way she was treating lawyers, the way she was treating litigants and wanted to see it come to an end. Judge Watson wanted to try to resolve what he could resolve. (Transcript Vol. XVI—24–27)

281. In their private meeting Judge Watson offered to assist Judge O'Neill in any way he could. He thought at first that Judge O'Neill was receptive but almost immediately she became defensive stating that she was tired of people "f'ing with her". She brought up Judge Cain and maintained that he had a vendetta against her dating back to the 1992 election. (Transcript Vol. XVI—29–31) Judge Watson discussed how to deal with people Judge O'Neill perceived to be challenging her authority as a judge. Watson recommended that Judge O'Neill get off the bench and vent frustration and anger in private and speak with the individual out of the public eye or even scream into a pillow in private. (Transcript Vol. XVI—32–33) He suggested that it may be helpful to take some time off and get her head cleared and deal with whatever she needed to deal with. (Transcript Vol. XVI—29) During the conversation Judge Watson told Judge O'Neill that he had told court administrative staff that in the future if Judge O'Neill had complaints and called or summoned people to her chambers he was to be called and he would be present. He said this was due to "The repetitive nature of the behavior. The frequency that it was happening. The fact that employees were beside themselves with having to deal with it. It was interrupting their regular work flow." (Transcript Vol. XVI—34) They discussed problems with Judge O'Neill's bailiff Karen Moore and Judge Watson told her it was up to her to take care of those problems. Judge Watson dictated a synopsis of the meeting on that day. (Relator's Exhibit SSS) Judge Watson said nothing to

Judge O'Neill about the grievances about to be filed against her because they related to Judge O'Neill's past conduct, which he could not change—his concern was with going forward. (Transcript Vol. XVI—48–49)

282. In her Answer regarding this meeting Judge O'Neill plead at ¶ 603 Judge Watson "proceeded to tell her to fire her bailiff, Karen Moore" and that "It is believed that he (Watson) was retaliating against Ms. Moore because she had filed a grievance against Judge Cain as Administrative Judge in 2000 ... the grievance was filed with Judge Watson." At ¶ 604 Judge O'Neill "avers that the conversation with Judge Watson was brief and the conversation mainly concerned the furniture, her bailiff and her mother. To the best of her recollection, Judge O'Neill recalls that Judge Watson told her that because her docket was so low she could afford to take some time off to visit her mother." In ¶ 605, Judge O'Neill "denies that she apologized, recognized that at times she lost her composure and asked Judge Watson for help." In ¶ 609, Judge O'Neill "avers that the meeting was brief, but unusual and Judge Watson left visibly agitated." Judge Watson testified Judge O'Neill brought up problems with her bailiff and that the statements regarding a grievance from Moore were "absolute fiction" (Transcript Vol. XVI—41) Judge Watson's testimony and his contemporaneous dictation about the meeting contradict the other assertions. (Relator's Exhibit SSS) Judge O'Neill testified at the hearing that she stood by the denials in her answer regarding the January 2001 meeting. She did recall that Judge Watson said something about punching a pillow or calling him. (Transcript Vol. XVII—259–264)

283. Judge Watson had continuing issues with Judge O'Neill and court employees, which occurred after their January 2001 meeting. He received constant phone calls and "venomous memos" about Elsa Cunbow, the secretary Judge O'Neill hired jointly with Judge Johnson. Cunbow was a neighbor and a friend of Judge O'Neill. The thrust of Judge O'Neill's complaints was that Elsa was somehow "gaming" the court system with requests for leave connected with her diagnosis and treatment for breast cancer. On March 23, 2001 Judge Watson wrote a memo to Judge O'Neill responding to three memos and a voicemail from Judge O'Neill in the previous ten days about difficulties with Cunbow advising Judge O'Neill that she had to come to a cooperative decision with Judge Johnson and to advise Judge Watson if they were unable to reach a resolution about Elsa. (Relator's Exhibit TTT, Respondent's Exhibit V)

284. At the June 6, 2001 meeting of the court personnel committee issues about Judge O'Neill and her staff were discussed. A motion was made to move Elsa off the 9th floor and for Judge Watson to write to the Chief Justice regarding the Court's advice for dealing with the problems they encountered with Judge O'Neill. A letter was sent on July 13, 2001. (Relator's Exhibit RRR)

Justice Moyer responded to Judge Watson that without a doctor's diagnosis of mental illness there was no basis to act. (Transcript Vol. XVI—59)

285. Judge Watson testified to his concerns about Judge O'Neill's honesty "She can look you in the eye and tell you something and believe it absolutely in her own mind and it's not the same truth that I think you and I deal with on a regular basis ... she's very good at re-creating history. I think I've never met another person like her. She's the most effective prevaricator I have ever seen." (Transcript Vol. XVI—60–61)

286. Regarding the effect that the collection of complaints regarding Judge O'Neill by the judges had on collegiality at the Court Judge Watson testified: "We had come to the conclusion that in our prior dealings with Judge O'Neill, she never admitted she was wrong and it was always somebody else's fault, therefore, our ability to have a collegial relationship was probably not going to exist. And— and we determined that regardless of our desire for a collegial relationship, these events had happened and there was a duty to report them and people were not reporting them because they were concerned about retribution. And we determined that we would lead and ask them then to follow." (Transcript Vol. XVI— 107–108) "People agonized over this and people sought counsel over this. And, you know, I—I don't think that people willy-nilly came forward and gladly did any of this. We're well aware of the consequences. And the folks that—the 80– some folks who, I believe, have come forward, have done so out of a concern for the institution and for the quality of justice in Franklin County." (Transcript Vol. XVI—109)

287. *VIOLATIONS CHARGED ON COUNT V*:

a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;

b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;

c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;

d) Canon 3(B)(4)—A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and other with whom the judge deals in an official capacity;

e) Canon 3(C)(1)—A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business;

f) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

g) DR 1–102(A)(5)—Engage in conduct that is prejudicial to the administration of justice.

288. In these series of incidents the panel majority concludes that Judge O'Neill's behavior towards all with whom she dealt in an official capacity was neither patient, dignified nor courteous. In considering the violations in this Count the panel majority was mindful of the interpersonal nature of these complaints and that personality conflicts are not in and of themselves grounds for discipline. These multiple events are not isolated incidents of a person having a bad day or being disturbed by an episode of neglect or incompetence.

289. The panel majority is also mindful of Judge O'Neill's additional intemperate behaviors described in the testimony given about incidents involved in Counts 1 through 4 of this Complaint. By mid–2000 these repeated intemperate behaviors had resulted in Judge O'Neill losing float bailiff coverage as well as an assigned court reporter. After meeting with the Court's Personnel Committee in 2000, acknowledging a problem and promising improvement, Judge O'Neill's intemperate behavior with court employees continued resulting in the extraordinary personnel committee meeting in July 2001 in which Judges Connor and Pfeifer moved that the secretary, Elsa Cunbow, be removed from Judge O'Neill's chambers and that the Chief Justice be consulted for assistance regarding the situation with Judge O'Neill.

290. The testimony of court administrative staff, Casey, Goodman, Richards and Roberts and court employees Grego, Nyce, Boughner and Karn confirm the personnel committee's concerns that they were risking a hostile work environment claim from an employee relating to Judge O'Neill's intemperate behavior. The testimony from Judges Cain and Watson as well as Court Director Casey describe how much of the Court's administrative resources were used managing and trying to resolve personnel issues created by Judge O'Neill's behavior.

291. The panel majority concludes that these multiple episodes of intemperate behavior with litigants, lawyers and court employees were clearly not the diligent discharge of Respondent's administrative responsibilities and they rose to the level of interfering with the administration of justice. The panel majority concludes by clear and convincing evidence that Judge O'Neill's behavior in all of the incidents described in Count 5 violated Canons 1, 2, 3, 3(B)(4), 3(C)(1) and 4 and DR 1–102(A)(5). See, *Inquiry Concerning Van Voorhis*, (Cal. Comm. On Jud. Performance, 2003)

292. *COUNT VI* alleged Respondent repeatedly violated the Code of Judicial Conduct during her political campaign by utilizing county resources and personnel to promote her campaign, by instructing those under her direction and control to solicit campaign contributions and by personally handling campaign contributions.

293. *Campaign Activities performed during business hours*—Judge O'Neill was a candidate for a seat on the Tenth District Court of Appeals in the November, 2002 election. Shelia Vitale, Judge O'Neill's staff attorney testified that she performed work for the campaign during regular court hours at Judge O'Neill's direction prior to Vitale's resignation on May 10, 2002. Vitale picked up campaign tee-shirts twice and made 2 or 3 trips to a downtown Columbus printing company to obtain car signs. Vitale and a law student, Matt Kunsman, folded and stuffed campaign flyers twice in Judge O'Neill's chambers. Vitale accompanied Judge O'Neill at her request on lunch-time trips to the office of her campaign treasurer, Michael Ambrose and to the Board of Elections. (Transcript Vol. XVIII—17–52)

294. Ciera Woodford was a high school student volunteering in Judge O'Neill's chambers whom Vitale observed doing copying and phone number lookups that Vitale believed was related to the campaign. Matt Kunsman was an extern working one day a week for Capital Law School credit. He assisted on the campaign and spent one day of work stamping and labeling campaign flyers in Judge O'Neill's chambers. (Transcript Vol. XVIII—185–188)

295. Judge O'Neill testified that Vitale was a professional salaried employee and that she provided at least 40 hours of work each week to the Court during the time she assisted in the campaign because Vitale worked late on occasion. Judge O'Neill did not keep records of days when Vitale worked late. (Transcript Vol. XIX—50–51)

296. *Campaign Solicitation:* On April 18, 2002 Judge O'Neill's campaign held a fundraiser at the River Club. Vitale attended the event. She was still working for Judge O'Neill but was scheduled to start a new position with the law firm of Cooper & Elliott on May 10, 2002. There was a sparse turnout. At the end of the event Judge O'Neill spoke to Vitale, who was standing in a small group with Michael Courtney (Judge O'Neill's new staff attorney) and Matt Kunsman. Vitale testified: "It was at the end of the fund-raiser, it was actually when the fund-raiser had ended, Judge O'Neill had come over to me, and I was standing with Mike Courtney and Matt Kunsman. And she was very upset. She was red faced and she began yelling at me as to where my husband was, his law—him and his law firm needed to step up to the plate and contribute to her campaign. And then she proceeded to yell at me to order both my husband's firm and the firm I was going to to give the full PAC contribution to her and she proceeded to say that the firm I was going to (Cooper & Elliott) had owed her.".... "There was no doubt in my mind that I was being ordered to get that contribution for her." (Transcript Vol. XVIII—63–65)

297. Michael Courtney testified: "A. Well, I remember a conversation about a recent case Cooper & Elliott had with Judge O'Neill in her courtroom. I did

hear her say a phrase, "stepping up to the plate," that Cooper & Elliott needs to step up to the plate. And I assumed that that meant in regards to supporting the campaign, financially or in other ways. Q. And were you aware at that time when you were hearing the judge make those comments that Sheila Vitale was going to be working for Cooper & Elliott? A. I think I first learned that she was going to be working with Cooper & Elliott during the interview process Q. And who was the judge addressing when she was making these comments at the fund-raiser about Cooper & Elliott? A. She was addressing Sheila." (Transcript Vol. XVIII—170–171)

298. Matt Kunsman testified: "The one that I remember the most was when she was talking to Sheila about her husband. Q. And who was her husband? A. I think her husband, Frank, he worked at another law firm. I don't remember the name of the firm, but Sheila and I had talked about it in the past. He was at a Workers' Compensation firm. Q. What did the judge say about Sheila's husband, Frank? A. It was right after the comment about the attendance not being high at the fund-raiser, not making enough money to cover the expenses, saying, "Hey, you got to get Frank to go to bat for us." (Transcript Vol. XVIII—191)

299. Vitale testified she was disturbed by these requests from Judge O'Neill and that several days later she consulted with Judge Michael Watson as the Administrative Judge. Judge Watson advised Vitale not to do anything she was not comfortable doing and that she may need to speak to someone about it. (Transcript Vol. XVI—65, 66, XVIII—69, 110–111; 155)

300. Eileen Paley (Judge O'Neill's campaign manager), Michael Ambrose (campaign treasurer) and Attorneys Stan Stein and Gary Jones attended the fundraiser and did not observe or participate in any conversation between Judge O'Neill and Vitale that evening and did not notice either Judge O'Neill or Vitale being upset or speaking in a loud voice. (Transcript Vol. XVIII—230–238, 277–295, Vol. XIX—20–21)

301. Judge O'Neill testified that she never directly solicited anyone for contributions to her campaign. She had no recollection of any conversation with Vitale about her husband's firm or a contribution from the firm of Cooper & Elliott. (Transcript Vol. XIX—72) A verdict by Cooper and Elliott in her courtroom was not discussed that evening. (Transcript Vol. XIX—86–87) She recalled only asking Shelia where her husband was and if he was coming that evening. (Transcript Vol. XIX—85–86) Judge O'Neill testified that she was not a sports person in terms of analogies and would never say "step up to the plate." (Transcript Vol. XIX—86) Judge O'Neill had a good relationship with Vitale, thought she was a good employee and could not explain the differences between their testimony. (Transcript Vol. XIX—80–89)

302. Vitale testified she appeared at this hearing pursuant to subpoena and she had hired counsel in regard to her testimony in this matter. One reason was a conversation she had in January or February of 2002 with Judge O'Neill about these grievances. Judge O'Neill discussed suing the courthouse for discrimination and sex discrimination and stated "that anyone that had been a part of this letter of inquiry or were going to testify against her, she was going to consider possibly suing." (Transcript Vol. XVIII—95, 155–156)

303. **Campaign Contributions**: Vitale testified that on a number of her trips with Judge O'Neill to her campaign treasurer's office she observed Judge O'Neill taking campaign contribution checks to the bank for deposit. At the end of a campaign fundraising event, Vitale observed Judge O'Neill take possession of the lockbox which contained the checks collected at the fundraiser. (Transcript Vol. XVIII—53–55, 58–59, 146–147) Judge O'Neill, Ambrose and Eileen Paley, (Judge O'Neill's campaign manager) also testified these events occurred. (Transcript Vol. 257,302–303, Vol. XIX—34–35, 53–54) Ambrose and Donald McTigue (campaign counsel) testified that once checks were given to a campaign staffer they were "received" by the campaign and there was no prohibition on who could deposit or handle the checks as a purely ministerial function. (Transcript Vol. XVIII—14–15, 243–244)

304. **VIOLATIONS CHARGED ON COUNT VI**:

a) Canon 1—A judge shall uphold the integrity and independence of the judiciary;

b) Canon 2—A judge shall respect and comply with the law and shall act at all times in a manner which promotes public confidence in the judiciary;

c) Canon 3—A judge shall perform the duties of judicial office impartially and diligently;

d) Canon 3(A)—The judicial duties of a judge take precedence over all the judge's other activities;

e) Canon 4—A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities;

f) Canon 7(B)(1)—A judge or judicial candidate shall maintain the dignity appropriate to judicial office;

g) Canon 7(C)(1)—A judicial candidate shall prohibit public employees subject to his or her direction or control from soliciting or receiving campaign fund contributions;

h) Canon 7(C)(2)(a)—A judicial candidate personally shall not solicit or receive campaign funds.

305. After considering the testimony, exhibits and evidence submitted, the panel majority finds by clear and convincing evidence that Respondent did violate

Canon 4, 7(C)(1) and Canon 7(C)(2)(a) during her conversations with Shelia Vitale. The panel majority finds by clear and convincing evidence that Respondent personally solicited and directed Vitale to obtain campaign contributions from her husband's firm and her future employer while Vitale was a public employee under Judge O'Neill's control. The panel majority did not find Respondent's testimony credible as opposed to the testimony of the three other participants in the conversation who had no reason or motive to be untruthful.

306. The panel finds that Respondent's handling of campaign funds after contributions had been received by her campaign committee did not violate any provision of the Code of Judicial Conduct.

307. The panel finds that Relator did not prove by clear and convincing evidence that the activities performed by Vitale, Kunsman or Woodford rose to the level of a violation of any Canon. First, the panel did not have clear and convincing evidence that some of the activities in question, particularly by Woodford, were campaign activities at all. With respect to those activities clearly connected to the campaign such as processing campaign literature, while the use of Respondent's chambers by volunteers for those campaign activities should not have occurred, the panel did not find evidence sufficient to prove that such use was habitual or more than minimal. As to campaign work performed by Vitale outside the courthouse, the panel did not find clear and convincing evidence that such activities were in fact use of public resources due to her status as a salaried professional with flexible work hours.

308. The panel did not find clear and convincing evidence to support violations of Canon 1, Canon 2, Canon 3, 3(A) or Canon 7(B)(1).

309. **General Defenses:** Respondent asserts a number of defenses, which challenge the amended complaint as a whole.

310. *First,* Respondent argues that Counts I—V and all allegations of the Amended Complaint should be dismissed on grounds of unreasonable delay which violated the provisions of Gov. Bar Rule V § 4(D) since the Relator did not seek to extend the usual time for the investigation of grievances from the Secretary of the Board. Extensions of up one year from the date of the filing of the grievance are permitted for "unusually complex investigations, including the investigation of multiple grievances." The Rule further provides that time limits are not jurisdictional. Respondent further argues that the doctrine of laches bars some of the incidents as they occurred in 1997 and 1998 (Dennis, Margolis, Zazworsky v. Petrella, Peterman and Gass). The panel denies the defense of unreasonable delay given the unusually complex and large nature of this investigation, given the non-jurisdictional nature of the time limits and given Respondent's failure to produce evidence of prejudice to her ability to defend. The panel further finds no present rule or precedent, which imposes a time limit for a person to submit a

grievance for investigation. As to the Amended Complaint the panel finds that the investigation of the new matters contained therein was completed timely and that reasonable operation of the rule does not require new matters submitted be completed within a time limit established by the submission of the first grievance in an investigation that involves multiple grievances.

311. *Second,* Respondent argued that Counts I—IV and part of Count V should be dismissed on the grounds of res judicata, collateral estoppel or precedent. Respondent submits that since allegations regarding timeliness and reversals for abuse of discretion were dismissed in the Respondent's prior disciplinary case in 1996 or did not survive probable cause in the instant complaint that all such remaining allegations should be dismissed. Further, when other Franklin County Common Pleas judges have had similar grievances dismissed against them, precedent bars the instant grievances. The panel concludes it has insufficient evidence to support that res judicata, collateral estoppel or precedent bar the present allegations regarding timeliness and reversals for abuse of discretion.

312. *Third,* Respondent argues that Disciplinary Counsel has not complied with procedural rules relating to notice and opportunity to be heard prior to a complaint, the Respondent's right to confidentiality and lack of a finding of probable cause for the amended Complaint. The panel finds that the Respondent was provided with an opportunity to respond to the allegations of the Complaint before it was filed and there is no evidence that Disciplinary Counsel breached Respondent's rights of confidentiality and that the applicable rules do not provide for probable cause review of amendments to complaints.

313. *Fourth,* Respondent argues that the Amended Complaint should be dismissed because the applicable provisions of the Code of Judicial Conduct and Disciplinary Rules under the Ohio Constitution and the United States Constitution are void for vagueness; violate equal protection and substantive due process. Existing precedent of the Ohio Supreme Court, *In Re Harper* (1996), 77 Ohio St.3d 211 [673 N.E.2d 1253] found provisions of the Code constitutional. Thus, this defense is not well-taken.

314. *Aggravation, Mitigation and Recommended Sanction*: The parties' positions on the issues of sanction in this case were diametrically opposed: The Relator argued only factors in aggravation and recommended a sanction of permanent disbarment. The Respondent recommended the dismissal of all charges and did not identify any factors as aggravation or mitigation. The panel majority, considering all the evidence submitted, identifies the following factors in mitigation and aggravation.

315. *Mitigation*: Judge O'Neill received her law degree from the University of Dayton and was admitted to practice in 1980. She practiced as an Assistant

Ohio Attorney General From 1980–1992, serving as Chief of the Mental Health Unit 1980–1985 and as General Counsel for the Ohio State Highway Patrol from 1985–1992. In 1992, she was elected to the Franklin County Common Pleas Court and in 1998 she was re-elected to that position. She is not seeking re-election to the position in November 2004. She ran unsuccessfully for a position on the Tenth District Court of Appeals in November 2002 and she is a candidate for a seat on the Tenth District Court of Appeals in the November 2004 election.

316. As a member of the Franklin County Common Pleas bench Judge O'Neill has actively pursued educating middle and high school students about the legal system. In 1993 she created the "Judge in the Classroom" program. On Friday mornings she gives presentations at schools and on other weekdays she hosts groups of students for observation in her courtroom. Since 1993 she has made over 400 presentations in 63 different schools. Janet Newlon, a seventh grade social studies teacher in Grove City testified that Judge O'Neill's presentations in her classes helped a lot and really added to their study of government.

317. Judge O'Neill testified that the efficient management of her docket is very important to her. In statistics submitted for the Franklin County Common Pleas Court for the years 1992–August 2003 (Respondent's Exhibit E) Judge O'Neill consistently ranks first in lowest number of criminal cases pending and often second in the lowest number of civil cases. Respondent maintained approximately 70 to 145 fewer criminal cases than the average criminal caseload for the Court. In August 2003 Judge O'Neill had 72 criminal cases pending while the court average was 217.

318. The panel heard character testimony from court employees Greg Mounts, Brian Stein and Sherry Mitchell. Mounts and Stein are Judge O'Neill's assigned probation officers and both testified they had good working relationships with Judge O'Neill and found her courteous and professional. Mitchell served as the Court's IT Manager for seven years through 2003. Mitchell testified that her contacts with Judge O'Neill were not regular but were always professional and appropriate and that Judge O'Neill had once mediated a dispute between Mitchell and court reporter Nyce. Mitchell was delegated to arrange special training for Elsa Cunbow in word processing and testified Elsa had trouble with basic word processing functions such as saving over auto-text or forgetting where a document was saved.

319. Character testimony was submitted from lawyers who had practiced before Judge O'Neill. James Arnold testified to a civil trial Judge O'Neill recently presided over that he believed had been professionally handled and Dale Perdue testified his experience with Judge O'Neill in civil pretrial conferences was appropriate. Regarding criminal cases lawyers Lewis E. Williams Jr. (also a former judge), Todd Barstow, Beverly Farlow, Jeff Berndt, Mark Hunt, David

Young, and Christopher M. Cooper testified to having cases before Judge O'Neill ranging from 'time to time' to 5–6 times a year. None of them had observed Judge O'Neill act in an unprofessional manner and believed she was a fair and hard-working judge.

320. Kelly Green (present staff attorney), Margaret Meckling (present bailiff) testified about their good working relationships with Judge O'Neill and their observations of her preparation and competence on the bench.

321. Respondent has maintained throughout these proceedings that the charges made in the Amended Complaint were not brought out of any real concern about any individual case but as part of a political agenda. The panel has endeavored throughout the hearing to determine from the evidence submitted and the sworn testimony of witnesses whether there is any validity or relevance to this claim. Respondent testified that three Republican judges, Judge Cain, Judge Miller and Judge Watson solicited these complaints and gathered this information and that "the whole collection over a period of time smacks of partisan politics." (Transcript Vol. VII—141–142)

322. Respondent defeated Judge Cain in the 1992 election and has testified that it is that defeat that motivated his actions in this matter. Judge Cain testified that as administrative judge since 1998 his motivation to take action was the volume of complaints he received about Judge O'Neill, which exceeded complaints he received about any other judge. Judge Cain testified that although complaining individuals were advised to file individual grievances no one individual would do so for fear of reprisals and because one incident would not be enough get anyone's attention. (Transcript Vol. IX—103–106)

323. Judge Cain discussed the complaints about Judge O'Neill with Judge Watson as Chair of the Personnel Committee and Judge Miller as Chair of the Rules Committee. In late 1999 after Judge O'Neill was re-elected the complaints seemed to increase and the judges decided they would tell people to write them down and Judge Miller would collect them. They consulted Disciplinary Counsel and were advised "to collect the information, and the individuals who had firsthand knowledge of what transpired, give them to us; and we'll investigate." The collection of information was submitted to Disciplinary Counsel in January 2001 and these judges had no further participation in the investigation or prosecution of this Amended Complaint.

324. The panel majority found that Respondent's claim that this action arose out of partisan politics was belied by the evidence that in July 2002 Judges John Connor and Beverly Pfeiffer, other Democratic judges on the Franklin County Common Pleas Court, made and seconded the motions to seek assistance from the Chief Justice about Judge O'Neill's conduct and take action on the issue with Judge O'Neill secretary, Elsa Cunbow. Part of Respondent's evidence of a

political conspiracy against her was also her exclusion from administrative committee appointments at the Court. However, Respondent testified that the three other Democratic judges on the bench have not been excluded from participation in court administration. (Transcript Vol. VII—163–165) Respondent later expanded her definition of political motivation: "When you have referred to these proceedings as, quote, politically motivated, closed quote, what did you mean by that phrase? A. Politically motivated, I mean that there is a group of people who have an agenda and who have the power and have abused that power in an effort to remove me from my employment, to take my position away from me. And in my opinion, have intentionally interfered with my ability to do my job and are seeking to deprive me of earning a livelihood." (Transcript Vol. XVII—150)

325. When asked to identify the persons who were seeking to deprive her of her livelihood Respondent testified: ". . . those people are the eight judges who signed the grievance but no one else, because anybody else that's certainly been involved in this has certainly been part of the tensions rising, certainly were working at the direction of or the request of those that were the ones that were the signators. So I would look to the judges." (Transcript Vol. XVII—166–167)

326. Rather than a political motivation, the panel majority finds there is clear and convincing evidence that the motivation for this process has been the persistent and accelerating pattern of improper activity by Judge O'Neill. The evidence upon which this panel must decide this matter is not what the signatory judges have said happened but rather the sworn testimony of the 76 litigants, lawyers, employees and staff who testified about their first-hand personal knowledge of Judge O'Neill's behavior over the past seven years. Those witnesses do not conform to any definition of conspirators: they are all ages, both sexes, all races, all political persuasions (Republicans, Democrats and everything in between), prosecutors, public defenders and private defense attorneys, civil plaintiff's counsel, civil defense counsel, convicted criminals, courtroom observers, law enforcement officials, law students, court employees, county employees and Judge O'Neill's former employees. The eight judges who signed this collection of grievances did not create these complaints. They provided a structure, a form in which the complaints that existed could be collected to investigate what was happening. The panel majority concludes by clear and convincing evidence that this Amended Complaint is about each individual case and is not about a political agenda.

327. Another factor in mitigation is absence of a prior disciplinary record. While the Respondent has never been sanctioned in a disciplinary proceeding, she testified that in 1996 charges against her were dismissed after a hearing under Gov. Jud. R. III by a five-judge commission.

328. The testimony about respondent's volatile and intemperate behavior raised the issue of a mental disability with the panel. However, the parties agreed and Judge O'Neill submitted to an examination by a psychiatrist chosen by Relator in May 2003. The examiner found no evidence of a mental illness as defined by R.C. 5122.01. Neither Relator nor Respondent chose to submit the report to the panel or use in evidence any of the findings made in that report. The parties represented that they had fully explored the issue of mental illness and it was a non-issue in this proceeding. At the request of the panel chair confirmation of these facts appear in the Transcript at Vol. XVI—152–154.

329. *Aggravation*: For the panel majority, the most troubling aspect of this entire case affecting aggravation was the Respondent's lack of credibility and outright dishonesty. Beyond the identified misrepresentations found as violations of DR 1–102(A)(4), the panel majority concluded that Judge O'Neill's Answer to the Amended Complaint and her testimony throughout this proceeding was false and self-serving. On only two occasions—in Burton v. Nicholson and regarding Woerner's bond forfeiture judgment—did she admit in testimony that anything she did was an error or was not appropriate. While she was technically cooperative in these proceedings and certainly her counsel conducted these hearings in a civil and professional manner, this final hearing took as long as it did because in every factual incident Judge O'Neill's version of the events, either plead in her Answer or in her final hearing testimony, contradicted the testimony of every other witness to those events. At times there were three versions of events: Respondent's pleading in the Answer, Respondent's testimony at final hearing and the testimony of the other factual witnesses. While Respondent generally claimed difficulty remembering events that had occurred years before, when it served to justify her actions her memory of events became detailed and vivid. The stipulations filed in this matter related solely to uncontested matters of dates, assignments, times, places and matters already of record (although even "the record" was contested in some incidents). Respondent called a single fact witness (Ronald Janes) and he corroborated Respondent's threat to revoke the bond of a defendant who chose trial! The testimony of the experience of court staff and judges with Respondent established that Respondent's reputation for being truthful left much to be desired. The panel majority finds Respondent's dishonesty, false statements and her refusal to acknowledge the wrongful nature of any of her conduct in the Amended Complaint throughout these proceedings to be significant aggravating factors.

330. The panel struggled throughout these hearings to understand Respondent's abusive and volatile behavior. Her intemperate behavior was directed at friends and foe alike. Respondent did testify that she believed that lawyers who appeared before her and court staff challenged her authority. "There is a lot of

attorneys that can be pretty challenging, and in your face. And it's probably more so with me than anybody else, because of the tense atmosphere down there. And it has been down there for the entire time that I've been on the bench." Respondent also included her bailiff, court reporter; float bailiffs and Judge Watson as persons who challenged her authority. (Transcript Vol. XI 46, 47–52) The panel majority found no evidence to corroborate Respondent's belief that persons she identified or who otherwise appeared before her as described in the incidents that comprise the Amended Complaint were challenging her authority.

331. Respondent testified that after receiving the first letter of inquiry in January 2001 she has sought counseling with several psychologists, not on a regular basis, to deal with employment-dynamics, human-resource-type issues and to assist her in dealing with the allegations in the letter of inquiry, which she said, were "just absolutely outrageous and outstanding." (Transcript Vol. XVII—152) The counseling sessions have helped her put things in perspective. At one point in her testimony it seemed that she was acknowledging some responsibility for over-reacting in situations. Respondent was asked by the Panel: "Q. You think now having consulted on this that there was a problem before with having your buttons pushed? A. Well, obviously, there must have because these allegations just hit me like a ton of bricks. So I felt that I needed to go talk to somebody about that. (Transcript Vol. XVII—162–163) Asked about the atmosphere in the courtroom by the Panel:" Looking back now, do you think you were responsible for causing any of those frictions? A. I think that I was— that I am to blame and I share the blame for everything that how I reacted to them, so yes. I think that it takes two to have—have a relationship and it takes two to either resolve that as best as possible or let it escalate into something worse. And I think that you're always going to have conflicts, but I think in hindsight, I knew then and I know it even better now that if—maybe if I had not reacted so quickly or had I not overreacted or maybe if I could have just reached out and grabbed those words back, certainly could have taken the tone and tenor down." (Transcript Vol. XVII—163)

332. However, when Respondent was asked by the Panel specifically about her behavior as testified to by the witnesses she adamantly maintained that it did not happen and her behavior was appropriate. "Q. My question is, however, the characterizations that have been put upon your actions by the witnesses that appeared of yelling or screaming or basically losing control in a situation, you have maintained to this point, I believe, that that kind of loss of control did not happen. A. Correct. Q. My question is: As we sit here today, have you ever lost control in the courtroom? A. No. Q. Have you ever had difficulty controlling your anger when a courtroom situation— A. No. Q.—arose? A. Not lost control in the courtroom, to the extent that it's been related here. Never lost control of

the courtroom. May not have done the best in taking back control of the courtroom, or managing a situation, but I—No. I've never yelled. I certainly have raised my voice. I certainly have been stern. I certainly have been less than empathetic or proactive in dealing with staff and situations like that; but never yelling and screaming. I don't know what the rest of the adjectives are that were used. Q. Throwing things, slamming things. A. Nothing thrown. Nothing slammed. Those—those—Those are not me. . . . Q. Do you think that there may have been times in some—given the testimony that we've heard today, in your courtroom where you have not been patient, dignified, and courteous to people who appear in front of you? A. No." (Transcript Vol. XVII—169–170) The panel majority concludes that Respondent has not and will not admit or take responsibility for her abusive and intemperate actions and does not acknowledge the wrongful nature of the conduct described in the Amended Complaint.

333. The panel majority finds that the victims of Respondent's misconduct were vulnerable and did suffer resulting harm. Certainly the criminal litigants who were the subjects of bond threats were harmed by loss of rights to freely and voluntarily make decisions and those who were jailed lost their freedom without cause. Birchler was deprived of the benefit of his appeal and of his right to probation. The litigants, lawyers and staff who were the subject of Respondent's explosions and tirades were embarrassed, frightened and demeaned. Respondent publicly criticized visiting judge Martin in a crowded courtroom. For court staff such explosions also jeopardized their employment and/or made their jobs more difficult. Staff who worked regularly with Respondent for example, Grego and Nyce, suffered medical consequences from the constant stress and unpredictability of working with Respondent.

334. The panel majority concludes that considering all the factual incidents found proven in this Amended Complaint a pattern of misconduct has been established and that pattern is motivated by a selfish motive. Absent from Respondent's pattern of conduct in these matters is any recognition of the importance of the public perception of the integrity of the judiciary. Respondent displayed no appreciation for the effect her conduct had on those she dealt with in her official capacity or the appearance created by her public behavior in her courtroom. Her actions whether abusive of litigant's legal rights (to trials, voluntary pleas, bonds and records) or abusive of the right to be treated with impartiality and dignity by a judge (not demeaning and abusive behavior) were clearly injudicial and prejudicial to public esteem for judicial office. As long as Respondent's caseload statistics remained the lowest in the Court it didn't matter what Respondent did or how she behaved to accomplish that goal. Ironically it was Respondent's witness former Judge Tracey who best described the need for a judge to recognize problems they may cause in the courtroom: "You know,

we're elected officials or I was an elected official and you want to be liked. I mean, judges want to be liked. And so I think I would—I would believe that judges would—would become involved even if it wasn't that big of a deal because little things are big deals to people ... There's no really small problems, you know, when you're in the courtroom." (Transcript Vol. XII—77–78)

335. ***Recommended Sanction***: At the outset, the panel majority must acknowledge that there is no Ohio case similar in size and scope to the charges against Respondent. Disciplinary Counsel has recommended disbarment, however, barring proof of theft or a felony conviction, that sanction has not been applied in any judicial misconduct case in this state. The parties have cited numerous out-of state cases that at best provide guidance on one aspect or another of the different violations found in this case.

336. The preamble to the Code of Judicial Conduct provides that the degree of discipline imposed should depend on the seriousness of the transgressions, whether there is a pattern of improper activity and the effect of the improper activity on others or on the judicial system and for the protection of the public. The panel majority as detailed above does find multiple serious transgressions, a pattern of improper activity that has had a significant deleterious effect on the public's perception of the integrity of the judicial system. (See also, other factors affecting judicial discipline described in: *In Re Deming* [108 Wash.2d 82], 736 P.2d 639 (Washington 1987) and *In re Brown* [464 Mich. 135], 626 N.W.2d 403 (Michigan 2001)

337. In reaching a recommendation the panel majority considered the sanctions ordered in Ohio cases involving similar violations. For what the panel majority considers the most serious violations, those involving DR 1–102(A)(4), under Ohio case law such violations, absent exceptional circumstances, mandate actual suspension. *Disciplinary Counsel v. Fowerbaugh,* 74 Ohio St.3d 187 [658 N.E.2d 237] (1995). The only recent case involving a judge who violated DR 1–102(A)(4) was *Cleveland Bar Assn. v. Katalinas,* 90 Ohio St.3d 140, 2000-Ohio-37 [735 N.E.2d 432], a default case with no mitigation involving theft of client funds which resulted in disbarment. For attorneys who violate DR 1–102(A)(4) sanctions range from 6 months for a single act to disbarment for multiple acts. In *Disciplinary Counsel v. Ferreri,* 88 Ohio St.3d 456, 2000-Ohio-382 [727 N.E.2d 908] a single incident involving an ex-parte conversation by a judge resulted in a six-month suspension. In an earlier case, *Disciplinary Counsel v. Ferreri,* 85 Ohio St.3d 649, 1999-Ohio-330 [710 N.E.2d 1107], Judge Ferreri received an eighteen month suspension with twelve months stayed for three incidents of false and intemperate comments made to news media criticizing other judges. In *Cleveland Bar Association v. Cleary,* 93 Ohio St.3d 191, 2001-Ohio-1326 [754 N.E.2d 235], a single incident regarding an improper quid pro quo in criminal

sentencing which was found to be prejudicial to public esteem for judicial office also resulted in a six month suspension. In *Disciplinary Counsel v. Campbell*, 68 Ohio St.3d 7, 1993-Ohio-8 [623 N.E.2d 24] multiple incidents of intemperate behavior involving sexual harassment resulted in a one-year suspension after the judge resigned his post. In *Disciplinary Counsel v. Karto*, 94 Ohio St.3d 109, 2002-Ohio-61 [760 N.E.2d 412], several incidents involving a judge's abuse of contempt power with litigants resulted in a six month suspension. Finally this Board in *Disciplinary Counsel v. Medley* (Case No. 02–79) recently recommended to the Supreme Court a sanction of 18 months, 6 months stayed in a multiple count complaint regarding injudicious behavior in which the panel majority found the judge had testified dishonestly to the panel.

338. This case is unique and unprecedented. It combines multiple incidents of different types of improper activity when 6 to 12 month suspensions have been ordered for far fewer acts of one type of improper activity. The panel majority balances against these violations Respondent's length of service as a judge and the volume of matters she handled. The mitigation testimony included those who found Respondent to be a fair and efficient judge and did not experience problems with her behavior. Although the sheer number and variety of incidents, in a disciplinary context in which actual grievance complaints against judges are uncommon, establishes a serious problem regarding Respondent, the panel majority also considers that these incidents arose out of five years of judicial service pre-dating the Complaint filed in 2002. The panel majority recognizes that most of the violations found address Respondent's lack of judicial temperament and lack of compliance with the particular obligations of judicial office. The majority of the violations do not impinge on the Respondent's underlying qualifications necessary for the practice of law. As a result, the panel majority concludes rather than warranting disbarment from the practice of law as recommended by the Relator, the sanction should be a significant actual suspension which recognizes the multiple serious violations relating to judicial service but does not ultimately deprive Respondent of the right to practice law.

339. Balancing the multiple violations found with aggravation by dishonesty, pattern of conduct, resulting harm, effect on public esteem for and integrity of the judiciary with mitigation of service to the profession, contribution to the community and absence of a prior disciplinary record, the majority of the panel recommends that the Respondent be suspended from the practice of law for two years.

**Judge Jack Puffenberger, dissenting:**

For the reasons listed below, I hereby dissent from the report and recommendation of the other two panel members.

The extensive allegations presented in this complaint are far reaching in substance and, in many instances, require Respondent to justify judicial determinations made many years before. This Board must be cautious not to infringe upon areas of our legal system wherein our judiciary has traditionally been granted extensive discretion in making judicial determinations. Inappropriate actions of one member of the judiciary must not be sanctioned in a manner that would have a "chilling effect" on judges who may sometimes utilize methods which may be perceived as "unconventional". Judges are constantly making split second decisions in the courtroom and sometimes their motives for making these determinations can be placed in question. Our legal system has acknowledged this and provides proper avenues of recourse outside the disciplinary process. To require our judges to be placed under oath in a disciplinary setting and explain why a judicial determination was made is foreign to our legal system. In situations where the judicial determination was made years earlier, that task of explaining why the decision was made can be nearly impossible.

While it is not my intention to review the panel report case by case, I will generally address each of the counts in the Amended Complaint and conclude by formulating a more generalized dissent to both the findings and the recommendation.

In reviewing each of the Counts in the Amended Complaint, the Board must apply the standard of whether the violations have been proven by clear and convincing evidence. This is a high standard to meet and is more than a simple preponderance of the evidence.

In Count I, the panel report finds that Respondent engaged in ex-parte communications. In *Nezvalova,* Disciplinary Counsel clearly failed to establish that the conversations were ex-parte in nature. No one gained a procedural or tactical advantage as a result of the conversation which was administrative in nature. Two distinguished judges, Judge Corzine and Judge Parrott, testified that this was not an ex-parte conversation. Likewise, the conversation in *Smiley* was administrative in nature and Judges Corzine, Parrott and former Judge Tracey testified that conversations such as this are not uncommon. Certainly the clear and convincing standard was not met to establish that any ex-parte communications even occurred unless one were to totally disbelieve the testimony of not only Judge O'Neill, but also the testimony of Judge Corzine, Judge Parrot and former Judge Tracey. Moreover, the *Smiley* case was not a pending case and the conversation did not involve the merits of the case. Absolutely no one was prejudiced by these conversations and they do not fall within the realm of sanctionable conversations. That portion of Count I relating to ex-parte communications is without merit and must be dismissed.

Count II alleges that Respondent refused to allow attorneys to go on the record. In 1998, the local rules of the Franklin County Common Pleas Court did not require pretrials to be on the record. The allegation that Attorney Shwartz was denied the opportunity to go on the record during a pretrial was readily admitted by Respondent in her letter to the Chief Justice on September 10, 1998. (Ex. ON 01507) Respondent explained to the Chief Justice that she, "denied Mr. Shwartz's request to put the bench conference on the record as I did not find it necessary to record my denial of his request for a continuance." This denial was not even found to be sufficient for the granting of an Affidavit of Disqualification by the Chief Justice, much less a disciplinary violation. In both *Dennis* and *Lane* the allegations of failure to allow a record occurred in pretrial settings. Both Judge Parrot and former Judge and now Professor Tracey testified that the preferred method of making a record is not to disrupt the schedule in order to make a record whenever one is demanded, but to wait until such time as there is an actual court hearing. In fact, Attorney Shwartz testified that a written motion would have been the proper way to make a record for the motion for continuance. The allegations in Count II have not been established by clear and convincing evidence and must be dismissed.

Count III consists of allegations that Respondent denied continuances without exercising judicial discretion. The granting or denial of requests for continuance should not be the subject of disciplinary actions. The law adequately provides recourse to the parties in these situations.

Count IV relates to alleged misrepresentations Respondent made in her interactions with lawyers, judges and court personnel. While there is certainly variation in the recollection of parties to the same incidents, it must be remembered that these incidents occurred years ago and it is common for people to have different perceptions of an incident after the passage of time. The panel report takes great umbrage to the fact that Respondent denied the allegations against her and her recollection of incidents was often times different from those of other witnesses. This does not mean that Respondent was necessarily lying or being deceitful. It means that she had a different perception of certain encounters. In addition, her answer to the complaint seems to contain responses in conflict with her own testimony at hearing. The panel was made aware that the answer was prepared prior to any formal discovery and that Respondent answered the complaint utilizing her best recollection at the time. Those familiar with legal proceedings are quite aware that recollection can be refreshed once the witness is afforded an opportunity to review documents relative to an incident. This is especially true when the incident occurred years prior. The finding of a violation for merely denying the allegations and having a different perception of what transpired from that of her accusers is totally unfair. In addition, it is not

difficult to find that a number of witnesses who testified as to Count IV had their own agendas which compromised their credibility. Once again, the burden of clear and convincing evidence has not been met in these allegations.

While Disciplinary Counsel has attempted to demonstrate a "pattern" of inappropriate behavior by Respondent, the allegation of a violation in Count VI is totally unrelated to any other count in that it concerns activity that occurred outside the courthouse setting. The Panel report finds a solitary violation related to a campaign conversation Respondent had with an individual who was still technically her employee even though the individual had already tendered her employment resignation. It is exactly this type of remote violation that the Preamble to the Code of Judicial Conduct envisioned when it states: "It is not intended, however, that every transgression will result in disciplinary action." This single technical violation of the campaign solicitation canon by a judge who has been involved in several contested elections does not demonstrate a "pattern" of campaign violations and should be dismissed in conformity with the spirit of the Preamble.

Counts I, II and III generally relate to matters within the discretion of the trial judge and this Board should not allow the disciplinary procedure to substitute for the Courts of Appeals and Counts IV and VI have been addressed above. However, Count V of the Amended Complaint is much more problematic for Respondent. In fact, it goes to the very crux of this dissent. Count V relates to Respondent's interaction with lawyers, judges and court staff. Herein lies the one true, glaring basis for the entire Amended Complaint: the judicial temperament of Respondent. This is the underlying theme of the entire complaint. All of the allegations, with the exception of the alleged campaign violation, relate in one way or another to the judicial temperament of Respondent. Judicial temperament includes common sense, compassion, humility, open-mindedness, patience, tact and understanding. It is a quality that can best be identified when it is absent. The absence of judicial temperament generally exhibits itself in many ways including arrogance, impatience, pomposity, loquacity, irascibility, arbitrariness or tyranny. Unfortunately, the absence of judicial temperament by Respondent exhibited itself far too often during the hearing of this matter. While all judges have "bad days" even this dissenter believes that Disciplinary Counsel has established a pattern of behavior by Respondent that exceeds the acceptable bounds of what must be demanded of the judiciary. I therefore agree that, in Count V, Disciplinary Counsel has established a violation of Canon 1 and Canon 3(B)(4) of the Code of Judicial Conduct which must be sanctioned. (The majority of the panel agrees with and adopts Judge Puffenberger's definition above of judicial temperament.)

The panel report regarding aggravation, mitigation and recommended sanction underscores the temptation to be swept up in the sheer magnitude of the evidence presented. Every possible aggravating circumstance is mentioned and testimony was molded to justify the severe sanction recommended. The panel heard many witnesses, reviewed many exhibits and considered an incredible number of incidents alleging numerous violations. The volume of evidence should not be used as a justification to take drastic action. A reasoned approach to this matter is consistent with the above argument. This is a case about a judge who lacks judicial temperament, nothing more, nothing less. After all of the detailed analysis of each specific case and every shred of evidence that could be solicited over a number of years, we are left with the ultimate conclusion: this is a judge who has a number of good qualities but judicial temperament is not one of them. Her behavior warrants action.

In considering a recommended sanction, the panel report discards each of Respondent's defenses. One of Respondent's defenses was that the complaints were politically motivated. Certainly, politics did not force Respondent to behave the way she did at times. However, to totally discard this factor one would have to ignore substantial evidence to the contrary. One witness, Sherry Mitchell, a former employee of the Franklin County Court of Common Pleas, who left for a better employment opportunity, seemed to be one of the few impartial witnesses on this topic. She described the Court as a "political, back-biting environment" and that decisions by court administration were "rarely based on fact" but rather were "made on personal agenda, who knew who and politics". She testified as to the "self-serving, malicious environment." One judge openly made derogatory comments about Respondent to courthouse staff. (TR 17/22) Having served on a multi-judge court, I do not discard this issue as easily as the other panel members. The atmosphere which seems to pervade this Court has Respondent at the center, but there are other parties who seem to relish throwing gasoline on the fire. The scene of one of the complainant judges on her hands and knees writing an antagonistic remark with chalk on Respondent's parking spot would be comical if not so tragic. Some who claim that Respondent brings disrespect to that Court should consider the atmosphere they have helped foster. It must be clearly stated once again that Respondent cannot utilize this atmosphere as justification for her actions, but to ignore it is to provide only a partial picture of reality. The panel report's reference to a prior disciplinary action that was dismissed is prejudicial and should be removed.

The panel report reference to Respondent's refusal to acknowledge the wrongful nature of her conduct as a significant aggravating factor is not borne out by her testimony. Respondent did testify that in some instances she should have handled things differently. She acknowledged that some mistakes were made.

The fact that she denies the allegations is not evidence of anything. To chastise her for denying the allegations and mounting a vigorous defense should not be an aggravating factor since many of the counts are without basis.

The panel report further considers the criminal litigants to be victims of Respondent's actions. All of these individuals had recourse in the law for perceived violations of their due process rights. These individuals do not have a "right" to probation or a presentence investigation if the judge determines that probation is not going to be granted. Competent counsel protects your due process rights within the law. That is their function. These criminal defendants were not denied their right to go to trial. These instances cannot stand alone on their merits as violations and certainly cannot be considered as a pattern of how Respondent handles criminal cases. Since 1992, she has presided over hundreds, if not thousands, of criminal cases and to allege that these several cases demonstrate a "pattern" is stretching beyond the limits of reasonableness.

The panel report finding that Respondent was motivated by a selfish motive lacks justification. Respondent did not personally gain from her actions in any way. To insinuate that her personal motive was to have a manageable caseload is to ignore pressures put on trial judges to keep the docket current. The Supreme Court initiated the case reporting requirements to insure the timely resolution of cases. Once again, the few cases mentioned in the Amended Complaint certainly do not establish a pattern that docket control was more important to Respondent that the rights of the parties. The testimony established the Respondent did grant continuance requests when she felt they were merited. A clear and convincing pattern is not established by such a miniscule percentage of cases handled.

In conclusion, the bases for the panel report sanction recommendation have not been established by clear and convincing evidence. It has not been established that Respondent acted with dishonesty. A pattern of conduct was not established except as it relates to intemperate behavior. Any resulting harm from Respondent's decisions was minimal and could have been reviewed by a higher court. Respondent was responsible for her part in the effect on the public esteem for the integrity of the judiciary. Others are also to blame.

At the end of the day, the question is what to do with a judge who lacks judicial temperament. Should she effectively be removed from office even though the citizens of Franklin County want her to be their judge? Should the citizens of Franklin County have the right to a judge who lacks judicial temperament if they want one?

Respondent has a problem that is affecting her ability to be a better judge. For some time the legal profession has sought to render assistance to members who experience problems. The OLAP program of the Ohio Sate Bar Association

is one example of a profession striving to assist colleagues who are experiencing personal problems. I believe that the panel unanimously agrees that Respondent is in need of professional assistance in helping her attain a better judicial temperament on a more consistent basis. Her situation is not hopeless. The testimony regarding her temperament was not all one-sided. A number of witnesses, including a former Board member, testified as to very positive experiences in her courtroom. Unfortunately, her past behavior toward others in the legal system has contributed to the dislike some individuals seem to have for her. Sometimes she is not an easy person to like. She is demanding. She is strong-willed. She can and has displayed some very negative emotions in the courthouse. It is my belief that the Board has several responsibilities in this matter. The Board must not get caught up in the negative media frenzy that has followed Respondent for some time. The Board must not look at the sheer volume of the evidence presented and think that severe punishment must be justified. Above all, the Board has a responsibility to try to assist this individual in dealing with her imperfections at the same time that she is sanctioned. Any sanction by this Board is a severe sanction for Respondent. The publicity of a sanction against a sitting judge for lack of proper judicial temperament will be a severe punishment in itself. The cost of her defense in this matter will be astronomical. The mitigating factors contained in the panel report are substantial and aggravating factors are minimal at best. This Board should strive to fashion a sanction that is not overly punitive, but addresses the true violation of Respondent: her temperament. It is my opinion that an appropriate sanction under the circumstances is a one year suspension with the suspension stayed and Respondent placed on probation for the one year period. Her probation should include: 1) verification of receipt of professional counseling to assist her in dealing with judicial temperament issues; and 2) cooperation with a judicial mentor who will monitor her progress and report regularly to the Supreme Court.

## BOARD RECOMMENDATION

Pursuant to Gov. Bar Rule V(6)(L), The Board of Commissioners On Grievances and Discipline of the Supreme Court of Ohio considered this matter on April 16, 2004. The Board adopted the Findings of Fact and Conclusions of Law of the panel majority except that it concludes that the Respondent's actions did not violate the Code of Judicial Conduct or the Disciplinary Rules in Count II. After full discussion and debate, the Board agreed with the views of the panel majority and recommends that the Respondent, Deborah O'Neill, be suspended from the practice of law in the State of Ohio for two years. The Board further recommends that the cost of these proceedings be taxed to the Respondent in any disciplinary matter entered, so that execution may issue.

Pursuant to the order of the Board of Commissioners on Grievances and Discipline of The Supreme Court of Ohio, I hereby certify the foregoing Findings of Fact, Conclusions

Of Law, and Recommendations as those of the Board.

"/s/ Jonathan W. Marshall"

JONATHAN W. MARSHALL, Secretary

Board of Commissioners on

Grievances and Discipline of

The Supreme Court of Ohio

End of Appendix to J. Pfeifer's opinion

———————

Jonathan E. Coughlan, Disciplinary Counsel, and Joseph M. Caligiuri, Assistant Disciplinary Counsel, for relator.

Bieser, Greer & Landis, L.L.P., David C. Greer and Gretchen M. Treherne, for respondent.

David M. McTigue, urging dismissal for amici curiae International Brotherhood of Electrical Workers Local 683, Plumbers and Pipefitters Local 189, Fraternal Order of Police Buckeye Troopers Lodge 146, International Brotherhood of Teamsters Local 413, and Central Ohio Labor Council, AFL–CIO.

Wolman & Associates and Benson A. Wolman, urging dismissal for amici curiae Ohio Democratic Party and Franklin County Democratic Party.